Barry I. Levy (BL 2190)
Max Gershenoff (MG 4648)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY, and GEICO
CASUALTY COMPANY,

                             Plaintiffs,

               -against-

YAN MOSHE a/k/a YAN LEVIEV, INTEGRATED
SPECIALTY ASC LLC f/k/a HEALTHPLUS SURGERY
CENTER LLC, HACKENSACK SPECIALTY ASC LLC
f/k/a DYNAMIC SURGERY CENTER LLC, EXCEL
SURGERY CENTER, L.L.C., NJMHMC LLC d/b/a
HUDSON REGIONAL HOSPITAL, REGINA MOSHE,
M.D., CITIMEDICAL I PLLC, CITIMED SERVICES, PA,
LEONID SHAPIRO, M.D., NEUROLOGICAL
DIAGNOSTICS PROFESSIONAL ASSOCIATION,
NIZAR KIFAIEH, M.D., and PREMIER ANESTHESIA
ASSOCIATES PA,

                           Defendants.

-----------------------------------------------------------------------X

Docket No.:_____ (    )

**Plaintiff Demands a Trial by Jury**

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

1

## NATURE OF THE ACTION

1.      This action seeks to recover more than $25,000,000.00 that the Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise non-reimbursable healthcare services, including purported examinations, diagnostic tests, pain management injections, surgical procedures, anesthesia services, drug screening, and the provision of surgical facility space (collectively the "Fraudulent Services").

2.      The Fraudulent Services purportedly were provided to individuals ("Insureds") who claimed to have been involved in automobile accidents and were eligible for coverage under GEICO no-fault insurance policies.

3.      In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $60,000,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of Defendants Integrated Specialty ASC LLC f/k/a Healthplus Surgery Center LLC ("Healthplus Surgery"), Hackensack Specialty ASC LLC f/k/a Dynamic Surgery Center LLC ("Dynamic Surgery"), Excel Surgery Center, L.L.C. ("Excel Surgery"), NJMHMC LLC d/b/a Hudson Regional Hospital ("Hudson Regional"), Citimedical I PLLC ("Citimedical"), Citimed Services, PA ("Citimed"), Neurological Diagnostics Professional Association ("Neurological Diagnostics"), and Premier Anesthesia Associates PA ("Premier Anesthesia")(collectively, the "Entity Defendants"), because:

   (i)      the Defendants were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws and, as a result, were not eligible to receive no-fault reimbursement in the first instance;

   (ii)     the Fraudulent Services were not provided in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws and, therefore, were not eligible for no-fault reimbursement in the first instance;

2

(iii)    the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; and

(iv)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the levels and types of services that purportedly were provided in order to inflate the charges submitted to GEICO.

4.    As set forth herein, the Defendants at all relevant times have known that:

(i)    the Defendants were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws and, as a result, were not eligible to receive no-fault reimbursement in the first instance;

(ii)    the Fraudulent Services were not provided in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws and, therefore, were not eligible for no-fault reimbursement in the first instance;

(iii)    the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; and

(iv)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the levels and types of services that purportedly were provided in order to inflate the charges submitted to GEICO.

5.    As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed through the Entity Defendants to GEICO.

6.    The charts annexed hereto as Exhibits "1" – "8" set forth a large, representative sample of the fraudulent claims that have been identified to-date that the Defendants have submitted, or caused to be submitted, to GEICO.

7.    The Defendants' interrelated fraudulent schemes began no later than 2011 and have continued uninterrupted since that time.

3

8.      As a result of the Defendants' interrelated fraudulent schemes, GEICO has incurred damages of more than $25,000,000.00.

## THE PARTIES

### I.      Plaintiffs

9.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York and New Jersey.

### II.      Defendants

### A.      Yan Moshe

10.      Defendant Yan Moshe a/k/a Yan Leviev ("Moshe") resides in and is a citizen of New York. Moshe owned, controlled, and was the member of Defendants Healthplus Surgery, Dynamic Surgery, Excel Surgery, and Hudson Regional. In addition, though Moshe is not and never has been a licensed physician or other healthcare professional, Moshe secretly and unlawfully owned, controlled, and/or derived economic benefit from Defendants Citimedical, Citimed, and Premier Anesthesia, each of which is a medical professional entity. Moshe caused billing for the Fraudulent Services to be submitted through the Entity Defendants to GEICO and other insurers in New York and New Jersey.

11.      Moshe has a long history of involvement in no-fault insurance fraud schemes, in which he secretly and unlawfully owned and controlled numerous healthcare practices, despite his lack of any healthcare license, and used them as vehicles to submit fraudulent no-fault insurance billing to automobile insurers.

12.     For example, in previous lawsuits entitled State Farm Mutual Automobile Insurance Company v. CPT Medical Services, et al., E.D.N.Y. Case No. 04-cv-5045, Travelers Indemnity Company v. Liberty Medical Imaging Associates, PC, et. al., E.D.N.Y. Case No. 07-cv-2519, State Farm Mutual Automobile Insurance Company v. CPT Medical Services, et al., E.D.N.Y. Case No. 04-cv-5045, State Farm Mutual Automobile Insurance Company v. Bronx Healthcare Medical, P.C., et al., E.D.N.Y. Case No. 08-cv-4912, Government Employees Insurance Co., et al. v. New Hyde Park Imaging, P.C., et al., E.D.N.Y. Case No. 11-cv-01166, Government Employees Insurance Co., et al. v. Mani Ushyarov, D.O., et al., E.D.N.Y. Case No. 11-cv-3657, and Liberty Mutual Insurance Company, et al. v. Nexray Medical Imaging, P.C., et al., E.D.N.Y. Case No. 12-cv-5666, the plaintiff-insurers credibly alleged that Moshe – together with various combinations of his associates – secretly and unlawfully owned and controlled various medical professional entities, which he used to submit fraudulent no-fault insurance billing for various types of healthcare services, while recruiting various licensed physicians to pose as the nominal or "paper" owners of the medical professional entities in order to conceal the fact that they were unlawfully owned and controlled by Moshe and other non-physicians.

**B.     Excel Surgery, Dynamic Surgery, Healthplus Surgery, and Hudson Regional**

13.     Defendant Excel Surgery is a New Jersey limited liability company with its principal place of business in New Jersey. Excel Surgery purported to be properly licensed in New Jersey as an ambulatory care facility, but actually was operated in pervasive violation of the pertinent licensing, regulatory, and operating requirements. Excel Surgery was organized in New Jersey on or about January 18, 2011, was controlled by Moshe, had Moshe as its member, and was used by the Defendants as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers in New York and New Jersey.

14.     Defendant Dynamic Surgery is a New Jersey limited liability company with its principal place of business in New Jersey. Dynamic Surgery purported to be properly licensed in New Jersey as an ambulatory care facility, but actually was operated in pervasive violation of the pertinent licensing, regulatory, and operating requirements. Dynamic Surgery was organized in New Jersey on or about November 23, 2016, was controlled by Moshe, had Moshe as its member, and was used by the Defendants as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers in New York and New Jersey.

15.     Defendant Healthplus Surgery is a New Jersey limited liability company with its principal place of business in New Jersey. Healthplus Surgery purported to be properly licensed in New Jersey as an ambulatory care facility, but actually was operated in pervasive violation of the pertinent licensing, regulatory, and operating requirements. Healthplus Surgery was organized in New Jersey on or about August 25, 2016, was controlled by Moshe, had Moshe as its member, and was used by the Defendants as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers in New York and New Jersey.

16.     In September 2018, the New Jersey Department of Health (the "NJDOH") closed Healthplus Surgery for several weeks after an investigation revealed that – between at least January 2018 and September 2018 – lapses in infection control in sterilization/cleaning of instruments and the injection of medications may have exposed a massive number of patients at Healthplus Surgery to bloodborne pathogens such as hepatitis B, hepatitis C, and human immunodeficiency virus ("HIV").

17.     When closing Healthplus, the NJDOH noted a wide and disturbing range of egregious sanitary and regulatory violations at Healthplus.

18.     In June 2019, after extensive, negative media coverage regarding the pervasive sanitary and regulatory violations at Healthplus Surgery – much of which also mentioned Moshe and his other ambulatory care facilities by name – Moshe changed the corporate name of Healthplus Surgery to "Integrated Specialty ASC LLC", and changed the corporate name of Dynamic Surgery to "Hackensack Specialty ASC LLC".

19.     Moshe changed the corporate names of his ambulatory care facilities in an attempt to conceal their history of serious sanitary and regulatory violations from the public.

20.     Defendant Hudson Regional is a New Jersey limited liability company with its principal place of business in New Jersey. Hudson Regional purported to be properly licensed in New Jersey as a hospital, but actually was operated in pervasive violation of the pertinent regulatory and operating requirements. Hudson Regional was organized in New Jersey on or about April 11, 2016, was controlled by Moshe, had Moshe as its member, and was used by the Defendants as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers in New York and New Jersey.

**C.     Regina Moshe, Citimedical, and Citimed**

21.     Defendant Regina Moshe, M.D. ("R. Moshe") resides in and is a citizen of New York. R. Moshe is Moshe's sister. R. Moshe was licensed to practice medicine in New York on September 25, 2012, and in New Jersey on March 26, 2012. R. Moshe falsely purported to own and control Defendants Citimedical and Citimed, and caused billing for the Fraudulent Services to be submitted to GEICO and other insurers.

22.     Defendant Citimedical is a New York medical professional limited liability company with its principal place of business in New York. Citimedical was fraudulently organized in New York on or about November 30, 2012, purportedly was owned by R. Moshe,

7

but in actuality was secretly and unlawfully owned and controlled by Moshe in contravention of New York law. Citimedical was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers in New York and New Jersey.

23.     Defendant Citimed is a New Jersey medical professional corporation with its principal place of business in New Jersey. Citimed was fraudulently incorporated in New Jersey on or about October 13, 2016, and purportedly was owned by R. Moshe, but in actuality was secretly and unlawfully owned and controlled by Moshe in contravention of New Jersey law. Citimed was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers in New York and New Jersey.

**D.      Leonid Shapiro, Nizar Kifaieh, Neurological Diagnostics, and Premier Anesthesia**

24.     Defendant Leonid Shapiro, M.D. ("Shapiro") resides in and is a citizen of New Jersey. Shapiro was licensed to practice medicine in New York on March 30, 1999, and in New Jersey on July 15, 1997. Shapiro owned and controlled Defendant Neurological Diagnostics and non-party Metro Pain Specialists Professional Corporation, falsely purported to own and control Defendant Premier Anesthesia, falsely purported to serve as medical director at Defendants Excel Surgery, Dynamic Surgery, and Healthplus Surgery, and as Director of Anesthesia at Defendant Hudson Regional, and caused billing for the Fraudulent Services to be submitted to GEICO and other insurers.

25.     Defendant Neurological Diagnostics is a New Jersey medical professional corporation with its principal place of business in New Jersey. Neurological Diagnostics was incorporated in New Jersey on or about February 11, 2014, was owned by Shapiro, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers in New Jersey.

26.    Defendant Nizar Kifaieh, M.D. ("Kifaieh") resides in and is a citizen of New Jersey. Kifaieh was licensed to practice medicine in New York on April 24, 2002, and in New Jersey on January 12, 2005. Kifaiah falsely purported to own and control Defendant Premier Anesthesia, and caused billing for the Fraudulent Services to be submitted to GEICO and other insurers.

27.    Defendant Premier Anesthesia is a New Jersey medical professional corporation with its principal place of business in New Jersey. Premier Anesthesia was fraudulently incorporated in New Jersey on or about November 4, 2017, purportedly was owned by Shapiro and Kifaieh, but in actuality was secretly and unlawfully owned and controlled by Moshe in contravention of New Jersey law. Premier Anesthesia was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers in New York and New Jersey.

**III.    Metro Pain Specialists Professional Corporation**

28.    Although it has not been named as a Defendant in this action, Metro Pain Specialists Professional Corporation ("Metro Pain") is relevant to understanding the claims in this action.

29.    Metro Pain is a New Jersey medical professional corporation, with its principal place of business in New Jersey, but which routinely operated as a medical practice in New York. Metro Pain was incorporated in New Jersey on or about January 2, 2012, and was owned by Shapiro.

**JURISDICTION AND VENUE**

30.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

31.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

32.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

33.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is a District where a substantial amount of the activities forming the basis of the Complaint occurred.

34.     For example, the Defendants submitted or caused to be submitted a massive amount of fraudulent billing to GEICO under New York automobile insurance policies, for treatment that they purported to provide to GEICO's New York-based Insureds. In reliance on the fraudulent claims, personnel at a GEICO office in the Eastern District of New York issued payment on the fraudulent claims.

35.     What is more, and as set forth herein, the Defendants transacted substantial business in New York, and derived a substantial amount of revenue based on their fraudulent and unlawful business activities in New York.

36.     Moreover, and as set forth herein, the Defendants not only regularly committed tortious acts in New York, but they also committed tortious acts in New Jersey that caused injury to GEICO in New York.

## ALLEGATIONS COMMON TO ALL CLAIMS

37.     GEICO underwrites automobile insurance in New York and New Jersey.

**I.      An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement**

**A.      Pertinent New York Law Governing No-Fault Insurance Reimbursement**

38.     New York's no-fault insurance laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

39.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.), automobile insurers are required to provide no-fault insurance benefits ("Personal Injury Protection" benefits or "PIP Benefits") to Insureds.

40.     In New York, PIP Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services.

41.     In New York, an Insured can assign his/her right to PIP Benefits to healthcare goods and services providers in exchange for those goods and services.

42.     In New York, pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

43.     In the alternative, in New York a healthcare provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500 form" or "CMS-1500 form").

44.    Pursuant to the New York no-fault insurance laws, healthcare providers are not eligible to bill for or to collect PIP Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services, or if they fail to meet the applicable licensing requirements in any other states in which such services are performed.

45.    For instance, the implementing regulation adopted by the New York Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

46.    In New York, only a licensed healthcare professional may: (i) practice the pertinent healthcare profession; (ii) own and control a professional corporation authorized to operate a professional healthcare practice; (iii) employ and supervise other healthcare professionals; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from healthcare professional services. Unlicensed individuals may not: (i) practice the pertinent healthcare profession; (ii) own or control a professional corporation authorized to operate a professional healthcare practice; (iii) employ or supervise healthcare professionals; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from professional healthcare services.

47.    New York law prohibits licensed healthcare providers from paying or accepting compensation in exchange for patient referrals. See, e.g., New York Education Law §§ 6509-a; 6531.

48.     Additionally, New York law requires the shareholders of a professional corporation to be engaged in the practice of their profession through the professional corporation in order for it to be lawfully licensed. See, e.g., N.Y. Business Corporation Law § 1507.

49.     Therefore, under the No-Fault Laws, a healthcare provider is not eligible to receive PIP Benefits if it is fraudulently incorporated, fraudulently licensed, if it engages in unlawful fee-splitting with unlicensed non-professionals, or if it pays or receives unlawful compensation in exchange for patient referrals.

50.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare providers that fail to comply with licensing requirements are ineligible to collect PIP Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

51.     In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule")

52.     When a healthcare provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

53.     Pursuant to New York Insurance Law § 403, the NF-3 and HCFA-1500 forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially

false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

**B.    Pertinent New Jersey Law Governing No-Fault Insurance Reimbursement**

54.    Like New York, New Jersey has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries. The statutory system is embodied within the Compulsory Insurance Law (N.J.S.A. 39:6B-1 to 3) and the Automobile Reparation Reform Act (N.J.S.A. 39:6A-1 et seq.), which require automobile insurers to provide PIP Benefits to Insureds.

55.    As in New York, under the New Jersey no-fault insurance laws, an Insured can assign his or her right to PIP Benefits to healthcare providers in exchange for their goods or services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company in order to receive payment for medically necessary goods or services, using the required claim forms, including the HCFA-1500 form.

56.    In order for a healthcare provider to be eligible to receive PIP Benefits in New Jersey, it must comply with all significant laws and regulations governing healthcare practice.

57.    Thus, a healthcare provider in New Jersey is not entitled to receive PIP Benefits where it has failed to comply with significant statutory and regulatory requirements governing healthcare practice, whether or not the underlying services were medically necessary. See, e.g., Liberty Mut. Ins. Co. v. Healthcare Integrated Servs., 2009 N.J. Super. Unpub. LEXIS 2416 at * 4 - * 5 (N.J. App. Div. 2009)(healthcare providers are "not entitled to reimbursement for services covered by PIP unless the provider and the services are in compliance with relevant laws and regulations.")

58.    Moreover, in order for a specific healthcare service to be eligible for PIP reimbursement in New Jersey, the service itself must be provided in compliance with all

significant laws and regulations governing healthcare practice. See, e.g., Healthcare Integrated Servs., supra.

59.     By extension, insurers such as GEICO are not obligated to make any payments of PIP Benefits to New Jersey healthcare providers or for healthcare services that are not in compliance with all significant statutory and regulatory requirements governing healthcare practice.

60.     In New Jersey, with limited exceptions not applicable here, unlicensed non-professionals may not own or control a medical practice. See N.J.A.C. 13:35-6.16(f); N.J.A.C. 13:44E-2.15(b).

61.     In New Jersey, with limited exceptions not applicable here, unlicensed non-professionals may not directly or indirectly employ physicians. See N.J.A.C. 13:35-6.16(f).

62.     Therefore, in New Jersey, medical practices are not eligible to receive PIP Benefits if: (i) they are owned or controlled by unlicensed non-professionals; or (ii) they are used by unlicensed non-professionals to directly or indirectly employ physicians.

63.     Pursuant to N.J.A.C. 13:35-6.17, physicians in New Jersey are prohibited from paying or receiving compensation, either directly or indirectly, in exchange for patient referrals.

64.     Among other things, N.J.A.C. 13:35-6.17(c)(1) specifies that:

A licensee shall not, directly or indirectly, give to or receive from any licensed or unlicensed source a gift of more than nominal (negligible) value; or any fee, commission, rebate or bonus or other compensation however denominated, which a reasonable person would recognize as having been given or received in appreciation for or to promote conduct by a licensee including: purchasing a medical product, ordering or promoting the sale or lease of a device or appliance or other prescribed item, prescribing any type of item or product for patient use or making or receiving a referral to or from another for professional services. …

(Emphasis added).

65.   N.J.A.C. 13:35-6.17(c)(1)(ii) specifies that "[t]his section shall be construed broadly to effectuate its remedial intent."

66.   Pursuant to N.J.A.C. 8:43A-3.2, ambulatory care facilities in New Jersey are required to comply with applicable state laws and regulations.

67.   Therefore, physicians, medical practices, and ambulatory care facilities that pay or receive compensation in exchange for patient referrals are not eligible to receive PIP Benefits.

68.   Moreover, N.J.A.C. 8:43A sets various requirements regarding the licensure and operation of ambulatory care facilities in New Jersey. Among other things:

(i)   N.J.A.C. 8:43A-7.2 – N.J.A.C. 8:43A-7.4 require every ambulatory care facility in New Jersey to have a physician on staff as medical director to "be responsible for the direction, provision, and quality of medical services provided to patients", including "[d]eveloping and maintaining written objectives, policies, a procedure manual, an organizational plan, and a quality assurance program for the medical service", and "[e]nsur[ing] that medical staffing patterns are implemented". The medical director also must develop, implement, and review "written medical policies, including medical staff bylaws, in cooperation with the medical staff." The medical director, or another physician designated by the medical director in writing, must be available to the ambulatory care facility "at all times".

(ii)   N.J.A.C. 8:43A-8.2 – N.J.A.C. 8:43A-8.3 require every ambulatory care facility in New Jersey to have a registered professional nurse on staff as the director of nursing, "who shall be on the premises of the facility during its hours of operation", and who must be responsible – among other things – "for the direction, provision, and quality of nursing services provided to patients".

(iii)   N.J.A.C. 8:43A-3.5 requires every ambulatory care facility in New Jersey to "develop written job descriptions and ensure that personnel are assigned duties based upon their education, training, and competencies, and in accordance with their job descriptions."

(iv)   N.J.A.C. 8:43A-9.3 requires every ambulatory care facility in New Jersey to "develop and implement written policies and procedures … for the administration, control, and storage of medications", including policies and procedures for the use of parenteral medications and for the control of controlled dangerous substances.

(v)   N.J.A.C. 8:43A-9.5 requires every ambulatory care facility in New Jersey to store drugs under the proper conditions.

(vi)    N.J.A.C. 8:43A-12.6 and N.J.A.C. 8:43A-14.1 – N.J.A.C. 8:43A-14.7 require every ambulatory care facility in New Jersey to develop and implement written bylaws, rules, regulations, policies, and procedures for surgical and anesthesia services, including policies and procedures regarding infection prevention and control that meet particularized standards.

69.    Ambulatory care facilities in New Jersey that fail to comply with these requirements, or the other significant regulatory requirements applicable to ambulatory care facilities, are not eligible to receive PIP Benefits.

70.    In New Jersey, physicians generally may not refer patients to a healthcare provider in which they, or their immediate family, have a significant beneficial interest. Specifically, N.J.S.A. 45:9-22.5 (the "Codey Law") provides that:

A practitioner shall not refer a patient or direct an employee of the practitioner to refer a patient to a healthcare service in which the practitioner, or the practitioner's immediate family, or the practitioner in combination with the practitioner's immediate family has a significant beneficial interest . . . .

71.    Pursuant to N.J.S.A. 45:9-22.4:

"Healthcare service" means a business entity which provides on an inpatient or outpatient basis: testing for or diagnosis or treatment of human disease or dysfunction; or dispensing of drugs or medical devices for the treatment of human disease or dysfunction. Healthcare service includes, but is not limited to, a bioanalytical laboratory, pharmacy, home healthcare agency, rehabilitation facility, nursing home, hospital, or a facility which provides radiological or other diagnostic imagery services, physical therapy, ambulatory surgery, or ophthalmic services.

"Practitioner" means a physician, chiropractor or podiatrist licensed pursuant to Title 45 of the Revised Statutes.

"Immediate family" means the practitioner's spouse and children, the practitioner's siblings and parents, the practitioner's spouse's siblings and parents, and the spouses of the practitioner's children.

"Significant beneficial interest" means any financial interest; but does not include ownership of a building wherein the space is leased to a person at the prevailing rate under a straight lease agreement, or any interest held in publicly traded securities.

72.     Pursuant to N.J.S.A. 45:9-22-5(c)(3), the Codey Law's restrictions on patient referrals do not apply to self-referrals for procedures to be performed at an ambulatory care facility – such as an ambulatory surgery center – so long as certain conditions are met (the "ASC Exception").

73.     Specifically, at all relevant times, pursuant to the ASC Exception in N.J.S.A. 45:9-22-5(c)(3), the Codey Law's restrictions on patient self-referrals did not apply to:

> ambulatory surgery or procedures requiring anesthesia performed at a surgical practice registered with the Department of Health . . . or at an ambulatory care facility licensed by the Department of Health to perform surgical and related services or lithotripsy services, if the following conditions are met:
>
> (a)     the practitioner who provided the referral personally performs the procedure;
>
> (b)     the practitioner's remuneration as an owner of or investor in the practice or facility is directly proportional to the practitioner's ownership interest and not to the volume of patients the practitioner refers to the practice or facility;
>
> (c)     all clinically-related decisions at a facility owned in part by non-practitioners are made by practitioners and are in the best interests of the patient; and
>
> (d)     disclosure of the referring practitioner's significant beneficial interest in the practice or facility is made to the patient in writing, at or prior to the time that the referral is made, consistent with the provisions of section 3 of P.L. 1989, c. 19 (C.45:9-22.6).

74.     Thus, at all relevant times, if a physician self-referred a patient for a procedure to be performed at an ambulatory surgery center, the referral would not qualify for the ASC Exception, and therefore would violate the Codey Law, unless – among other things – the referring physician disclosed his/her (or immediate family member's) significant beneficial interest in the practice of facility to the patient in writing, at or prior to the time when the referral was made.

75.    Physicians, ambulatory surgery centers, and hospitals which engage in self-referral arrangements that violate the Codey Law are not eligible to receive PIP Benefits.

76.    Pursuant to N.J.S.A 14A:17-5, a foreign professional entity cannot offer medical professional services in the State of New Jersey without being properly organized or incorporated under New Jersey law.

77.    Therefore, insurers such as GEICO are not obligated to make any payments of PIP Benefits to healthcare services providers that unlawfully operate in New Jersey as foreign professional entities.

78.    Pursuant to N.J.S.A. 39:6A-4, an insurer such as GEICO is only required to pay PIP Benefits in New Jersey for reasonable, necessary, and appropriate treatment. Concomitantly, a healthcare provider in New Jersey is only eligible to receive PIP Benefits for medically necessary services.

79.    Pursuant to N.J.S.A. 39:6A-2(m):

"Medically necessary" means that the treatment is consistent with the symptoms or diagnosis, and treatment of the injury:

   (1)    is not primarily for the convenience of the injured person or provider,

   (2)    is the most appropriate standard or level of service which is in accordance with standards of good practice and standard professional treatment protocols, as such protocols may be recognized or designated by the Commissioner of Banking and Insurance, in consultation with the Commissioner of Health and Senior Services or with a professional licensing or certifying board in the Division of Consumer Affairs in the Department of Law and Public Safety, or by a nationally recognized professional organization, and

   (3)    does not involve unnecessary diagnostic testing.

80.    Like New York, New Jersey has established a medical fee schedule (the "NJ Fee Schedule") that is applicable to claims for PIP Benefits.

81.     When a healthcare provider submits a claim for PIP Benefits using the CPT codes set forth in the NJ Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

82.     The New Jersey no-fault insurance laws specifically prohibit healthcare service providers from charging for services in amounts exceeding the amounts set forth in the NJ Fee Schedule. See N.J.S.A. § 39:6A-4.6; N.J.A.C. 11:3-29:6.

83.     The New Jersey Administrative Code provides that the NJ Fee Schedule shall be interpreted in accordance with the Medicare Claims Processing Manual ("MCPM"), the National Correct Coding Initiative ("NCCI") Policy Manual, and the American Medical Association's CPT Assistant (the "CPT Assistant").

84.     Additionally, no-fault providers and insurers are directed to use the NCCI "Edits" in determining whether or not CPT codes must be bundled or can be billed separately, i.e., unbundled.  The NCCI Edits define when two CPT codes should not be reported together either in all situations or most situations.

85.     The MCPM, NCCI Policy Manual, NCCI Edits, and CPT Assistant are all incorporated by reference into the New Jersey no-fault insurance regulations.  See N.J.A.C. 11:3-29.4.

86.     With respect to unbundling, N.J.A.C. 11:3-29.4 provides that:

Artificially separating or partitioning what is inherently one total procedure into subparts that are integral to the whole for the purpose of increasing medical fees is prohibited.

87.     Chapter 1 of the NCCI Policy manual provides that:

Procedures should be reported with the most comprehensive CPT code that describes the services performed.   Physicians must not unbundle the services described by a HCPCS/CPT code.

88.     Chapter 12 of the MCPM provides that:

The narrative for many CPT codes includes a parenthetical statement that the procedure represents a 'separate procedure.'   The inclusion of this statement indicates that the procedure, while possible to perform separately, is generally included in a more comprehensive procedure, and the service is not to be billed when a related, more comprehensive, service is performed.

89.     New Jersey has a strong public policy against insurance fraud. This policy is manifested in a series of statutes, including the New Jersey Insurance Fraud Prevention Act (the "IFPA"), N.J.S.A. 17:33A-1 et seq.

90.     A healthcare provider violates the IFPA if, among other things, it:

(i)     Presents or causes to be presented any written or oral statement as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

(ii)    Prepares or makes any written or oral statement that is intended to be presented to any insurance company in connection with, or in support of, any claims for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

(iii)   Conceals or knowingly fails to disclose the occurrence of an event which affects a person's initial or continued right or entitlement to (a) any insurance benefits or payment or (b) the amount of any benefit or payment to which the person is entitled.

(iv)    Knowingly assists, conspires with, or urges any person or practitioner to violate any of the above provisions.

(v)     Knowingly benefits, directly or indirectly, from the proceeds derived from a violation of any of the above provisions due to the assistance, conspiracy or urging of any person or practitioner.

See N.J.S.A. 17:33A-4.

91.     What is more, "A person or practitioner who is the owner, administrator or

21

employee of any hospital violates [the IFPA] if he knowingly allows the use of the facilities of the hospital by any person in furtherance of a scheme or conspiracy to violate any of the provisions of [the IFPA]." See id.

92. Violators of the IFPA may be liable to an insurer for restitution, attorney's fees, and the reasonable costs of the insurer's investigation. See N.J.S.A 17:33A-7(a).

93. A person that engages in a pattern of fraudulent behavior under the IFPA may be liable to an insurer for treble damages. See N.J.S.A. 17:33A-7(b).

94. The IFPA defines a pattern as five or more "related violations". See N.J.S.A. 17:33A-3. Violations are related if they involve either the same victim, or the same or similar actions on the part of the person or practitioner charged with violating the IFPA. See N.J.S.A.17:33A-3.

## II.     The Defendants' Interrelated Fraudulent Schemes

### A.     The Unlawful Operation of Excel Surgery, Dynamic Surgery, and Healthplus Surgery

95. By early 2011, Moshe had made a large amount of money through his previous no-fault insurance fraud schemes, and was seeking opportunities to increase his ill-gotten gains.

96. Accordingly, Moshe decided to obtain a series of ambulatory care facilities, so that he could use them as vehicles to continue to submit a massive amount of additional, fraudulent no-fault insurance billing to GEICO and other insurers in New York and New Jersey.

### 1.     The Unlawful Operation of Excel Surgery Without a Legitimate Medical Director and in Pervasive Violation of Significant Regulatory Requirements

97. Toward that end, in January 2011, Moshe organized Excel Surgery. Thereafter, in mid-2011, Moshe caused Excel Surgery to purchase the assets – including the ambulatory care facility license – of an existing ambulatory care facility.

98.     Then, in late 2011, Moshe caused Excel Surgery to commence operations as an ambulatory care facility located at 321 Essex Street, Hackensack, New Jersey (the "Essex Street Location").

99.     Moshe knew that – as an ambulatory care facility – Excel Surgery was required to have a qualified medical director on staff, and was required to comply with the numerous significant regulatory requirements applicable to ambulatory care facilities, which are designed to protect the public health and welfare.

100.    However, Moshe was concerned that – if he appointed a legitimate physician to serve as Excel Surgery's legitimate medical director – any such physician would impede the fraudulent and unlawful scheme described herein.

101.    Accordingly, Moshe recruited a physician named Navrajan Kukreja, M.D. ("Kukreja") to serve as Excel Surgery's phony "medical director".

102.    In order to circumvent New Jersey law and induce the NJDOH to maintain Excel Surgery's licensure and to permit Excel Surgery to operate as an ambulatory care facility, Moshe and Excel Surgery entered into a secret scheme with Kukreja. In exchange for compensation from Moshe and Excel Surgery, Kukreja agreed to falsely pose as the true medical director at Excel Surgery, without actually fulfilling the statutory and regulatory requirements applicable to ambulatory care facility medical directors.

103.    Thereafter, as Moshe had intended, Kukreja utterly failed to fulfill the responsibilities applicable to ambulatory care facility medical directors at Excel Surgery. Among other things, Kukreja failed to assume responsibility for the direction, provision, and quality of medical services provided to patients at Excel Surgery, and failed to develop, maintain, or implement written medical policies or quality assurance programs for Excel Surgery.

104.     To the contrary, from the beginning of his tenure as Excel Surgery's phony "medical director", Kukreja ceded all decision-making and policy-making authority regarding healthcare services at Excel Surgery – including the authority that should have been vested in a legitimate medical director – to Moshe, who was not himself licensed as a physician or healthcare professional.

105.     Moshe then proceeded to operate Excel Surgery in pervasive violation of the pertinent regulations. For example, during Kukreja's purported tenure as Excel Surgery's ersatz medical director, the NJDOH repeatedly cited Excel Surgery for serious regulatory violations, including, but not limited to:

(i)     Failure to develop written job descriptions and ensure that personnel were assigned duties based upon their education, training, and competencies, and in accordance with their job descriptions, as required by N.J.A.C. 8:43A-3.5(a).

(ii)    Failure to calibrate instruments in accordance with the manufacturers' instructions, as required by N.J.A.C. 8:43A-6.10.

(iii)   Failure to ensure that the director of nursing was on the premises during Excel Surgery's hours of operation, as required by N.J.A.C. 8:43A-8.2.

(iv)    Failure to ensure the development and implementation of policies regarding the administration, control, and storage of medications, including the preparation and use of parenteral medications, as required by N.J.A.C. 8:43A-9.3(b)(4).

(v)     Failure to develop and implement policies and procedures regarding the control of controlled dangerous substances, as required by N.J.A.C. 8:43A-9.3(b)(7).

(vi)    Failure to maintain current, complete medical records as required by N.J.A.C. 8:43A-13.1.

106.     In fact, the regulatory violations at Excel Surgery were so egregious and pervasive that – in late 2015 – the New Jersey State Board of Medical Examiners (the "NJ State Board") ordered Kukreja to cease and desist from the practice of medicine.

24

107.    In particular, pursuant to a consent order dated December 1, 2015, the NJ State Board ordered Kukreja to cease and desist from the practice of medicine based – among other things – on NJDOH inspections at Excel, which "resulted in multiple violations and citations", and on allegations that Kukreja had "facilitated the unlicensed practice of medicine while employed at Excel".

108.    After Kukreja was subjected to professional discipline based – among other things – on the pervasive regulatory violations at Excel Surgery, he no longer was fit for service as Excel Surgery's phony "medical director". Accordingly, Moshe was forced to commence a search for another physician who would be willing to pose as the phony medical director at Excel Surgery.

109.    Thereafter, in or about 2013, Moshe recruited Shapiro, another physician who was willing to falsely pose as the phony medical director at Excel Surgery.

110.    As they previously had done with Kukreja, in order to circumvent New Jersey law and induce the NJDOH to maintain Excel Surgery's licensure and to permit Excel Surgery to operate as an ambulatory care facility, Moshe and Excel Surgery entered into a secret scheme with Shapiro. In exchange for compensation from Moshe and Excel Surgery, Shapiro agreed to falsely pose as the true medical director at Excel Surgery, without actually fulfilling the statutory and regulatory requirements applicable to ambulatory care facility medical directors.

111.    In fact – like Kukreja before him – Shapiro utterly failed to fulfill the responsibilities applicable to ambulatory care facility medical directors in New Jersey. Among other things, Shapiro failed to assume responsibility for the direction, provision, and quality of medical services provided to patients at Excel Surgery, and failed to develop, maintain, or implement written medical policies or quality assurance programs for Excel Surgery.

112.    Rather – and like Kukreja before him – Shapiro ceded all decision-making and policy-making authority regarding healthcare services at Excel Surgery, including the authority that should have been vested in a legitimate medical director, to Moshe.

113.    Shapiro could not legitimately have fulfilled his responsibilities as Excel Surgery's medical director, because – during the same period when he was purporting to serve as medical director at Excel Surgery – Shapiro was operating Metro Pain and Neurological Diagnostics at numerous locations in New York and New Jersey, and was maintaining an extremely busy practice as a treating physician. These activities prevented Shapiro from being available to Excel Surgery at all times, and prevented Shapiro from actually fulfilling his required duties as Excel Surgery's medical director.

114.    In keeping with the fact that Shapiro did not legitimately fulfill his required duties as Excel Surgery's medical director, Excel Surgery continued to be cited for serious regulatory violations during Shapiro's purported tenure as medical director, and Shapiro permitted Excel Surgery to engage in the fraudulent and unlawful scheme described herein.

115.    For example, during Shapiro's purported tenure as Excel Surgery's "medical director", Excel Surgery was cited by the NJDOH for, among other things:

(i)     Failure to develop written job descriptions and ensure that personnel were assigned duties based upon their education, training, and competencies, and in accordance with their job descriptions, as required by N.J.A.C. 8:43A-3.5(a).

(ii)    Failure to ensure that all newly-hired employees were tested for tuberculosis, as required by N.J.A.C. 8:43A-3.7(d)(1).

(iii)   Failure to maintain current, complete medical records as required by N.J.A.C. 8:43A-13.1.

(iv)    Failure to establish and implement a written patient care quality assurance plan, as required by N.J.A.C. 8:43A-18.1(a).

(v)    Failure to report all fires, disasters, accidents, or other unanticipated events that resulted in the evacuation of patients from the facility to the NJDOH, as required by N.J.A.C. 8:43A-3.8(a)(1).

116.   In fact, during Shapiro's purported tenure as Excel Surgery's "medical director", the NJDOH repeatedly concluded that Excel Surgery was not in compliance with the standards for licensure of ambulatory care facilities.

## 2.    The Unlawful Operation of Dynamic Surgery Without a Legitimate Medical Director and in Violation of Significant Regulatory Requirements

117.   By late 2016, Excel Surgery already had been cited by the NJDOH for numerous regulatory violations, to the point where the first of its phony "medical directors" – Kukreja – actually had been barred from practicing medicine as a result.

118.   Moshe was concerned that Excel Surgery's history of regulatory violations, and the volume of fraudulent PIP billing that he was submitting through Excel Surgery, would draw the continued, unwanted attention of regulatory authorities, as well as insurer investigative departments, law enforcement, and the general public.

119.   Accordingly, in November 2016, Moshe organized Dynamic Surgery, and in December 2016 Moshe transferred ownership of the ambulatory care facility at the Essex Street Location from Excel Surgery to Dynamic Surgery.

120.   Thereafter, Moshe caused Dynamic Surgery to commence operations as an ambulatory care facility at the Essex Street Location, in place of Excel Surgery.

121.   There was no legitimate reason why Moshe transferred the ambulatory care facility at the Essex Street Location from Excel Surgery, which he owned, to Dynamic Surgery, which he also owned. The only reason why Moshe transferred the ambulatory care facility from Excel Surgery to Dynamic Surgery was to reduce the volume of fraudulent PIP billing submitted through any one entity under any one tax identification number, avoid detection, conceal the

history of regulatory violations at the Essex Street Location from the general public, and conceal and perpetuate the interrelated fraudulent schemes described herein.

122.   In early 2017, Dynamic Surgery began to operate from the Essex Street Location, in place of Excel Surgery.

123.   As was the case with Excel Surgery, Moshe unlawfully operated Dynamic Surgery without a legitimate medical director.

124.   For example, according to an April 9, 2017 report in The Record, Dynamic Surgery's website listed Kukreja as its purported medical director, even though – during the entire period when Dynamic Surgery was operating from the Essex Street Location – Kukreja was barred from practicing medicine in New Jersey because of the NJ State Board's cease and desist order.

125.   Once The Record published the fact that Dynamic Surgery listed Kukreja – who was barred from practicing medicine – as its purported medical director, Moshe was forced to commence a search for another physician who would be willing to pose as the phony medical director at Dynamic Surgery.

126.   Thereafter, in or about mid-2017, Moshe again recruited Shapiro, who was willing to pose as the phony medical director at Dynamic Surgery, just as he previously had done at Excel Surgery.

127.   As Moshe and Shapiro previously had done at Excel Surgery, in order to circumvent New Jersey law and induce the NJDOH to maintain Dynamic Surgery's licensure and to permit Dynamic Surgery to operate as an ambulatory care facility, Moshe and Dynamic Surgery entered into a secret scheme with Shapiro. In exchange for compensation from Moshe and Dynamic Surgery, Shapiro agreed to falsely pose as the true medical director at Dynamic

Surgery, without actually fulfilling the statutory and regulatory requirements applicable to ambulatory care facility medical directors.

128.    In fact – like Kukreja before him – Shapiro utterly failed to fulfill the responsibilities applicable to ambulatory care facility medical directors at Dynamic Surgery. Among other things, Shapiro failed to assume responsibility for the direction, provision, and quality of medical services provided to patients at Dynamic Surgery, and failed to develop, maintain, or implement written medical policies or quality assurance programs for Dynamic Surgery.

129.    Shapiro could not legitimately have fulfilled his responsibilities as Dynamic Surgery's medical director, because – during the same period when he was purporting to serve as medical director at Dynamic Surgery – Shapiro was purporting to serve as medical director at Healthplus Surgery, was operating Metro Pain and Neurological Diagnostics at numerous locations in New York and New Jersey, and was maintaining an extremely busy practice as a treating physician. These activities prevented Shapiro from being available to Dynamic Surgery at all times, and prevented Shapiro from actually fulfilling his required duties as Dynamic Surgery's medical director.

130.    Like Kukreja before him, Shapiro ceded all decision-making and policy-making authority regarding healthcare services at Dynamic Surgery – including the authority that should have been vested in a legitimate medical director – to Moshe.

131.    Moshe then proceeded to operate Dynamic Surgery in pervasive violation of the pertinent regulations, just as he previously had done at Excel Surgery.

132. For example, on June 5, 2018, the NJDOH cited Dynamic Surgery for failure to ensure implementation of patient grievance policies and procedures, and failure to ensure that patients receiving anesthesia did not drive themselves home following their procedures.

133. What is more, on September 24, 2018, the NJDOH once again cited Dynamic Surgery for a number of serious regulatory violations, including:

(i) Failure to develop and implement policies and procedures regarding the control of controlled dangerous substances, as required by N.J.A.C. 8:43A-9.3(b)(7).

(ii) Failure to develop and implement policies and procedures regarding infection prevention and control, as required by N.J.A.C. 8:43A-14.1, N.J.A.C. 8:43A-14.2, and N.J.A.C. 8:43A-14.3.

134. Furthermore – and in keeping with the fact that Dynamic Surgery lacked a legitimate medical director – Dynamic Surgery engaged in the fraudulent and unlawful scheme described herein throughout the entire course of its operations.

3. **The Unlawful Operation of Healthplus Surgery Without a Legitimate Medical Director and in Violation of Significant Regulatory Requirements**

135. In late 2016, Moshe wanted to submit even more fraudulent PIP billing to GEICO and other insurers. However, Moshe was concerned that if he submitted all of the fraudulent PIP billing through Excel Surgery or Dynamic Surgery, under a single tax identification number, it would draw the unwanted attention of regulatory authorities, insurer investigative departments, and law enforcement.

136. Accordingly, in August 2016, Moshe organized Healthplus Surgery. Thereafter, in November 2016, Moshe caused Healthplus Surgery to purchase the assets – including the ambulatory care facility license – of an existing ambulatory care facility.

137.   Then, in late 2016, Moshe caused Healthplus Surgery to commence operations as an ambulatory care facility located at 190 Midland Avenue, Saddle Brook, New Jersey (the "Midland Avenue Location").

138.   As was the case with Excel Surgery and Dynamic Surgery, Moshe knew that – as an ambulatory care facility – Healthplus Surgery was required to have a qualified medical director on staff, and was required to comply with the numerous regulatory requirements applicable to ambulatory care facilities, which are designed to protect the public health and welfare.

139.   However, Moshe was concerned that – if he appointed a legitimate physician to serve as Healthplus Surgery's medical director – any such physician would impede the fraudulent and unlawful scheme described herein.

140.   Accordingly, in late 2016 Moshe recruited Shapiro, who was willing to pose as the phony medical director at Healthplus Surgery, just as he previously had done at Excel Surgery.

141.   In order to circumvent New Jersey law and induce the NJDOH to maintain Healthplus Surgery's licensure and to permit Healthplus Surgery to operate as an ambulatory care facility, Moshe and Healthplus Surgery entered into a secret scheme with Shapiro. In exchange for compensation from Moshe and Healthplus Surgery, Shapiro agreed to falsely pose as the true medical director at Healthplus Surgery, without actually fulfilling the statutory and regulatory requirements applicable to ambulatory care facility medical directors.

142.   Thereafter, as Moshe had intended, Shapiro utterly failed to fulfill the responsibilities applicable to ambulatory care facility medical directors at Healthplus Surgery. Among other things, Shapiro failed to assume responsibility for the direction, provision, and

quality of medical services provided to patients at Healthplus Surgery, and failed to develop, maintain, or implement written medical policies or quality assurance programs for Healthplus Surgery.

143.    To the contrary, from the beginning of his tenure as Healthplus Surgery's phony "medical director", Shapiro ceded all decision-making and policy-making authority regarding healthcare services at Healthplus Surgery – including the authority that should have been vested in a legitimate medical director – to Moshe.

144.    Shapiro could not legitimately have fulfilled his responsibilities as Healthplus Surgery's medical director, because – during the same period when he was purporting to serve as medical director at Healthplus Surgery – Shapiro was purporting to serve as medical director at Dynamic Surgery, was operating Metro Pain and Neurological Diagnostics at numerous locations in New York and New Jersey, and was maintaining an extremely busy practice as a treating physician. These activities prevented Shapiro from being available to Healthplus Surgery at all times, and prevented Shapiro from actually fulfilling his required duties as Healthplus Surgery's medical director.

145.    What is more – and in keeping with the fact that Healthplus Surgery lacked a legitimate medical director – Healthplus Surgery engaged in the fraudulent and unlawful scheme described herein throughout the entire course of its operations.

146.    In fact, the regulatory violations at Healthplus Surgery were so pervasive and dangerous to patients that – as set forth above – the NJDOH temporarily closed Healthplus Surgery in September 2018 after determining that the unsanitary conditions at Healthplus Surgery may have exposed a massive number of patients to bloodborne pathogens such as hepatitis B, hepatitis C, and HIV.

147.   When closing Healthplus Surgery, the NJDOH noted an extremely disturbing series of sanitary and regulatory violations at Healthplus Surgery, including – but not limited to – the following:

(i)   Failure to develop written job descriptions and ensure that personnel were assigned duties based upon their education, training, and competencies, and in accordance with their job descriptions, as required by N.J.A.C. 8:43A-3.5(a).

(ii)   Failure to ensure the development and implementation of policies regarding the administration, control, and storage of medications, including the preparation and use of parenteral medications, as required by N.J.A.C. 8:43A-9.3(b)(4) and N.J.A.C. 8:43A-9.5(b).

(iii)   Failure to develop and implement policies and procedures regarding the control of controlled dangerous substances, as required by N.J.A.C. 8:43A-9.3(b)(7).

(iv)   Failure to develop and implement policies and procedures regarding infection prevention and control, as required by N.J.A.C. 8:43A-12.6(a)(16)(ii), N.J.A.C. 8:43A-14.1, N.J.A.C. 8:43A-14.2, and N.J.A.C. 8:43A-14.3.

148.   Among many other things, the NJDOH noted that:

(i)   Healthplus Surgery staff had been observed failing to maintain proper hand hygiene after cleaning operating rooms, when transporting patients, and when handling medication.

(ii)   Healthplus Surgery personnel had been present in sterile environments without the required coverings.

(iii)   The Healthplus Surgery staff nurse who was responsible for day-to-day activities regarding infection control lacked infection control education and training.

(iv)   Healthplus Surgery failed to properly clean its operating room in between surgical procedures.

(v)   Healthplus Surgery transported soiled surgical instruments without ensuring that they were properly secured.

(vi)   Single dose medication bags were reused for multiple patients at Healthplus Surgery.

(vii)   Large amounts of controlled dangerous substances and drugs of abuse – such as Fentanyl – were unaccounted for at Healthplus Surgery, which had no policies and procedures establishing a verifiable record system for controlled drugs.

(viii)   Healthplus Surgery had failed to store medications at the required temperatures.

(ix)   Healthplus Surgery permitted a stretcher to remain in its hallway with a sheet that had "a wet red stain, approximately 2 inches in diameter", and then failed to disinfect the stretcher when the sheet was finally changed at the NJDOH's urging.

149.   Moshe, Excel Surgery, Dynamic Surgery, and Healthplus Surgery's failure to appoint legitimate medical directors who legitimately fulfilled the required duties for ambulatory care facility medical directors – and pervasive failure to comply with other significant regulations applicable to ambulatory care facilities – placed patients at considerable risk, because they were subjected to surgical and other procedures at Excel Surgery, Dynamic Surgery, and Healthplus Surgery without the oversight required by the pertinent regulations.

**B.   Moshe's Unlawful Ownership Interest in and Control Over Citimedical and Citimed, and the Unlawful Referrals to Excel Surgery, Dynamic Surgery, Healthplus Surgery, Citimed, and Hudson Regional**

150.   Excel Surgery, Dynamic Surgery, and Healthplus Surgery were ambulatory care facilities that operated as ambulatory surgery centers.

151.   As ambulatory surgery centers, Excel Surgery, Dynamic Surgery, and Healthplus Surgery provided surgical facility space to physicians and other healthcare providers, and generated revenue by charging facility fees to GEICO and other automobile insurers in connection with the surgical and pain management procedures they hosted.

152.   As a result, Excel Surgery, Dynamic Surgery, and Healthplus Surgery's business depended on patient referrals from physicians and other healthcare providers. Unless physicians and other healthcare providers scheduled surgical or pain management procedures at Excel Surgery, Dynamic Surgery, Healthplus Surgery, they would be unable to generate revenue from facility fees, or remain in business.

153.    Moshe was concerned that the serious regulatory and sanitary violations at his ambulatory surgery centers – beginning at Excel Surgery and continuing at Dynamic Surgery and Healthplus Surgery – would make it difficult for his facilities to obtain legitimate patient referrals from legitimate healthcare providers.

154.    Moshe also was concerned that his own extensive history of involvement in no-fault insurance fraud schemes – which had by that point led to him being named as a defendant in numerous, high-profile federal lawsuits alleging no-fault insurance fraud – would likewise make it difficult for his facilities to obtain legitimate patient referrals from legitimate healthcare providers.

155.    Accordingly, Moshe decided to unlawfully own and/or control Citimedical, a professional healthcare practice that he could use – among other things – to generate unlawful patient referrals to Excel Surgery, Dynamic Surgery, and Healthplus Surgery.

156.    Toward that end, in late 2012, Moshe approached R. Moshe, and offered R. Moshe the opportunity to become the nominal or "paper" owner of Citimedical, a professional medical entity.

157.    R. Moshe was receptive to Moshe's offer because she was not otherwise a candidate for highly remunerative employment as a physician. She had attended a for-profit medical school outside of the United States, had only recently been licensed to practice medicine, and had not yet been board certified in any medical specialties.

158.    In order to circumvent New York law and to induce the New York State Education Department to issue a certificate of authority authorizing Citimedical to operate as a medical practice, Moshe entered into a secret scheme with R. Moshe. In exchange for compensation from Moshe, in late 2012 R. Moshe agreed to falsely represent in the certificate of organization filed

35

with the Department of Education, and in the triennial statements filed thereafter, that she was the true member of Citimedical and that she truly owned, controlled, and practiced medicine through Citimedical.

159.    In actuality, once Citimedical was fraudulently organized on November 30, 2012, R. Moshe ceded true control over the professional entity to Moshe.

160.    All decision-making authority relating to the operation and management of Citimedical was vested entirely with Moshe. In addition, R. Moshe never controlled any of Citimedical's books or records, including its bank account; never selected, directed, and/or controlled any of the individuals or entities responsible for handling Citimedical's financial affairs; never hired or supervised Citimedical's employees or independent contractors; and was unaware of the most fundamental aspects of how Citimedical operated.

161.    Moshe – rather than R. Moshe – provided all start-up costs and investment in Citimedical. R. Moshe did not incur any costs to establish Citimedical's practice, nor did she invest any significant amount of money in the professional entity she purportedly owned.

162.    In reality, R. Moshe was nothing more than Moshe's de facto employee at Citimedical.

163.    Moshe used the façade of Citimedical to do indirectly what he was forbidden from doing directly, namely to: (i) employ healthcare professionals; (ii) control their practices and cause them to refer Insureds to Excel Surgery, Dynamic Surgery, and Healthplus Surgery; and (iii) charge for and derive an economic benefit from their services.  Indeed, with the exception of a small segment of services that were provided by Citimedical, R. Moshe was not qualified by either her education or training to supervise or direct the performance of the services that were billed to GEICO including, for example, orthopedics, pain management, and anesthesia.

164. In keeping with the fact that Moshe – rather than R. Moshe – controlled Citimedical, Citimedical operated from a large number of high-volume multidisciplinary clinics in the New York metropolitan area that Moshe also controlled, including clinics located at 1963 Grand Concourse, Bronx, New York; 910 East Gun Hill Road, Bronx, New York; 55 Greene Avenue, Brooklyn, New York; 9218 165th Street, Jamaica, New York; and 6336 99th Street, Rego Park, New York, among other locations.

165. Though ostensibly organized to provide a range of healthcare services to Insureds at individual locations, these clinics in actuality were organized to supply convenient, one-stop shops for no-fault insurance fraud.

166. Citimedical was able to operate on a turnkey basis and obtain access to patients at these high-volume multidisciplinary clinics – despite the fact that Citimedical was nominally owned on paper by a recently-licensed physician with no significant professional reputation – because it actually was owned and controlled by Moshe, who also controlled the clinic locations and had been engaging in no-fault insurance fraud schemes for many years.

167. In keeping with the fact that Moshe – rather than R. Moshe – controlled Citimedical, Citimedical also unlawfully operated and purported to provide healthcare services from the Essex Street Location, the Midland Avenue Location, and Hudson Regional, which also were controlled by Moshe, despite the fact that Citimedical was a New York professional entity that could not lawfully provide healthcare services in New Jersey. For example:

   (i)    On November 17, 2015, Citimedical purported to provide an arthroscopic surgical procedure to an Insured named SC at the Essex Street Location, which then was billed to GEICO, despite the fact that Citimedical could not lawfully provide that service in New Jersey.

   (ii)   On January 9, 2016, Citimedical purported to provide an interventional pain management injection to an Insured named RM at the Essex Street Location,

which then was billed to GEICO, despite the fact that Citimedical could not lawfully provide that service in New Jersey.

(iii)    On January 31, 2016, Citimedical purported to provide a nerve destruction procedure to an Insured named MS at the Essex Street Location, which then was billed to GEICO, despite the fact that Citimedical could not lawfully provide that service in New Jersey.

(iv)    On February 23, 2016, Citimedical purported to provide an arthroscopic surgical procedure to an Insured named AD at the Essex Street Location, which then was billed to GEICO, despite the fact that Citimedical could not lawfully provide that service in New Jersey.

(v)     On March 26, 2016, Citimedical purported to provide an interventional pain management injection to an Insured named CA at the Essex Street Location, which then was billed to GEICO, despite the fact that Citimedical could not lawfully provide that service in New Jersey.

(vi)    On July 29, 2016, Citimedical purported to provide an arthroscopic surgical procedure to an Insured named AP at the Essex Street Location, which then was billed to GEICO, despite the fact that Citimedical could not lawfully provide that service in New Jersey.

(vii)   On October 19, 2016, Citimedical purported to provide a surgical procedure to an Insured named AR at Hudson Regional, which then was billed to GEICO, despite the fact that Citimedical could not lawfully provide that service in New Jersey.

(viii)  On June 20, 2017, Citimedical purported to provide a patient examination to an Insured named MF at Hudson Regional, which then was billed to GEICO, despite the fact that Citimedical could not lawfully provide that service in New Jersey.

(ix)    On July 11, 2017, Citimedical purported to provide a patient examination to an Insured named JQ at Hudson Regional, which then was billed to GEICO, despite the fact that Citimedical could not lawfully provide that service in New Jersey.

(x)     On August 31, 2017, Citimedical purported to provide a patient examination to an Insured named RM at Hudson Regional, which then was billed to GEICO, despite the fact that Citimedical could not lawfully provide that service in New Jersey.

(xi)    On August 31, 2017, Citimedical purported to provide a patient examination to an Insured named MS at Hudson Regional, which then was billed to GEICO, despite the fact that Citimedical could not lawfully provide that service in New Jersey.

(xii)   On September 13, 2017, Citimedical purported to provide a physical performance test to an Insured named DT at the Midland Avenue Location, which then was

billed to GEICO, despite the fact that Citimedical could not lawfully provide that service in New Jersey.

(xiii)   On November 22, 2017, Citimedical purported to provide a physical performance test to an Insured named RC at the Midland Avenue Location, which then was billed to GEICO, despite the fact that Citimedical could not lawfully provide that service in New Jersey.

(xiv)   On December 5, 2017, Citimedical purported to provide a patient examination to an Insured named KH at Hudson Regional, which then was billed to GEICO, despite the fact that Citimedical could not lawfully provide that service in New Jersey.

(xv)    On February 5, 2018, Citimedical purported to provide a patient examination to an Insured named RG at the Midland Avenue Location, which then was billed to GEICO, despite the fact that Citimedical could not lawfully provide that service in New Jersey.

168.    These are only representative examples. In the claims identified in Exhibit "5", Citimedical routinely operated as a medical practice in New Jersey – including at Excel Surgery/Dynamic Surgery's Essex Street Location, at Healthplus Surgery's Midland Avenue Location, and at Hudson Regional – despite the fact that, as a New York professional entity, it could not lawfully operate as a medical practice in New Jersey.

169.    Citimedical routinely and unlawfully operated as a medical practice in New Jersey because it was unlawfully controlled by Moshe, an unlicensed non-physician whose focus was on generating fraudulent PIP billing, and who did not care about the laws and regulations applicable to medical practices in New Jersey.

170.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

171.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

172. It is improbable that two or more Insureds, who were involved in the same automobile accident, would suffer substantially identical injuries in the accident, or require a substantially identical course of treatment.

173. It is even more improbable – to the point of impossibility – that this would occur over and over again, often with the Insureds purportedly presenting to a single healthcare provider with substantially identical injuries on the exact same dates after their accidents.

174. Even so – and in keeping with the fact that Citimedical was not a legitimate medical practice at all, and instead was unlawfully controlled by Moshe, a non-physician – Citimedical's treatment and billing records routinely falsely represented that multiple Insureds, who had been involved in a single accident, had substantially identical injuries and required a substantially identical course of treatment as a result of the accident.

175. For example:

(i) On March 22, 2016, two Insureds – AF and AP – were involved in the same automobile accident. Thereafter, AF and AP both presented – incredibly – on the exact same date, March 28, 2016, to a multidisciplinary clinic controlled by Moshe in Bronx, New York, where Citimedical purported to provide them with initial examinations. AF and AP were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different. Even so, at Moshe's direction, Citimedical provided both of them with substantially identical, phony "diagnoses", and a substantially identical treatment plan.

(ii) On May 5, 2016, two Insureds – SA and DS – were involved in the same automobile accident. Thereafter, SA and DS both presented – incredibly – on the exact same date, May 11, 2016, to a multidisciplinary clinic controlled by Moshe in Rego Park, New York, where Citimedical purported to provide them with initial examinations. SA and DS were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different. Even so, at Moshe's direction, Citimedical provided both of them with substantially identical, phony "diagnoses", and a substantially identical treatment plan.

(iii)     On August 17, 2016, two Insureds – RA and KI – were involved in the same automobile accident. Thereafter, RA and KI both presented – incredibly – <u>on the exact same date</u>, August 22, 2016, to a multidisciplinary clinic controlled by Moshe in Rego Park, New York, where Citimedical purported to provide them with initial examinations. RA and KI were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different. Even so, at Moshe's direction, Citimedical provided both of them with substantially identical, phony "diagnoses", and a substantially identical treatment plan.

(iv)     On January 14, 2017, two Insureds – LA and RA – were involved in the same automobile accident. Thereafter, LA and RA both presented – incredibly – <u>on the exact same date</u>, January 19, 2017, to a multidisciplinary clinic controlled by Moshe in Rego Park, New York, where Citimedical purported to provide them with initial examinations. LA and RA were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different. Even so, at Moshe's direction, Citimedical provided both of them with substantially identical, phony "diagnoses", and a substantially identical treatment plan.

(v)      On March 19, 2017, two Insureds – FG and SG – were involved in the same automobile accident. Thereafter, FG and SG both presented – incredibly – <u>on the exact same date</u>, March 30, 2017, to a multidisciplinary clinic controlled by Moshe in Jamaica, New York, where Citimedical purported to provide them with initial examinations. FG and SG were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different. Even so, at Moshe's direction, Citimedical provided both of them with substantially identical, phony "diagnoses", and a substantially identical treatment plan.

(vi)     On March 26, 2017, three Insureds – JQ, SQ, and MS – were involved in the same automobile accident. Thereafter, JQ, SQ, and MS all presented – incredibly – <u>on the exact same date</u>, March 30, 2017, to a multidisciplinary clinic controlled by Moshe in Brooklyn, New York, where Citimedical purported to provide them with initial examinations. JQ, SQ, and MS were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different. Even so, at Moshe's direction, Citimedical provided all three of them with substantially identical, phony "diagnoses", and a substantially identical treatment plan.

(vii)    On April 17, 2017, two Insureds – DC and MH – were involved in the same automobile accident. Thereafter, DC and MH both presented – incredibly – <u>on the</u>

exact same date, April 21, 2017, to a multidisciplinary clinic controlled by Moshe in Rego Park, New York, where Citimedical purported to provide them with initial examinations. DC and MH were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different. Even so, at Moshe's direction, Citimedical provided both of them with substantially identical, phony "diagnoses", and a substantially identical treatment plan.

(viii)   On June 22, 2018, four Insureds – AL, CL, DL, and JL – were involved in the same automobile accident. Thereafter, AL, CL, DL, and JL all presented – incredibly – on the exact same date, June 29, 2018, to a multidisciplinary clinic controlled by Moshe in Rego Park, New York, where Citimedical purported to provide them with initial examinations. AL, CL, DL, and JL were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different. Even so, at Moshe's direction, Citimedical provided all four of them with substantially identical, phony "diagnoses", and a substantially identical treatment plan.

(ix)   On April 5, 2018, two Insureds – MA and RL – were involved in the same automobile accident. Thereafter, MA and RL both presented – incredibly – on the exact same date, April 16, 2018, to a multidisciplinary clinic controlled by Moshe in Rego Park, New York, where Citimedical purported to provide them with initial examinations. MA and RL were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different. Even so, at Moshe's direction, Citimedical provided both of them with substantially identical, phony "diagnoses", and a substantially identical treatment plan.

(x)   On June 21, 2018, two Insureds – DL and GL – were involved in the same automobile accident. Thereafter, DL and GL both presented – incredibly – on the exact same date, July 16, 2018, to a multidisciplinary clinic controlled by Moshe in Bronx, New York, where Citimedical purported to provide them with initial examinations. DL and GL were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different. Even so, at Moshe's direction, Citimedical provided both of them with substantially identical, phony "diagnoses", and a substantially identical treatment plan.

176.   These are only representative examples. In the claims identified in Exhibit "5", Citimedical frequently issued substantially identical "diagnoses", often on or about the same

date, to more than one Insured involved in a single accident, despite the fact that the Insureds were differently situated.

177. Citimedical issued these impossible, phony "diagnoses" because it unlawfully was controlled by Moshe, an unlicensed non-physician, whose focus was on generating phony diagnoses to support fraudulent PIP billing, rather than on legitimate patient care.

178. Moreover, and in keeping with the fact that R. Moshe was nothing more than Moshe's de facto employee at Citimedical, R. Moshe – at the direction of Moshe – caused numerous Insureds to be self-referred from Citimedical to Excel Surgery, Dynamic Surgery, and Healthplus Surgery for various services and procedures, in violation of the Codey Law.

179. In this context, R. Moshe – as a licensed physician – was a "practitioner" as defined by the Codey Law.

180. Moshe – as R. Moshe's brother – was R. Moshe's "immediate family", as defined by the Codey Law.

181. Excel Surgery, Dynamic Surgery, and Healthplus Surgery were "healthcare services" as defined by the Codey Law, in that they were "business entit[ies] which provide[d] on an inpatient or outpatient basis: … diagnosis or treatment of human disease or dysfunction …."

182. In the context of the Codey Law, Moshe – who owned Excel Surgery, Dynamic Surgery, and Healthplus Surgery – had a "significant beneficial interest" in Excel Surgery, Dynamic Surgery, and Healthplus Surgery.

183. Accordingly, pursuant to the Codey Law, R. Moshe could not lawfully refer Insureds to Excel Surgery, Dynamic Surgery, or Healthplus Surgery, or cause Insureds to be referred to Excel Surgery, Dynamic Surgery, or Healthplus Surgery for services and procedures,

unless, among other things, disclosure of Moshe's significant beneficial interest in the pertinent ambulatory surgery centers, and his relationship with R. Moshe, was made to the Insureds in writing, at or prior to the time that the referrals were made.

184.     Even so, in the claims identified in Exhibits "1" – "3" and "5", R. Moshe – at Moshe's direction – regularly caused Insureds to be referred from Citimedical to Excel Surgery, Dynamic Surgery, or Healthplus Surgery, without disclosing Moshe's significant beneficial interests in the ambulatory surgery centers, or his relationship with R. Moshe, to the Insureds in writing at or prior to the time when the referrals were made.

185.     For example:

(i)      On or about May 19, 2015, R. Moshe – at Moshe's direction – caused an Insured named MC to be referred from Citimedical to Excel Surgery for an arthroscopic surgical procedure, without disclosing Moshe's significant beneficial interest in Excel Surgery, or his relationship to R. Moshe, in writing at or prior to the time when the referral was made.

(ii)     On or about March 26, 2016, R. Moshe – at Moshe's direction – caused an Insured named CA to be referred from Citimedical to Excel Surgery for an interventional pain management injection, without disclosing Moshe's significant beneficial interest in Excel Surgery, or his relationship to R. Moshe, in writing at or prior to the time when the referral was made.

(iii)    On or about March 26, 2016, R. Moshe – at Moshe's direction – caused an Insured named NA to be referred from Citimedical to Excel Surgery for an interventional pain management injection, without disclosing Moshe's significant beneficial interest in Excel Surgery, or his relationship to R. Moshe, in writing at or prior to the time when the referral was made.

(iv)     On or about July 29, 2016, R. Moshe – at Moshe's direction – caused an Insured named AP to be referred from Citimedical to Excel Surgery for an arthroscopic surgical procedure, without disclosing Moshe's significant beneficial interest in Excel Surgery, or his relationship to R. Moshe, in writing at or prior to the time when the referral was made.

(v)      On or about January 26, 2018, R. Moshe – at Moshe's direction – caused an Insured named KJ to be referred from Citimedical to Healthplus Surgery for an arthroscopic surgical procedure, without disclosing Moshe's significant beneficial

interest in Healthplus Surgery, or his relationship to R. Moshe, in writing at or prior to the time when the referral was made.

(vi)   On or about June 19, 2018, R. Moshe – at Moshe's direction – caused an Insured named JM to be referred from Citimedical to Healthplus Surgery for an interventional pain management injection, without disclosing Moshe's significant beneficial interest in Healthplus Surgery, or his relationship to R. Moshe, in writing at or prior to the time when the referral was made.

(vii)  On or about July 23, 2018, R. Moshe – at Moshe's direction – caused an Insured named WB to be referred from Citimedical to Healthplus Surgery for an interventional pain management injection, without disclosing Moshe's significant beneficial interest in Healthplus Surgery, or his relationship to R. Moshe, in writing at or prior to the time when the referral was made.

(viii) On or about November 7, 2018, R. Moshe – at Moshe's direction – caused an Insured named PP to be referred from Citimedical to Healthplus Surgery for an interventional pain management procedure, without disclosing Moshe's significant beneficial interest in Healthplus Surgery, or his relationship to R. Moshe, in writing at or prior to the time when the referral was made.

(ix)   On or about December 5, 2018, R. Moshe – at Moshe's direction – caused an Insured named SA to be referred from Citimedical to Dynamic Surgery for an interventional pain management procedure, without disclosing Moshe's significant beneficial interest in Dynamic Surgery, or his relationship to R. Moshe, in writing at or prior to the time when the referral was made.

186.   These are only representative examples. In the claims identified in Exhibits 1" – "3" and "5", R. Moshe – at Moshe's direction – regularly caused Insureds to be referred from Citimedical to Excel Surgery, Dynamic Surgery, or Healthplus Surgery for surgical or interventional pain management procedures, without disclosing Moshe's significant beneficial interests in the ambulatory surgery centers, or his relationship with R. Moshe, in writing at or prior to the time when the referrals were made.

187.   In late 2016, Moshe was preparing to open Dynamic Surgery to replace Excel Surgery (in name only), and also was preparing to open Healthplus Surgery.

188.   Moshe knew that someone would have to provide anesthesia services in connection with the interventional pain management and surgical procedures that Dynamic

Surgery and Healthplus Surgery hosted, because: (i) neither Dynamic Surgery or Healthplus Surgery had been authorized by the NJDOH to provide such services; and (ii) insurance companies had successfully rejected payment to Excel (as Dynamic's predecessor) for such anesthesia services based on the absence of Excel's authority to provide such services.

189. Moshe also knew – from his experience at Excel Surgery – that the anesthesia services would be highly lucrative, if recoverable, because: (i) reimbursement was payable under the NJ Fee schedule regardless of whether the patients were covered by New York and/or New York policies; and (ii) the NJ Fee Schedule provided reimbursement that was several multiples beyond what was payable in New York. However, Moshe knew that, as an unlicensed non-physician, he could not own, control, or derive economic benefit from a medical practice that provided anesthesia services.

190. Moshe therefore decided to fraudulently incorporate Citimed, another medical professional entity that he could use to provide anesthesia and other medical services at Dynamic Surgery and Healthplus Surgery, so that he could personally profit from the provision of anesthesia and other medical services at Dynamic Surgery and Healthplus Surgery.

191. Toward that end, in late 2016, Moshe once again approached R. Moshe, and offered R. Moshe the opportunity to become the nominal or "paper" owner of Citimed.

192. R. Moshe was receptive to Moshe's offer because she still was not otherwise a candidate for highly remunerative employment as a physician. By that point, her only board certification was in internal medicine, rather than a more lucrative specialty. What is more, R. Moshe's main work experience as a physician had been at Citimedical, where she primarily purported to perform basic, medically unnecessary examinations, diagnostic testing, and physical

therapy at the direction of her brother, Moshe. This limited work experience as a physician likewise limited R. Moshe's prospects for highly remunerative medical employment.

193.    In order to circumvent New Jersey law limiting ownership of medical practices to licensed healthcare professionals, Moshe once again entered into a secret scheme with R. Moshe. In exchange for compensation from Moshe, in late 2016 R. Moshe agreed to falsely represent that she truly owned, controlled, and practiced medicine through Citimed.

194.    In actuality, once Citimed was fraudulently incorporated on October 13, 2016, R. Moshe ceded true control over the professional entity to Moshe, just as she previously had done at Citimedical.

195.    As had been the case at Citimedical, all decision-making authority relating to the operation and management of Citimed was vested entirely with Moshe. In addition, R. Moshe never controlled any of Citimed's books or records, including its bank account; never selected, directed, and/or controlled any of the individuals or entities responsible for handling Citimed's financial affairs; never hired or supervised Citimed's employees or independent contractors; and was unaware of the most fundamental aspects of how Citimed operated.

196.    As he previously had done at Citimedical, Moshe – rather than R. Moshe – provided all start-up costs and investment in Citimed. R. Moshe did not incur any costs to establish Citimed's practice, nor did she invest any significant amount of money in the professional entity she purportedly owned.

197.    In reality, R. Moshe was nothing more than Moshe's de facto employee at Citimed, just as she had been at Citimedical.

198.   Moshe used the façade of Citimed to do indirectly what he was forbidden from doing directly, namely to: (i) employ healthcare professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

199.   In keeping with the fact that Moshe – rather than R. Moshe – controlled Citimed, Citimed operated almost exclusively from Dynamic Surgery's Essex Street Location, Healthplus Surgery's Midland Avenue Location, and Hudson Regional, all of which were controlled by Moshe.

200.   Citimed was able to operate on a turnkey basis from the Essex Street Location, the Midland Avenue Location, and Hudson Regional, and to receive patient referrals at those locations – despite the fact that it was a newly-created medical practice, with no goodwill, that nominally was owned on paper by a physician with no significant professional reputation – because it secretly and unlawfully was owned and controlled by Moshe, who also controlled the Essex Street Location, the Midland Avenue Location, and Hudson Regional.

201.   In keeping with the fact that R. Moshe did not legitimately own or control Citimed, Citimed primarily purported to provide anesthesia services, arthroscopic surgical procedures, and interventional pain management injections that R. Moshe, as an internist, lacked the education and training to perform herself.

202.   In fact – and again, in keeping with the fact that R. Moshe did not legitimately own or control Citimed – R. Moshe did not personally perform any significant amount of the healthcare services that were billed through Citimed to GEICO and other insurers, and was only rarely present at the Essex Street Location, the Midland Avenue Location, and Hudson Regional when Citimed was purporting to operate at those locations. Notwithstanding, between late 2016 and December 31, 2018, Citimed billed GEICO more than $10.5 million, of which more than eighty five (85%)

percent were for anesthesia services performed in relation to the Essex Street Location and Midland Avenue Location.

203.    In keeping with the fact that R. Moshe was nothing more than Moshe's de facto employee at Citimed, R. Moshe – at the direction of Moshe – caused numerous Insureds to be self-referred from Citimedical to Citimed in violation of the Codey Law.

204.    In this context, R. Moshe – as a licensed physician – was a "practitioner" as defined by the Codey Law.

205.    Moshe – as R. Moshe's brother – was R. Moshe's "immediate family", as defined by the Codey Law.

206.    Citimed was a "healthcare service" as defined by the Codey Law, in that it was a "business entity which provide[d] on an inpatient or outpatient basis: … diagnosis or treatment of human disease or dysfunction … ."

207.    In the context of the Codey Law, R. Moshe – who purported to own Citimed – had a "significant beneficial interest" in Citimed.

208.    In the context of the Codey Law, Moshe – who truly owned and controlled Citimed – also had a "significant beneficial interest" in Citimed.

209.    Accordingly, pursuant to the Codey Law, R. Moshe could not lawfully refer Insureds to Citimed, or cause Insureds to be referred to Citimed, unless – among other things – disclosure of her and Moshe's significant beneficial interests in Citimed was made to the Insureds in writing, at or prior to the time that the referrals were made.

210.    Even so, in the claims identified in Exhibits "5" and "6", R. Moshe – at Moshe's direction – regularly caused Insureds to be referred from Citimedical to Citimed, without

disclosing her or Moshe's significant beneficial interests in Citimed at or prior to the time when the referrals were made.

211.   For example:

(i)   On or about October 23, 2017, R. Moshe – at Moshe's direction – caused an Insured named RG to be referred from Citimedical to Citimed for an arthroscopic surgical procedure, without disclosing either her or Moshe's significant beneficial interest in Citimed in writing at or prior to the time when the referral was made.

(ii)   On or about January 31, 2018, R. Moshe – at Moshe's direction – caused an Insured named PG to be referred from Citimedical to Citimed for an interventional pain management injection, without disclosing either her or Moshe's significant beneficial interest in Citimed in writing at or prior to the time when the referral was made.

(iii)   On or about April 18, 2018, R. Moshe – at Moshe's direction – caused an Insured named TG to be referred from Citimedical to Citimed for an arthroscopic surgical procedure, without disclosing either her or Moshe's significant beneficial interest in Citimed in writing at or prior to the time when the referral was made.

(iv)   On or about May 12, 2018, R. Moshe – at Moshe's direction – caused an Insured named OG to be referred from Citimedical to Citimed for anesthesia services, without disclosing either her or Moshe's significant beneficial interest in Citimed in writing at or prior to the time when the referral was made.

(v)   On or about September 28, 2018, R. Moshe – at Moshe's direction – caused an Insured named RG to be referred from Citimedical to Citimed for an arthroscopic surgical procedure, without disclosing either her or Moshe's significant beneficial interest in Citimed in writing at or prior to the time when the referral was made.

(vi)   On or about November 13, 2018, R. Moshe – at Moshe's direction – caused an Insured named SG to be referred from Citimedical to Citimed for an interventional pain management injection, without disclosing either her or Moshe's significant beneficial interest in Citimed in writing at or prior to the time when the referral was made.

(vii)   On or about December 16, 2018, R. Moshe – at Moshe's direction – caused an Insured named LG to be referred from Citimedical to Citimed for an interventional pain management injection, without disclosing either her or Moshe's significant beneficial interest in Citimed in writing at or prior to the time when the referral was made.

(viii)   On or about January 11, 2019, R. Moshe – at Moshe's direction – caused an Insured named JG to be referred from Citimedical to Citimed for an interventional

pain management injection, without disclosing either her or Moshe's significant beneficial interest in Citimed in writing at or prior to the time when the referral was made.

(ix)    On or about January 15, 2019, R. Moshe – at Moshe's direction – caused an Insured named SG to be referred from Citimedical to Citimed for an interventional pain management injection, without disclosing either her or Moshe's significant beneficial interest in Citimed in writing at or prior to the time when the referral was made.

(x)    On or about March 29, 2019, R. Moshe – at Moshe's direction – caused an Insured named NG to be referred from Citimedical to Citimed for an interventional pain management injection, without disclosing either her or Moshe's significant beneficial interest in Citimed in writing at or prior to the time when the referral was made.

212.    These are only representative examples. In the claims identified in Exhibits "5" and "6", R. Moshe – at Moshe's direction – regularly caused Insureds to be referred from Citimedical to Citimed, without disclosing her or Moshe's significant beneficial interests in Citimed at or prior to the time when the referrals were made.

213.    Citimed and Citimedical engaged in these violations of the Codey Law because they were unlawfully owned and controlled by Moshe, who was not a licensed healthcare professional.

214.    Not only did R. Moshe – at Moshe's direction – cause Insureds to be referred from Citimedical to Citimed in violation of the Codey Law, but – in order to maximize the fraudulent PIP billing that they could submit or cause to be submitted – R. Moshe and Moshe also caused Insureds to be referred from Citimedical to Hudson Regional for surgical and interventional pain management services in violation of the Codey Law.

215.    In the context of the Codey Law, Moshe – who owned Hudson Regional, and who was R. Moshe's immediate family member – had a "significant beneficial interest" in Hudson Regional.

216.    Hudson Regional was a "healthcare service" as defined by the Codey Law, in that it was a "business entity which provide[d] on an inpatient or outpatient basis: … diagnosis or treatment of human disease or dysfunction … ."

217.    Accordingly, pursuant to the Codey Law, R. Moshe could not lawfully refer Insureds to Hudson Regional, or cause Insureds to be referred to Hudson Regional.

218.    Even so, in the claims identified in Exhibits "4" and "5", R. Moshe – at Moshe's direction – regularly and unlawfully caused Insureds to be referred from Citimedical to Hudson Regional for surgical and interventional pain management services, without even disclosing Moshe's significant beneficial interests in Hudson Regional, or his relationship with R. Moshe, at or prior to the time when the referrals were made.

219.    For example:

(i)     On or about January 23, 2018, R. Moshe – at Moshe's direction – caused an Insured named CP to be referred from Citimedical to Hudson Regional for an arthroscopic surgical procedure, without disclosing Moshe's significant beneficial interest in Hudson Regional, or his relationship to R. Moshe, in writing at or prior to the time when the referral was made.

(ii)    On or about February 23, 2018, R. Moshe – at Moshe's direction – caused an Insured named MJ to be referred from Citimedical to Hudson Regional for an arthroscopic surgical procedure, without disclosing Moshe's significant beneficial interest in Hudson Regional, or his relationship to R. Moshe, in writing at or prior to the time when the referral was made.

(iii)   On or about March 2, 2018, R. Moshe – at Moshe's direction – caused an Insured named MH to be referred from Citimedical to Hudson Regional for an arthroscopic surgical procedure, without disclosing Moshe's significant beneficial interest in Hudson Regional, or his relationship to R. Moshe, in writing at or prior to the time when the referral was made.

(iv)    On or about March 14, 2018, R. Moshe – at Moshe's direction – caused an Insured named FV to be referred from Citimedical to Hudson Regional for an arthroscopic surgical procedure, without disclosing Moshe's significant beneficial interest in Hudson Regional, or his relationship to R. Moshe, in writing at or prior to the time when the referral was made.

(v)     On or about September 14, 2018, R. Moshe – at Moshe's direction – caused an Insured named AR to be referred from Citimedical to Hudson Regional for an arthroscopic surgical procedure, without disclosing Moshe's significant beneficial interest in Hudson Regional, or his relationship to R. Moshe, in writing at or prior to the time when the referral was made.

(vi)    On or about September 21, 2018, R. Moshe – at Moshe's direction – caused an Insured named CL to be referred from Citimedical to Hudson Regional for an arthroscopic surgical procedure, without disclosing Moshe's significant beneficial interest in Hudson Regional, or his relationship to R. Moshe, in writing at or prior to the time when the referral was made.

(vii)   On or about September 28, 2018, R. Moshe – at Moshe's direction – caused an Insured named EG to be referred from Citimedical to Hudson Regional for an arthroscopic surgical procedure, without disclosing Moshe's significant beneficial interest in Hudson Regional, or his relationship to R. Moshe, in writing at or prior to the time when the referral was made.

(viii)  On or about September 28, 2018, R. Moshe – at Moshe's direction – caused an Insured named BK to be referred from Citimedical to Hudson Regional for an arthroscopic surgical procedure, without disclosing Moshe's significant beneficial interest in Hudson Regional, or his relationship to R. Moshe, in writing at or prior to the time when the referral was made.

(ix)    On or about October 22, 2018, R. Moshe – at Moshe's direction – caused an Insured named HV to be referred from Citimedical to Hudson Regional for an arthroscopic surgical procedure, without disclosing Moshe's significant beneficial interest in Hudson Regional, or his relationship to R. Moshe, in writing at or prior to the time when the referral was made.

(x)     On or about October 24, 2018, R. Moshe – at Moshe's direction – caused an Insured named MV to be referred from Citimedical to Hudson Regional for an arthroscopic surgical procedure, without disclosing Moshe's significant beneficial interest in Hudson Regional, or his relationship to R. Moshe, in writing at or prior to the time when the referral was made.

(xi)    On or about November 14, 2018, R. Moshe – at Moshe's direction – caused an Insured named CZ to be referred from Citimedical to Hudson Regional for an arthroscopic surgical procedure, without disclosing Moshe's significant beneficial interest in Hudson Regional, or his relationship to R. Moshe, in writing at or prior to the time when the referral was made.

(xii)   On or about April 11, 2019, R. Moshe – at Moshe's direction – caused an Insured named GC to be referred from Citimedical to Hudson Regional for an arthroscopic surgical procedure, without disclosing Moshe's significant beneficial

interest in Hudson Regional, or his relationship to R. Moshe,  in writing at or prior to the time when the referral was made.

(xiii)   On or about June 6, 2019, R. Moshe – at Moshe's direction – caused an Insured named MW to be referred from Citimedical to Hudson Regional for an arthroscopic surgical procedure, without disclosing Moshe's significant beneficial interest in Hudson Regional, or his relationship to R. Moshe,  in writing at or prior to the time when the referral was made.

(xiv)   On or about June 6, 2019, R. Moshe – at Moshe's direction – caused an Insured named AZ to be referred from Citimedical to Hudson Regional for an arthroscopic surgical procedure, without disclosing Moshe's significant beneficial interest in Hudson Regional, or his relationship to R. Moshe,  in writing at or prior to the time when the referral was made.

(xv)   On or about June 28, 2019, R. Moshe – at Moshe's direction – caused an Insured named LB to be referred from Citimedical to Hudson Regional for interventional pain management injections, without disclosing Moshe's significant beneficial interest in Hudson Regional, or his relationship to R. Moshe,  in writing at or prior to the time when the referral was made.

220.   These are only representative examples. In the claims identified in Exhibits "4" and "5", R. Moshe – at Moshe's direction – routinely and unlawfully caused Insureds to be referred from Citimedical to Hudson Regional for surgical and interventional pain management services, without even disclosing Moshe's significant beneficial interests in Hudson Regional, or his relationship with R. Moshe, at or prior to the time when the referrals were made.

221.   The vast majority of the Insureds who were referred from Citimedical to Hudson Regional for surgical and interventional pain management procedures suffered from no accident-related injuries more serious than ordinary soft tissue injuries such as sprains or strains, to the extent that they actually suffered from any accident-related injuries at all.

222.   Generally, when a patient presents with a soft tissue injury such as a sprain or strain secondary to an automobile accident, the initial standard of care is conservative treatment comprised of rest, ice, compression, and – if applicable – elevation of the affected body part.

223.   If that sort of conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic treatment, physical therapy, and the use of pain management medication.

224.   The substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through this sort of conservative treatment, or no treatment at all.

225.   In a legitimate clinical setting, pain management injections and other interventional pain management procedures should not be administered until a patient has failed more conservative treatments, including chiropractic treatment, physical therapy, and pain management medication.

226.   This is because the substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through conservative treatment, or no treatment at all, and invasive interventional pain management procedures entail a degree of risk to the patient that is absent in more conservative forms of treatment.

227.   Even so, in the claims identified in Exhibits "4" and "5", R. Moshe – at Moshe's direction – routinely caused Insureds to be referred from Citimedical to Hudson Regional for interventional pain management injections and surgical procedures before the Insureds legitimately had failed a course of conservative treatment.

228.   For example:

(i)    On June 28, 2018, an Insured named AR was involved in an automobile accident. Though AR could not legitimately have failed a course of conservative treatment less than three months after his accident, R. Moshe – at Moshe's direction – nonetheless caused AR to be referred from Citimedical to Hudson Regional for a medically unnecessary arthroscopic surgical procedure on September 14, 2018, less than three months after the accident.

(ii)   On July 2, 2018, an Insured named CL was involved in an automobile accident. Though CL could not legitimately have failed a course of conservative treatment less than three months after her accident, R. Moshe – at Moshe's direction –

nonetheless caused CL to be referred from Citimedical to Hudson Regional for a medically unnecessary arthroscopic surgical procedure on September 21, 2018, less than three months after the accident.

(iii)   On July 15, 2018, an Insured named BK was involved in an automobile accident. Though BK could not legitimately have failed a course of conservative treatment less than three months after his accident, R. Moshe – at Moshe's direction – nonetheless caused BK to be referred from Citimedical to Hudson Regional for a medically unnecessary arthroscopic surgical procedure on September 28, 2018, less than three months after the accident.

(iv)   On July 21, 2018, an Insured named HV was involved in an automobile accident. Though HV could not legitimately have failed a course of conservative treatment just three months after her accident, R. Moshe – at Moshe's direction – nonetheless caused HV to be referred from Citimedical to Hudson Regional for a medically unnecessary arthroscopic surgical procedure on October 22, 2018, just three months after the accident.

(v)   On July 23, 2018, an Insured named BM was involved in an automobile accident. Though BM could not legitimately have failed a course of conservative treatment just two months after his accident, R. Moshe – at Moshe's direction – nonetheless caused BM to be referred from Citimedical to Hudson Regional for a medically unnecessary arthroscopic surgical procedure on September 21, 2018, just two months after the accident.

(vi)   On July 29, 2018, an Insured named DG was involved in an automobile accident. Though DG could not legitimately have failed a course of conservative treatment less than three months after his accident, R. Moshe – at Moshe's direction – nonetheless caused DG to be referred from Citimedical to Hudson Regional for a medically unnecessary arthroscopic surgical procedure on October 17, 2018, less than three months after the accident.

(vii)   On January 3, 2019, an Insured named WG was involved in an automobile accident. Though WG could not legitimately have failed a course of conservative treatment less than two months after his accident, R. Moshe – at Moshe's direction – nonetheless caused WG to be referred from Citimedical to Hudson Regional for a medically unnecessary arthroscopic surgical procedure on February 26, 2019, less than two months after the accident.

(viii)   On January 19, 2019, an Insured named AA was involved in an automobile accident. Though AA could not legitimately have failed a course of conservative treatment less than three months after her accident, R. Moshe – at Moshe's direction – nonetheless caused AA to be referred from Citimedical to Hudson Regional for a medically unnecessary interventional pain management injection on April 12, 2019, less than three months after the accident.

(ix)      On January 29, 2019, an Insured named AG was involved in an automobile accident. Though AG could not legitimately have failed a course of conservative treatment just two and a half months after her accident, R. Moshe – at Moshe's direction – nonetheless caused AG to be referred from Citimedical to Hudson Regional for a medically unnecessary interventional pain management injection on April 12, 2019, just two and a half months after the accident.

(x)      On February 17, 2019, an Insured named RW was involved in an automobile accident. Though RW could not legitimately have failed a course of conservative treatment less than three months after her accident, R. Moshe – at Moshe's direction – nonetheless caused RW to be referred from Citimedical to Hudson Regional for a medically unnecessary arthroscopic surgical procedure on April 29, 2019, less than three months after the accident.

229.      These are only representative examples. In the claims identified in Exhibits "4" and "5", R. Moshe – at Moshe's direction – routinely and unlawfully caused Insureds to be referred from Citimedical to Hudson Regional for surgical and interventional pain management services before the Insureds legitimately had failed a course of conservative treatment.

230.      Moshe's unlawful ownership interests in and control over Citimedical and Citimed, and the pattern of unlawful referrals described herein, placed patients at considerable risk, in that it subjected them to invasive medical procedures that were not medically necessary, in order to increase the volume of fraudulent PIP billing that the Defendants could submit and cause to be submitted to GEICO and other insurers.

## C.   Moshe's Unlawful Compensation to Shapiro in Exchange for Referrals from Neurological Diagnostics and Metro Pain to Excel Surgery, Dynamic Surgery, Healthplus Surgery, and Hudson Regional

231.      In late 2013, Moshe wanted to submit even more fraudulent no-fault insurance billing through Excel Surgery to GEICO and other insurers.

232.      However, Moshe was concerned that, if he used Citimedical as a vehicle to make even more unlawful self-referrals to Excel Surgery, his unlawful ownership and control over

Citimedical could draw the attention of insurer investigative departments, regulatory authorities, and law enforcement.

233.   Accordingly, in or about late 2013, Moshe entered into a secret scheme with Shapiro, whereby – in exchange for unlawful compensation from Moshe – Shapiro agreed to refer Insureds to Excel Surgery, or to cause Insureds to be referred to Excel Surgery, for medically unnecessary surgical and interventional pain management procedures.

234.   Moshe compensated Shapiro for the referrals to Excel Surgery by appointing Shapiro as Excel Surgery's sham "medical director". In fact, as set forth above, Shapiro never actually performed his duties as Excel Surgery's phony medical director, and Shapiro's compensation as Excel Surgery's purported medical director actually was compensation in exchange for patient referrals to Excel Surgery, and in exchange for permitting Moshe to operate Excel Surgery without the required medical director oversight.

235.   Thereafter, in exchange for this compensation from Moshe and Excel Surgery, Shapiro caused large numbers of GEICO Insureds to be referred from Metro Pain and Neurological Diagnostics to Excel Surgery for medically unnecessary surgical and interventional pain management procedures.

236.   Then, in late 2016, once Healthplus Surgery was organized and operating at the Midland Avenue Location, Moshe once again entered into a secret scheme with Shapiro, whereby  – in exchange for unlawful compensation from Moshe – Shapiro agreed to refer Insureds to Healthplus Surgery, or to cause Insureds to be referred to Healthplus Surgery, for medically unnecessary surgical and interventional pain management procedures.

237.   In particular, and as he had previously done at Excel Surgery, Moshe compensated Shapiro for the referrals to Healthplus Surgery by appointing Shapiro as Healthplus

Surgery's sham "medical director". In fact, as set forth above, Shapiro never actually performed his duties as Healthplus Surgery's phony medical director, and Shapiro's compensation as Healthplus Surgery's purported medical director actually was compensation in exchange for patient referrals to Healthplus Surgery, and in exchange for permitting Moshe to operate Healthplus Surgery without the required medical director oversight.

238.    Thereafter, in exchange for this compensation from Moshe and Healthplus Surgery, Shapiro caused large numbers of GEICO Insureds to be referred from Metro Pain and Neurological Diagnostics to Healthplus Surgery for medically unnecessary surgical and interventional pain management procedures.

239.    Thereafter, in mid-2017, once Dynamic Surgery was organized as a replacement for Excel Surgery at the Essex Street Location, Moshe once again entered into a secret scheme with Shapiro, whereby – in exchange for unlawful compensation from Moshe – Shapiro agreed to refer Insureds to Dynamic Surgery, or to cause Insureds to be referred to Dynamic Surgery, for medically unnecessary surgical and interventional pain management procedures.

240.    In particular, and as he had previously done at Excel Surgery and Healthplus Surgery, Moshe compensated Shapiro for the referrals to Dynamic Surgery by appointing Shapiro as Dynamic Surgery's sham "medical director". In fact, as set forth above, Shapiro never actually performed his duties as Dynamic Surgery's phony medical director, and Shapiro's compensation as Dynamic Surgery's purported medical director actually was compensation in exchange for patient referrals to Dynamic Surgery, and in exchange for permitting Moshe to operate Dynamic Surgery without the required medical director oversight.

241.    Then, in exchange for this compensation from Moshe and Dynamic Surgery, Shapiro caused large numbers of GEICO Insureds to be referred from Metro Pain and

Neurological Diagnostics to Dynamic Surgery for medically unnecessary surgical and interventional pain management procedures.

242.     Then, in late 2017, after organizing Hudson Regional, Moshe once again entered into a secret scheme with Shapiro, whereby  – in exchange for unlawful compensation from Moshe – Shapiro agreed to refer Insureds to Hudson Regional, or to cause Insureds to be referred to Hudson Regional, for medically unnecessary surgical and interventional pain management procedures.

243.     Moshe compensated Shapiro for the referrals to Hudson Regional with the appointments as Dynamic Surgery and Healthplus Surgery's phony "medical directors", and also by appointing Shapiro as Hudson Regional's phony "director of anesthesia".

244.     In fact, just as he had done during his phony tenure as "medical director" at Excel Surgery, Healthplus Surgery, and Dynamic Surgery, Shapiro failed to actually fulfill his duties as "director of anesthesia" at Hudson Regional.

245.     For example, and as set forth below, during his phony tenure as Hudson Regional's director of anesthesia, Shapiro permitted Premier Anesthesia – a fraudulently incorporated anesthesia practice that Moshe secretly and unlawfully owned and controlled – to provide virtually all of the anesthesia services at Hudson Regional, oftentimes pursuant to unlawful referrals to which Shapiro himself was a party.

246.     What is more, Shapiro permitted anesthesia to be provided in connection with garden-variety pain management injections at Hudson Regional, such as epidural injections and facet injections, despite the fact that – in a legitimate clinical setting – such injections do not warrant anesthesia.

247.    Indeed, according to a review of the literature published in Pain Physician, the official journal of the American Society of Interventional Pain Physicians, "[m]ost practice guidelines discourage the routine use of sedation for interventional pain procedures." See Smith, Howard, M.D., Evaluation of Intravenous Sedation on Diagnostic Spinal Injection Procedures, Pain Physician 2013.

248.    Along similar lines, the American Society of Anesthesiologists has specified that "the majority of minor pain procedures, under most routine circumstances, do not require anesthesia care other than local anesthesia. Such procedures include epidural steroid injections, epidural blood patch, trigger point injections, sacroiliac joint injections, bursal injections, occipital nerve block and facet injections." See American Society of Anesthesiologists, "Statement on Anesthetic Care during Interventional Pain Procedures for Adults", October 20, 2010.

249.    Then, in exchange for this compensation from Moshe, Dynamic Surgery, Healthplus Surgery, and Hudson Regional, Shapiro caused large numbers of GEICO Insureds to be referred from Metro Pain and Neurological Diagnostics to Hudson Regional for medically unnecessary surgical and interventional pain management procedures.

250.    The vast majority of the Insureds who were referred from Metro Pain and Neurological Diagnostics to Excel Surgery, Healthplus Surgery, Dynamic Surgery, and Hudson Regional for surgical and interventional pain management procedures suffered from no accident-related injuries more serious than ordinary soft tissue injuries such as sprains or strains, to the extent that they actually suffered from any accident-related injuries at all.

251.    As set forth above, when a patient presents with a soft tissue injury such as a sprain or strain secondary to an automobile accident, the initial standard of care is conservative

treatment comprised of rest, ice, compression, and – if applicable – elevation of the affected body part.

252.   If that sort of conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic treatment, physical therapy, and the use of pain management medication.

253.   The substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through this sort of conservative treatment, or no treatment at all.

254.   In a legitimate clinical setting, pain management injections and other interventional pain management procedures should not be administered until a patient has failed more conservative treatments, including chiropractic treatment, physical therapy, and pain management medication.

255.   This is because the substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through conservative treatment, or no treatment at all, and invasive interventional pain management procedures entail a degree of risk to the patient that is absent in more conservative forms of treatment.

256.   Even so, in the claims identified in Exhibits "1" – "4" and "7", Shapiro routinely caused Insureds to be referred from Metro Pain and Neurological Diagnostics to Excel Surgery, Healthplus Surgery, Dynamic Surgery, and Hudson Regional for interventional pain management injections and surgical procedures before the Insureds legitimately had failed a course of conservative treatment.

257.   For example:

(i)   On November 21, 2014, an Insured named JG was involved in an automobile accident. Though JG could not legitimately have failed a course of conservative treatment just two months after his accident, Shapiro nonetheless caused JG to be referred from Metro Pain to Excel Surgery for medically unnecessary

interventional pain management injections on January 22, 2015, just two months after the accident.

(ii)     On January 6, 2015, an Insured named RR was involved in an automobile accident. Though RR could not legitimately have failed a course of conservative treatment just two months after his accident, Shapiro nonetheless caused RR to be referred from Metro Pain to Excel Surgery for medically unnecessary interventional pain management injections on March 5, 2015, just two months after the accident.

(iii)    On February 3, 2015, an Insured named HM was involved in an automobile accident. Though HM could not legitimately have failed a course of conservative treatment less than a month and a half after his accident, Shapiro nonetheless caused HM to be referred from Metro Pain to Excel Surgery for a medically unnecessary interventional pain management injection on March 12, 2015, less than a month and a half after the accident.

(iv)    On October 16, 2016, an Insured named AT was involved in an automobile accident. Though AT could not legitimately have failed a course of conservative treatment just two months after her accident, Shapiro nonetheless caused AT to be referred from Metro Pain to Healthplus Surgery for medically unnecessary interventional pain management injections on December 14, 2016, just two and a half months after the accident.

(v)     On October 22, 2016, an Insured named MB was involved in an automobile accident. Though MB could not legitimately have failed a course of conservative treatment just two and a half months after her accident, Shapiro nonetheless caused MB to be referred from Neurological Diagnostics to Excel Surgery for medically unnecessary interventional pain management injections on January 6, 2017, just two and a half months after the accident.

(vi)    On June 12, 2017, an Insured named DC was involved in an automobile accident. Though DC could not legitimately have failed a course of conservative treatment less than one and a half months after her accident, Shapiro nonetheless caused DC to be referred from Metro Pain to Dynamic Surgery for medically unnecessary interventional pain management injections on July 30, 2017, less than one and a half months after the accident.

(vii)   On June 13, 2017, an Insured named JN was involved in an automobile accident. Though JN could not legitimately have failed a course of conservative treatment just one and a half months after his accident, Shapiro nonetheless caused JN to be referred from Metro Pain to Dynamic Surgery for a medically unnecessary interventional pain management injection on August 2, 2017, just one and a half months after the accident.

(viii)    On June 20, 2017, an Insured named YV was involved in an automobile accident. Though YV could not legitimately have failed a course of conservative treatment just one and a half months after his accident, Shapiro nonetheless caused YV to be referred from Metro Pain to Dynamic Surgery for a medically unnecessary interventional pain management injection on August 2, 2017, just one and a half months after the accident.

(ix)    On October 31, 2017, an Insured named ML was involved in an automobile accident. Though ML could not legitimately have failed a course of conservative treatment just two and a half months after his accident, Shapiro nonetheless caused ML to be referred from Metro Pain to Hudson Regional for medically unnecessary interventional pain management injections on January 11, 2018, just two and a half months after the accident.

(x)    On November 1, 2017, an Insured named MM was involved in an automobile accident. Though MM could not legitimately have failed a course of conservative treatment just two and a half months after her accident, Shapiro nonetheless caused MM to be referred from Metro Pain to Hudson Regional for medically unnecessary interventional pain management injections on January 11, 2018, just two and a half months after the accident.

(xi)    On November 7, 2017, an Insured named MH was involved in an automobile accident. Though MH could not legitimately have failed a course of conservative treatment less than three months after his accident, Shapiro nonetheless caused MH to be referred from Metro Pain to Hudson Regional for a medically unnecessary interventional pain management injection on January 17, 2018, less than three months after the accident.

(xii)    On April 5, 2018, an Insured named CB was involved in an automobile accident. Though CB could not legitimately have failed a course of conservative treatment less than two months after his accident, Shapiro nonetheless caused CB to be referred from Metro Pain to Healthplus Surgery for a medically unnecessary arthroscopic surgical procedure on May 21, 2018, less than two months after the accident.

(xiii)    On April 27, 2018, an Insured named FB was involved in an automobile accident. Though FB could not legitimately have failed a course of conservative treatment just one month after his accident, Shapiro nonetheless caused FB to be referred from Metro Pain to Healthplus Surgery for a medically unnecessary arthroscopic surgical procedure on May 31, 2018, just one month after the accident.

(xiv)    On April 27, 2018, an Insured named GG was involved in an automobile accident. Though GG could not legitimately have failed a course of conservative treatment just a month and a half after his accident, Shapiro nonetheless caused GG to be referred from Metro Pain to Healthplus Surgery for a medically unnecessary

arthroscopic surgical procedure on June 11, 2018, just a month and a half after the accident.

(xv) On May 15, 2018, an Insured named AK was involved in an automobile accident. Though AK could not legitimately have failed a course of conservative treatment just two months after his accident, Shapiro nonetheless caused AK to be referred from Metro Pain to Healthplus Surgery for a medically unnecessary arthroscopic surgical procedure on July 18, 2018, just two months after the accident.

(xvi) On May 16, 2018, an Insured named DM was involved in an automobile accident. Though DM could not legitimately have failed a course of conservative treatment less than two months after her accident, Shapiro nonetheless caused DM to be referred from Metro Pain to Healthplus Surgery for medically unnecessary interventional pain management injections on July 6, 2018, less than two months after the accident.

(xvii) On May 22, 2018, an Insured named NT was involved in an automobile accident. Though NT could not legitimately have failed a course of conservative treatment just three months after her accident, Shapiro nonetheless caused NT to be referred from Neurological Diagnostics to Dynamic Surgery for a medically unnecessary interventional pain management injection on August 24, 2018, just three months after the accident.

(xviii) On May 22, 2018, an Insured named AA was involved in an automobile accident. Though AA could not legitimately have failed a course of conservative treatment just three months after his accident, Shapiro nonetheless caused AA to be referred from Neurological Diagnostics to Dynamic Surgery for a medically unnecessary interventional pain management injection on August 24, 2018, just three months after the accident.

(xix) On July 11, 2018, an Insured named KG was involved in an automobile accident. Though KG could not legitimately have failed a course of conservative treatment less than three months after his accident, Shapiro nonetheless caused KG to be referred from Metro Pain to Hudson Regional for a medically unnecessary arthroscopic surgical procedure on September 20, 2018, less than three months after the accident.

(xx) On April 9, 2019, an Insured named MC was involved in an automobile accident. Though MC could not legitimately have failed a course of conservative treatment just two months after her accident, Shapiro nonetheless caused MC to be referred from Metro Pain to Hudson Regional for a medically unnecessary arthroscopic surgical procedure on June 10, 2019, just two months after the accident.

258. These are only representative examples. In the claims identified in Exhibits Exhibits "1" – "4" and "7", Shapiro routinely caused Insureds to be referred from Metro Pain

and Neurological Diagnostics to Excel Surgery, Healthplus Surgery, Dynamic Surgery, and Hudson Regional for interventional pain management injections and surgical procedures before the Insureds legitimately had failed a course of conservative treatment.

259.   What is more, in a legitimate clinical setting, pain management injections should not be administered more than once every two months, and multiple varieties of pain management injections should not be administered simultaneously.

260.   This is because: (i) properly administered pain management injections should provide pain relief lasting for at least two months; (ii) a proper interval between pain management injections, and different types of pain management injections, is necessary to determine whether or not the initial pain management injections were effective; and (iii) if a patient's pain is not relieved through the pain management injections, the pain may be caused by something more serious than a soft tissue injury secondary to an automobile accident, and the perpetuating causes of the pain must be identified and managed.

261.   Even so, in the claims identified in Exhibits "1" – "4" and "7", Shapiro routinely caused Insureds to be referred to Excel Surgery, Healthplus Surgery, Dynamic Surgery, and Hudson Regional for multiple pain management injections to Insureds within a span of weeks, despite the fact that such an regimen not only was medically unnecessary, but also placed the Insureds at risk.

262.   For example:

(i)     On September 29, 2014, an Insured named SS was involved in an automobile accident. Thereafter, Shapiro caused SS to be referred to Excel Surgery for multiple pain management injections on March 12, 2015, March 26, 2015, April 17, 2015, April 30, 2015, and May 14, 2015.

(ii)    On October 12, 2015, an Insured named DS was involved in an automobile accident. Thereafter, Shapiro caused DS to be referred to Excel Surgery for

multiple pain management injections on January 28, 2016, again on February 5, 2016, and again on March 10, 2016.

(iii)     On June 7, 2016, an Insured named JS was involved in an automobile accident. Thereafter, Shapiro caused JS to be referred to Excel Surgery for multiple pain management injections on September 11, 2016, September 25, 2016, October 9, 2016, October 23, 2016, and November 6.

(iv)     On October 13, 2016, an Insured named AT was involved in an automobile accident. Thereafter, Shapiro caused AT to be referred to Healthplus Surgery for multiple pain management injections on December 14, 2016 and January 18, 2017, and to Excel Surgery for another pain management injection on January 6, 2017.

(v)     On December 26, 2016, an Insured named MY was involved in an automobile accident. Thereafter, Shapiro caused MY to be referred to Dynamic Surgery for multiple pain management injections on October 27, 2017, November 9, 2017, and December 8, 2017, and to Hudson Regional for multiple pain management injections on January 5, 2018.

(vi)     On February 2, 2017, an Insured named TS was involved in an automobile accident. Thereafter, Shapiro caused TS to be referred to Dynamic Surgery for multiple pain management injections on December 15, 2017, and to Hudson Regional for multiple pain management injections on January 11, 2018.

(vii)     On February 13, 2017, an Insured named JA was involved in an automobile accident. Thereafter, Shapiro caused JA to be referred to Dynamic Surgery for multiple pain management injections on December 1, 2017 and December 15, 2017, and to Hudson Regional for multiple pain management injections on January 5, 2018.

(viii)     On July 10, 2017, an Insured named EW was involved in an automobile accident. Thereafter, Shapiro caused EW to be referred to Hudson Regional for a pain management injection on January 11, 2018, and to Dynamic Surgery for multiple pain management injections on February 22, 2018, March 22, 2018, and April 12, 2018

(ix)     On July 21, 2017, an Insured named KB was involved in an automobile accident. Thereafter, Shapiro caused KB to be referred to Healthplus Surgery for multiple pain management injections on October 20, 2017, to Dynamic Surgery for multiple pain management injections on December 7, 2017, to Hudson Regional for multiple pain management injections on January 11, 2018, and to Dynamic Surgery for still more pain management injections on January 25, 2018, February 8, 2018, June 14, 2018, July 12, 2018, and July 26, 2018.

(x)     On August 18, 2017, an Insured named BO was involved in an automobile accident. Thereafter, Shapiro caused BO to be referred to Dynamic Surgery for a pain management injection on December 22, 2017, and to Hudson Regional for multiple pain management injections on January 11, 2018.

(xi)    On August 29, 2017, an Insured named RC was involved in an automobile accident. Thereafter, Shapiro caused RC to be referred to Dynamic Surgery for multiple pain management injections on December 15, 2017, to Hudson Regional for multiple pain management injections on January 5, 2018, and back to Dynamic Surgery for still more pain management injections on January 26, 2018.

(xii)   On September 5, 2017, an Insured named AW was involved in an automobile accident. Thereafter, Shapiro caused AW to be referred to Healthplus Surgery for multiple pain management injections on December 3, 2017, to Dynamic Surgery for multiple pain management injections on December 22, 2017, and to Hudson Regional for multiple pain management injections on January 5, 2018.

(xiii)  On September 13, 2017, an Insured named AC was involved in an automobile accident. Thereafter, Shapiro caused AC to be referred to Hudson Regional for multiple pain management injections on January 5, 2018, and then to Dynamic Surgery for multiple pain management injections on January 26, 2018, February 9, 2018, April 6, 2018, and April 20, 2018.

(xiv)   On January 22, 2018, an Insured named VZ was involved in an automobile accident. Thereafter, Shapiro caused VZ to be referred to Dynamic Surgery for multiple pain management injections on May 4, 2018, May 20, 2018, June 3, 2018, and July 8, 2018, to Hudson Regional for multiple pain management injections on September 17, 2018, and back to Dynamic Surgery for still more pain management injections on October 7, 2018.

(xv)    On February 9, 2018, an Insured named RT was involved in an automobile accident. Thereafter, Shapiro caused RT to be referred to Dynamic Surgery for multiple pain management injections on May 20, 2018, June 3, 2018, July 8, 2018, and July 22, 2018.

(xvi)   On June 19, 2018, an Insured named DS was involved in an automobile accident. Thereafter, Shapiro caused DS to be referred to Dynamic Surgery for multiple pain management injections on August 24, 2018, September 9, 2018, October 7, 2018, October 21, 2018, December 2, 2018, and December 16, 2018.

(xvii)  On July 19, 2018, an Insured named GT was involved in an automobile accident. Thereafter, Shapiro caused GT to be referred to Healthplus Surgery for multiple pain management injections on November 2, 2018 and November 16, 2018.

(xviii) On December 31, 2018, an Insured named IS was involved in an automobile accident. Thereafter, Shapiro caused IS to be referred to Dynamic Surgery for

multiple pain management injections on May 19, 2019, June 2, 2019, June 23, 2019, and July 14, 2019.

(xix)   On February 5, 2019, an Insured named SS was involved in an automobile accident. Thereafter, Shapiro caused SS to be referred to Dynamic Surgery for multiple pain management injections on June 2, 2019, and again on June 23, 2019.

(xx)   On February 27, 2019, an Insured named CV was involved in an automobile accident. Thereafter, Shapiro caused CV to be referred to Healthplus Surgery for multiple pain management injections on June 8, 2019, and to Dynamic Surgery for multiple pain management injections on July 19, 2019.

263.   These are only representative examples. Shapiro caused these referrals to be made without regard for medical necessity because he wanted to continue to receive unlawful compensation from Moshe, Excel Surgery, Healthplus Surgery, Dynamic Surgery, and Hudson Regional in exchange for the referrals.

264.   As set forth above, there are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

265.   An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

266.   It is extremely improbable that two or more Insureds, who were involved in the same automobile accident, not only would suffer substantially similar injuries in the accident, but would recover (or fail to recover) at such an identical rate that they would all require referrals to an ambulatory surgery center for substantially similar interventional pain management procedures on or about the same date many weeks or even months after the accident.

267.   It is even more improbable – to the point of impossibility – that this legitimately would occur over and over again.

268.   Even so, in the claims identified in   Exhibits  "1"  –  "3"  and  "7",  Shapiro routinely caused multiple Insureds, who had been involved in the same underlying accidents, to be referred from Metro Pain or Neurological Diagnostics to Excel Surgery, Dynamic Surgery, or Healthplus Surgery for interventional pain management procedures on or about the same dates many weeks or even months after the accidents.

269.   For example:

(i)   On August 4, 2016, two Insureds – HD and DM – were involved in the same automobile accident. Thereafter, both HD and DM presented at Metro Pain for treatment. HD and DM were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they were injured at all in the accident, their injuries were different, and resolved differently over time. HD and DM did not both require referrals for substantially similar interventional pain management injections on or about the exact same date almost two months after their accident. Even so, in exchange for unlawful compensation from Moshe and Excel Surgery, Shapiro caused both HD and DM to be referred from Metro Pain to Excel Surgery for substantially identical interventional pain management injections on September 30, 2016.

(ii)   On November 25, 2016, three Insureds – LB, SE, and CH – all were involved in the same automobile accident. Thereafter, incredibly, LB, SE, and CH all presented at Metro Pain for treatment. LB, SE, and CH were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they were injured at all in the accident, their injuries were different, and resolved differently over time. LB, SE, and CH did not all require referrals for substantially similar interventional pain management injections during the same time period months after their accident. Even so, in exchange for unlawful compensation from Moshe and Healthplus Surgery, Shapiro caused LB, SE, and CH all to be referred from Metro Pain to Healthplus Surgery for substantially identical arthroscopic surgical procedures over the course of early February 2017.

(iii)   On March 7, 2017, two Insureds – JD and NE – were involved in the same automobile accident. Thereafter, both JD and NE presented at Metro Pain for treatment. JD and NE were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they were injured at all in the accident, their injuries were different, and resolved differently over time. JD and NE did not both require referrals for substantially similar interventional pain management injections during the same time period months after their accident. Even so, in exchange for unlawful compensation from Moshe and Dynamic Surgery, Shapiro caused both JD and NE to be referred from

Metro Pain to Dynamic Surgery for substantially identical interventional pain management injections on May 26, 2017.

(iv)     On July 30, 2017, two Insureds – AL and UR – were involved in the same automobile accident. Thereafter, both AL and UR presented at Neurological Diagnostics for treatment. AL and UR were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they were injured at all in the accident, their injuries were different, and resolved differently over time. AL and UR did not both require referrals for substantially similar interventional pain management injections on the same date months after their accident. Even so, in exchange for unlawful compensation from Moshe and Healthplus Surgery, Shapiro caused both AL and UR to be referred from Neurological Diagnostics to Healthplus Surgery for substantially identical interventional pain management injections on December 2, 2017.

(v)      On September 24, 2017, two Insureds – PI and CB – were involved in the same automobile accident. Thereafter, both PI and CB presented at Metro Pain for treatment. PI and CB were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they were injured at all in the accident, their injuries were different, and resolved differently over time. PI and CB did not both require referrals for substantially similar arthroscopic surgical procedures during the same time period months after their accident. Even so, in exchange for unlawful compensation from Moshe and Healthplus Surgery, Shapiro caused both PI and CB to be referred from Metro Pain to Healthplus Surgery for substantially identical arthroscopic surgical procedures on September 10, 2018.

(vi)     On December 4, 2017, two Insureds – MF and PL – were involved in the same automobile accident. Thereafter, both MF and PL presented at Neurological Diagnostics for treatment. MF and PL were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they were injured at all in the accident, their injuries were different, and resolved differently over time. MF and PL did not both require referrals for substantially similar interventional pain management injections during the same time period months after their accident. Even so, in exchange for unlawful compensation from Moshe, Healthplus Surgery, and Dynamic Surgery, Shapiro caused both MF and PL to be referred from Neurological Diagnostics to Dynamic Surgery and Healthplus Surgery, respectively, for substantially identical interventional pain management injections over the course of late June-early July 2018.

(vii)    On December 18, 2017, two Insureds – NS and VY – were involved in the same automobile accident. Thereafter, both NS and VY presented at Neurological Diagnostics for treatment. NS and VY were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they were injured at all in the accident, their injuries were different,

and resolved differently over time. NS and VY did not both require referrals for substantially similar interventional pain management injections on the same date months after their accident. Even so, in exchange for unlawful compensation from Moshe and Dynamic Surgery, Shapiro caused both NS and VY to be referred from Neurological Diagnostics to Dynamic Surgery for substantially identical interventional pain management injections on June 8, 2018.

(viii)   On January 24, 2018, two Insureds – JC and JR – were involved in the same automobile accident. Thereafter, both JC and JR presented at Metro Pain for treatment. JC and JR were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they were injured at all in the accident, their injuries were different, and resolved differently over time. JC and JR did not both require referrals for substantially similar interventional pain management injections on or about the exact same date months after their accident. Even so, in exchange for unlawful compensation from Moshe and Dynamic Surgery, Shapiro caused both JC and JR to be referred from Metro Pain to Dynamic Surgery for substantially identical interventional pain management injections over the course of late May 2018.

(ix)   On January 25, 2018, two Insureds – OB and AL– were involved in the same automobile accident. Thereafter, both OB and AL presented at Metro Pain for treatment. OB and AL were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they were injured at all in the accident, their injuries were different, and resolved differently over time. OB and AL did not both require referrals for substantially similar interventional pain management injections on or about the exact same date months after their accident. Even so, in exchange for unlawful compensation from Moshe and Dynamic Surgery, Shapiro caused both OB and AL to be referred from Metro Pain to Dynamic Surgery for substantially identical interventional pain management injections over the course of mid-to-late May 2018.

(x)   On March 18, 2018, two Insureds – RC and SW – were involved in the same automobile accident. Thereafter, both RC and SW presented at Metro Pain for treatment. RC and SW were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they were injured at all in the accident, their injuries were different, and resolved differently over time. RC and SW did not both require referrals for substantially similar arthroscopic surgical procedures during the same time period months after their accident. Even so, in exchange for unlawful compensation from Moshe and Healthplus Surgery, Shapiro caused both RC and SW to be referred from Metro Pain to Healthplus Surgery for substantially identical arthroscopic surgical procedures over the course of late May-early June 2018.

(xi)   On May 22, 2018, two Insureds – AA and NT – were involved in the same automobile accident. Thereafter, both AA and NT presented at Neurological Diagnostics for treatment. AA and NT were different ages, in different physical

condition, and experienced the impact from different locations in the vehicle. To the extent that they were injured at all in the accident, their injuries were different, and resolved differently over time. AA and NT did not both require referrals for substantially similar interventional pain management injections on or about the exact same dates months after their accident. Even so, in exchange for unlawful compensation from Moshe and Dynamic Surgery, Shapiro caused both AA and NT to be referred from Neurological Diagnostics to Dynamic Surgery for substantially identical interventional pain management injections on August 24, 2018 and on October 26, 2018.

(xii)    On August 10, 2018, two Insureds – AP and VP – were involved in the same automobile accident. Thereafter, both AP and VP presented at Neurological Diagnostics for treatment. AP and VP were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they were injured at all in the accident, their injuries were different, and resolved differently over time. AP and VP did not both require referrals for substantially similar interventional pain management injections during the same time period months after their accident. Even so, in exchange for unlawful compensation from Moshe and Dynamic Surgery, Shapiro caused both AP and VP to be referred from Neurological Diagnostics to Dynamic Surgery for substantially identical interventional pain management injections over the course of late March-late April 2019.

(xiii)   On August 20, 2018, two Insureds – WG and YL – were involved in the same automobile accident. Thereafter, both WG and YL presented at Metro Pain for treatment. WG and YL were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they were injured at all in the accident, their injuries were different, and resolved differently over time. WG and YL did not both require referrals for substantially similar interventional pain management injections on or about the exact same date months after their accident. Even so, in exchange for unlawful compensation from Moshe and Dynamic Surgery, Shapiro caused both WG and YL to be referred from Metro Pain to Dynamic Surgery for substantially identical interventional pain management injections on February 1, 2019.

(xiv)    On April 9, 2019, four Insureds – JB, TC, DS, and LS – all were involved in the same automobile accident. Thereafter, incredibly, JB, TC, DS, and LS all presented at Metro Pain for treatment. JB, TC, DS, and LS were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they were injured at all in the accident, their injuries were different, and resolved differently over time. JB, TC, DS, and LS did not all require referrals for substantially similar arthroscopic surgical procedures during the same time period. Even so, in exchange for unlawful compensation from Moshe and Healthplus Surgery, Shapiro caused JB, TC, DS, and LS all to be referred from Metro Pain to Healthplus Surgery for substantially identical arthroscopic surgical procedures over the course of May-July 2019.

(xv)   On June 14, 2019, two Insureds – VT and EW – were involved in the same automobile accident. Thereafter, both VT and EW presented at Metro Pain for treatment. VT and EW were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they were injured at all in the accident, their injuries were different, and resolved differently over time. VT and EW did not both require referrals for substantially similar arthroscopic surgical procedures on or about the exact same date months after their accident. Even so, in exchange for unlawful compensation from Moshe and Healthplus Surgery, Shapiro caused both VT and EW to be referred from Metro Pain to Healthplus Surgery for substantially identical arthroscopic surgical procedures on September 9, 2019.

270.    These are only representative examples. In exchange for unlawful compensation from Moshe, Excel Surgery, Dynamic Surgery, and Healthplus Surgery, Shapiro routinely caused multiple Insureds, who had been involved in the same underlying accidents, to be referred to Excel Surgery, Dynamic Surgery, or Healthplus Surgery regardless of their individual circumstances or presentation.

271.    In keeping with the fact that Shapiro's referrals to Excel Surgery, Dynamic Surgery, Healthplus Surgery, and Hudson Regional were motivated by unlawful compensation, rather than medical necessity, very few of the Insureds whom Shapiro referred or caused to be referred from Metro Pain to Excel Surgery, Dynamic Surgery, Healthplus Surgery, or Hudson Regional resided or worked near Excel Surgery, Dynamic Surgery, Healthplus Surgery, or Hudson Regional.

272.    Rather, the substantial majority of the Insureds whom Shapiro referred or caused to be referred from Metro Pain to Excel Surgery, Dynamic Surgery, Healthplus Surgery, and Hudson Regional resided and worked in New York, a substantial distance away from Excel Surgery, Dynamic Surgery, Healthplus Surgery, and Hudson Regional

273.    There was no legitimate reason why Insureds who resided in New York would require referrals to ambulatory surgery centers such as Excel Surgery, Dynamic Surgery, and

Healthplus Surgery, or to a hospital such as Hudson Regional, which were inconveniently located far from the Insureds' homes and workplaces.

274.    In fact, there were numerous ambulatory surgery centers and hospitals located in New York, which were much closer to the Insureds' homes, which did not share Excel Surgery, Dynamic Surgery, and Healthplus Surgery's disturbing history of regulatory and sanitary violations, and which were far more established and reputable than Hudson Regional.

275.    The only reason Shapiro referred the Insureds to Excel Surgery, Dynamic Surgery, Healthplus Surgery, and Hudson Regional, or caused them to be referred to Excel Surgery, Dynamic Surgery, Healthplus Surgery, and Hudson Regional, was because Moshe, Excel Surgery, Dynamic Surgery, Healthplus Surgery, and Hudson Regional were paying him unlawful compensation in exchange for the referrals.

276.    In all of the claims identified in Exhibits "1" – "4" and "7", Shapiro, Moshe, Neurological Diagnostics, Excel Surgery, Dynamic Surgery, Healthplus Surgery, and Hudson Regional falsely represented that they were in compliance with all significant laws governing healthcare practice, and therefore were eligible to collect PIP Benefits in the first instance.

277.    In fact, Shapiro, Moshe, Neurological Diagnostics, Excel Surgery, Dynamic Surgery, Healthplus Surgery, and Hudson Regional were not in compliance with all significant laws and regulations governing healthcare practice, and were not eligible to collect PIP Benefits in the first instance, inasmuch as they paid and/or received illegal compensation in exchange for patient referrals.

D.   **The Unlawful Operation of Premier Anesthesia, and the Unlawful Referrals from Metro Pain to Premier Anesthesia**

278.   By late 2017, Moshe was concerned that the volume of fraudulent anesthesia billing that he was submitting or causing to be submitted through Citimed would draw the attention of insurer investigative departments, regulatory authorities, and law enforcement.

279.   Accordingly, Moshe decided to fraudulently incorporate Premier Anesthesia, another medical professional entity that he could use to provide anesthesia and other services at Dynamic Surgery, Healthplus Surgery, and Hudson Regional, so as to reduce the volume of fraudulent anesthesia and related billing from Citimed, avoid detection, and conceal and perpetuate the Defendants' interrelated fraudulent schemes.

280.   Toward that end, in late 2017, Moshe approached Shapiro, and offered Shapiro the opportunity to become the nominal or "paper" owner of Premier Anesthesia, just as R. Moshe had been the nominal or "paper" owner of Citimed.

281.   In exchange for compensation from Moshe – including the compensation Shapiro received as the ersatz "medical director" at Dynamic Surgery and Healthplus Surgery and as the phony "director of anesthesia" at Hudson Regional – Shapiro agreed to falsely represent that he truly owned and controlled Premier Anesthesia.

282.   In actuality, once Premier Anesthesia was fraudulently incorporated on November 4, 2017, Shapiro ceded true control over the professional entity to Moshe.

283.   As had been the case at Citimed, all decision-making authority relating to the operation and management of Premier Anesthesia was vested entirely with Moshe. In addition, Shapiro never controlled any of Premier Anesthesia's books or records, including its bank account; never selected, directed, and/or controlled any of the individuals or entities responsible for handling Premier Anesthesia's financial affairs; never hired or supervised Premier Anesthesia's

76

employees or independent contractors; and was unaware of the most fundamental aspects of how Premier Anesthesia operated.

284.    As he previously had done at Citimedical and Citimed, Moshe – rather than Shapiro – provided all start-up costs and investment in Premier Anesthesia. Shapiro did not incur any costs to establish Premier Anesthesia's practice, nor did he invest any money in the professional entity he purportedly owned.

285.    In reality, Shapiro was nothing more than Moshe's de facto employee at Premier Anesthesia, just as R. Moshe had been at Citimedical and Citimed.

286.    Moshe used the façade of Premier Anesthesia to do indirectly what he was forbidden from doing directly, namely to: (i) employ healthcare professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

287.    In mid 2018, Moshe and Shapiro grew concerned that Shapiro's simultaneous ownership of Metro Pain and Neurological Diagnostics, and his purported "ownership" of Premier Anesthesia, could draw unwanted attention to the Defendants' interrelated fraudulent schemes.

288.    Accordingly, at Moshe's behest, in or about August 2018, Shapiro purported to transfer his nominal or "paper" ownership interest in Premier Anesthesia to Kifaieh.

289.    Like Shapiro before him, Kifaieh agreed to falsely represent that he truly owned, controlled, and practiced medicine through Premier Anesthesia.

290.    In actuality, Kifaieh – like Shapiro before him – ceded true control over Premier Anesthesia to Moshe, in exchange for compensation from Moshe.

291.    After Kifaieh took over as Premier Anesthesia's nominal or "paper" owner, all decision-making authority relating to the operation and management of Premier Anesthesia continued to be vested entirely with Moshe.

292.    Like Shapiro, Kifaieh never controlled any of Premier Anesthesia's books or records, including its bank account; never selected, directed, and/or controlled any of the individuals or entities responsible for handling Premier Anesthesia's financial affairs; never hired or supervised Premier Anesthesia's employees or independent contractors; and was unaware of the most fundamental aspects of how Premier Anesthesia operated.

293.    Like Shapiro before him, Kifaieh did not invest any money in Premier Anesthesia, the professional entity he purportedly owned.

294.    In reality, Kifaieh was nothing more than Moshe's de facto employee at Premier Anesthesia, just as Shapiro had been.

295.    After Kifaieh took over as Premier Anesthesia's nominal or "paper" owner, Moshe continued to use the façade of Premier Anesthesia to do indirectly what he was forbidden from doing directly, namely to: (i) employ healthcare professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

296.    In keeping with the fact that Moshe – rather than Shapiro or Kifaieh – owned and controlled Premier Anesthesia, Premier Anesthesia operated almost exclusively from Dynamic Surgery's Essex Street Location, Healthplus Surgery's Midland Avenue Location, and Hudson Regional, all of which were controlled by Moshe.

297.    Premier Anesthesia was able to operate on a turnkey basis from the Essex Street Location, the Midland Avenue Location, and Hudson Regional, and to obtain patient referrals at those locations – despite the fact that it was a newly-created medical practice, with no goodwill – because it secretly and unlawfully was owned and controlled by Moshe, who also controlled the Essex Street Location, the Midland Avenue Location, and Hudson Regional.

298. In keeping with the fact that Shapiro and Kifaieh did not legitimately own or control Premier Anesthesia, Shapiro and Kifaieh did not personally perform any significant amount of the healthcare services that were billed through Premier Anesthesia to GEICO and other insurers.

299. In keeping with the fact that Moshe – rather than Shapiro or Kifaieh – owned and controlled Premier Anesthesia, Kifaieh gave testimony during a September 10, 2019 examination under oath indicating, among other things, that:

(i) Kifaieh did not know when Premier Anesthesia was incorporated, or whether anyone invested any start-up capital into Premier Anesthesia, a medical practice he supposedly owned.

(ii) Kifaieh did not pay Shapiro any money in exchange for his purported "ownership" interest in Premier Anesthesia, nor did Shapiro retain any interest in Premier Anesthesia's accounts receivable following the purported "sale".

(iii) The accounting director and general counsel for Hudson Regional – which was owned by Moshe – facilitated the purported "sale" of Premier Anesthesia from Shapiro to Kifaieh.

(iv) Premier Anesthesia did not own its own equipment, and all of the equipment and supplies it used to render healthcare services were provided by Dynamic Surgery, Healthplus Surgery, and Hudson Regional, which were owned by Moshe.

(v) Kifaieh did not know how patients came to be referred to Premier Anesthesia, or what kind of insurance they had.

(vi) Kifaieh did not know who opened Premier Anesthesia's corporate bank account, or the account number.

(vii) Kifaieh did not have signatory authority on Premier Anesthesia's corporate bank account, and did not believe that Shapiro ever had the "ability to make transactions" on the bank account, either.

(viii) However, the accounting director for Hudson Regional – which was owned by Moshe – did have signatory authority on Premier Anesthesia's corporate bank account, and controlled the account.

(ix)      Premier Anesthesia's billing was under the control of a billing company owned by Moshe, pursuant to a verbal agreement, and Premier's billing issues were overseen by Hudson Regional staff, including its accounting director.

300.      In keeping with the fact that Shapiro was nothing more than Moshe's <u>de facto</u> employee at Premier Anesthesia, Shapiro – at the direction of Moshe – caused numerous Insureds to be self-referred from Metro Pain and Neurological Diagnostics to Premier Anesthesia in violation of the Codey Law.

301.      In this context, Shapiro – as a licensed physician – was a "practitioner" as defined by the Codey Law.

302.      Premier Anesthesia was a "healthcare service" as defined by the Codey Law, in that it was a "business entity which provide[d] on an inpatient or outpatient basis: … diagnosis or treatment of human disease or dysfunction … ."

303.      In the context of the Codey Law, Shapiro – who purported to own Premier Anesthesia – had a "significant beneficial interest" in Premier Anesthesia.

304.      Accordingly, pursuant to the Codey Law, Shapiro could not lawfully refer Insureds to Premier Anesthesia, or cause Insureds to be referred to Premier Anesthesia, unless, among other things, disclosure of his significant beneficial interest in Premier Anesthesia was made to the Insureds in writing, at or prior to the time that the referrals were made.

305.      Even so, in the claims identified in Exhibit "8", Shapiro – at Moshe's direction – regularly caused Insureds to be referred from Metro Pain to Premier Anesthesia, without disclosing his significant beneficial interests in Premier Anesthesia at or prior to the time when the referrals were made.

306.      For example:

(i)      On or about June 7, 2018, Shapiro – at Moshe's direction – caused an Insured named KW to be referred from Metro Pain to Premier Anesthesia for anesthesia

services, without disclosing Shapiro's significant beneficial interest in Premier Anesthesia in writing at or prior to the time when the referral was made.

(ii)     On or about June 27, 2018, Shapiro – at Moshe's direction – caused an Insured named AV to be referred from Metro Pain to Premier Anesthesia for anesthesia services, without disclosing Shapiro's significant beneficial interest in Premier Anesthesia in writing at or prior to the time when the referral was made.

(iii)    On or about June 27, 2018, Shapiro – at Moshe's direction – caused an Insured named RV to be referred from Metro Pain to Premier Anesthesia for anesthesia services, without disclosing Shapiro's significant beneficial interest in Premier Anesthesia in writing at or prior to the time when the referral was made.

(iv)     On or about July 20, 2018, Shapiro – at Moshe's direction – caused an Insured named CT to be referred from Metro Pain to Premier Anesthesia for anesthesia services, without disclosing Shapiro's significant beneficial interest in Premier Anesthesia in writing at or prior to the time when the referral was made.

(v)      On or about July 20, 2018, Shapiro – at Moshe's direction – caused an Insured named ST to be referred from Metro Pain to Premier Anesthesia for anesthesia services, without disclosing Shapiro's significant beneficial interest in Premier Anesthesia in writing at or prior to the time when the referral was made.

(vi)     On or about July 22, 2018, Shapiro – at Moshe's direction – caused an Insured named RT to be referred from Metro Pain to Premier Anesthesia for anesthesia services, without disclosing Shapiro's significant beneficial interest in Premier Anesthesia in writing at or prior to the time when the referral was made.

(vii)    On or about July 22, 2018, Shapiro – at Moshe's direction – caused an Insured named PT to be referred from Metro Pain to Premier Anesthesia for anesthesia services, without disclosing Shapiro's significant beneficial interest in Premier Anesthesia in writing at or prior to the time when the referral was made.

(viii)   On or about July 27, 2018, Shapiro – at Moshe's direction – caused an Insured named JV to be referred from Metro Pain to Premier Anesthesia for anesthesia services, without disclosing Shapiro's significant beneficial interest in Premier Anesthesia in writing at or prior to the time when the referral was made.

(ix)     On or about August 6, 2018, Shapiro – at Moshe's direction – caused an Insured named PV to be referred from Metro Pain to Premier Anesthesia for anesthesia services, without disclosing Shapiro's significant beneficial interest in Premier Anesthesia in writing at or prior to the time when the referral was made.

(x)      On or about August 10, 2018, Shapiro – at Moshe's direction – caused an Insured named AT to be referred from Metro Pain to Premier Anesthesia for anesthesia

services, without disclosing Shapiro's significant beneficial interest in Premier Anesthesia in writing at or prior to the time when the referral was made.

307.     These are only representative examples. In the claims identified in Exhibit "8", Shapiro – at Moshe's direction – regularly caused Insureds to be referred from Metro Pain to Premier Anesthesia, without disclosing his significant beneficial interests in Premier Anesthesia at or prior to the time when the referrals were made.

## E.     The Unlawful Referrals to Hudson Regional for Medically Unnecessary Drug Screening

308.     In late 2017, after organizing Hudson Regional, Moshe sought to maximize the fraudulent billing he could submit or cause to be submitted to GEICO and other insurers, by using Hudson Regional as a vehicle to submit fraudulent and unbundled billing for medically unnecessary drug screening to GEICO and other insurers.

309.     Hudson Regional needed patient referrals in order to bill for drug screening.

310.     Moshe knew that, because he secretly owned and controlled Premier Anesthesia, and also owned Dynamic Surgery and Healthplus Surgery, he could direct the anesthesiologists who provided anesthesiology services for Premier Anesthesia at Dynamic Surgery and Healthplus Surgery to order drug screens in connection with the surgical and interventional pain management services, and related anesthesia services, that were performed at Dynamic Surgery and Healthplus Surgery.

311.     Then, Moshe could ensure that all of the resulting drug screens be provided by and billed through Hudson Regional to GEICO and other insurers.

312.     In a legitimate clinical setting, drug screening may be medically warranted in advance of anesthesia services to determine whether a patient is taking any medications or using any illicit drugs that might have a negative interaction with the anesthesia.

313.    However, absent some indication that a patient is abusing drugs, or a legitimate question regarding the medications that a patient is taking, there generally will be no medical need to routinely administer drug screening in advance of anesthesia services.

314.    In virtually all of the claims identified in Exhibits "4" and "8", there was no indication that the Insureds were abusing drugs, and there was no legitimate question regarding the medications that the Insureds were taking.

315.    Even so, in the claims identified in Exhibits "4" and "8", Moshe directed the physicians associated with Premier Anesthesia to routinely order medically unnecessary drug screens in connection with the interventional pain management procedures and anesthesia services that were provided at Dynamic Surgery and Healthplus Surgery.

316.    Then, Moshe used his control over Premier Anesthesia, Dynamic Surgery, and Healthplus Surgery to ensure that the resulting, medically unnecessary drug screens were provided by Hudson Regional, and billed through Hudson Regional in an unlawfully unbundled manner.

317.    Not only were the drug screens medically unnecessary because there was no indication that the Insureds were taking any unreported medications or using any illicit drugs that might have a negative interaction with the anesthesia, but the drug screens also were medically unnecessary because – by the time the results of the drug screens were obtained – the interventional pain management procedures and anesthesia services already had been performed.

318.    For example:

(i)     On July 20, 2018, Moshe caused an Insured named JJ to be referred from Premier Anesthesia to Hudson Regional for drug screens, ostensibly in connection with interventional pain management and anesthesia services that were to be provided to JJ at Dynamic Surgery on July 20, 2018. Not only were the drug screens medically unnecessary because there was no indication that JJ might be taking any medications or using any illicit drugs that might have a negative interaction

with the anesthesia, but they also were medically unnecessary because – by the time the results of the drug screens arrived – JJ already had received the interventional pain management and anesthesia services.

(ii)    On July 25, 2018, Moshe caused an Insured named RJ to be referred from Premier Anesthesia to Hudson Regional for drug screens, ostensibly in connection with interventional pain management and anesthesia services that were to be provided to RJ at Healthplus Surgery on July 25, 2018. Not only were the drug screens medically unnecessary because there was no indication that RJ might be taking any medications or using any illicit drugs that might have a negative interaction with the anesthesia, but they also were medically unnecessary because – by the time the results of the drug screens arrived – RJ already had received the interventional pain management and anesthesia services.

(iii)    On July 28, 2018, Moshe caused an Insured named DJ to be referred from Premier Anesthesia to Hudson Regional for drug screens, ostensibly in connection with interventional pain management and anesthesia services that were to be provided to DJ at Dynamic Surgery on July 28, 2018. Not only were the drug screens medically unnecessary because there was no indication that DJ might be taking any medications or using any illicit drugs that might have a negative interaction with the anesthesia, but they also were medically unnecessary because – by the time the results of the drug screens arrived – DJ already had received the interventional pain management and anesthesia services.

(iv)    On July 29, 2018, Moshe caused an Insured named SM to be referred from Premier Anesthesia to Hudson Regional for drug screens, ostensibly in connection with arthroscopic surgery and anesthesia services that were to be provided to SM at Dynamic Surgery on July 29, 2018. Not only were the drug screens medically unnecessary because there was no indication that SM might be taking any medications or using any illicit drugs that might have a negative interaction with the anesthesia, but they also were medically unnecessary because – by the time the results of the drug screens arrived – SM already had received the arthroscopic surgery and anesthesia services.

(v)    On August 3, 2018, Moshe caused an Insured named AJ to be referred from Premier Anesthesia to Hudson Regional for drug screens, ostensibly in connection with interventional pain management and anesthesia services that were to be provided to AJ at Healthplus Surgery on August 3, 2018. Not only were the drug screens medically unnecessary because there was no indication that AJ might be taking any medications or using any illicit drugs that might have a negative interaction with the anesthesia, but they also were medically unnecessary because – by the time the results of the drug screens arrived – AJ already had received the interventional pain management and anesthesia services.

(vi)    On August 11, 2018, Moshe caused an Insured named HR to be referred from Premier Anesthesia to Hudson Regional for drug screens, ostensibly in connection

with interventional pain management and anesthesia services that were to be provided to HR at Healthplus Surgery on August 11, 2018. Not only were the drug screens medically unnecessary because there was no indication that HR might be taking any medications or using any illicit drugs that might have a negative interaction with the anesthesia, but they also were medically unnecessary because – by the time the results of the drug screens arrived – HR already had received the interventional pain management and anesthesia services.

(vii)   On August 14, 2018, Moshe caused an Insured named CP to be referred from Premier Anesthesia to Hudson Regional for drug screens, ostensibly in connection with arthroscopic surgery and anesthesia services that were to be provided to CP at Dynamic Surgery on August 14, 2018. Not only were the drug screens medically unnecessary because there was no indication that CP might be taking any medications or using any illicit drugs that might have a negative interaction with the anesthesia, but they also were medically unnecessary because – by the time the results of the drug screens arrived – CP already had received the arthroscopic surgery and anesthesia services.

(viii)   On August 18, 2018, Moshe caused an Insured named LJ to be referred from Premier Anesthesia to Hudson Regional for drug screens, ostensibly in connection with interventional pain management and anesthesia services that were to be provided to LJ at Healthplus Surgery on August 18, 2018. Not only were the drug screens medically unnecessary because there was no indication that LJ might be taking any medications or using any illicit drugs that might have a negative interaction with the anesthesia, but they also were medically unnecessary because – by the time the results of the drug screens arrived – LJ already had received the interventional pain management and anesthesia services.

(ix)   On September 10, 2018, Moshe caused an Insured named MJ to be referred from Premier Anesthesia to Hudson Regional for drug screens, ostensibly in connection with arthroscopic surgery and anesthesia services that were to be provided to MJ at Dynamic Surgery on September 10, 2018. Not only were the drug screens medically unnecessary because there was no indication that MJ might be taking any medications or using any illicit drugs that might have a negative interaction with the anesthesia, but they also were medically unnecessary because – by the time the results of the drug screens arrived – MJ already had received the arthroscopic surgery and anesthesia services.

(x)   On September 26, 2018, Moshe caused an Insured named CJ to be referred from Premier Anesthesia to Hudson Regional for drug screens, ostensibly in connection with interventional pain management and anesthesia services that were to be provided to CJ at Dynamic Surgery on September 26, 2018. Not only were the drug screens medically unnecessary because there was no indication that CJ might be taking any medications or using any illicit drugs that might have a negative interaction with the anesthesia, but they also were medically unnecessary because

– by the time the results of the drug screens arrived – CJ already had received the arthroscopic surgery and anesthesia services.

(xi)  On October 7, 2018, Moshe caused an Insured named KI to be referred from Premier Anesthesia to Hudson Regional for drug screens, ostensibly in connection with interventional pain management and anesthesia services that were to be provided to KI at Dynamic Surgery on October 7, 2018. Not only were the drug screens medically unnecessary because there was no indication that KI might be taking any medications or using any illicit drugs that might have a negative interaction with the anesthesia, but they also were medically unnecessary because – by the time the results of the drug screens arrived – KI already had received the interventional pain management and anesthesia services.

(xii)  On October 12, 2018, Moshe caused an Insured named RJ to be referred from Premier Anesthesia to Hudson Regional for drug screens, ostensibly in connection with interventional pain management and anesthesia services that were to be provided to RJ at Healthplus Surgery on October 12, 2018. Not only were the drug screens medically unnecessary because there was no indication that RJ might be taking any medications or using any illicit drugs that might have a negative interaction with the anesthesia, but they also were medically unnecessary because – by the time the results of the drug screens arrived – RJ already had received the interventional pain management and anesthesia services.

(xiii)  On December 12, 2018, Moshe caused an Insured named FJ to be referred from Premier Anesthesia to Hudson Regional for drug screens, ostensibly in connection with interventional pain management and anesthesia services that were to be provided to FJ at Healthplus Surgery on December 12, 2018. Not only were the drug screens medically unnecessary because there was no indication that FJ might be taking any medications or using any illicit drugs that might have a negative interaction with the anesthesia, but they also were medically unnecessary because – by the time the results of the drug screens arrived – FJ already had received the interventional pain management and anesthesia services.

(xiv)  On December 14, 2018, Moshe caused an Insured named JJ to be referred from Premier Anesthesia to Hudson Regional for drug screens, ostensibly in connection with interventional pain management and anesthesia services that were to be provided to JJ at Dynamic Surgery on December 14, 2018. Not only were the drug screens medically unnecessary because there was no indication that JJ might be taking any medications or using any illicit drugs that might have a negative interaction with the anesthesia, but they also were medically unnecessary because – by the time the results of the drug screens arrived – JJ already had received the interventional pain management and anesthesia services.

(xv)  On December 27, 2018, Moshe caused an Insured named JJ to be referred from Premier Anesthesia to Hudson Regional for drug screens, ostensibly in connection with interventional pain management and anesthesia services that were to be

provided to JJ at Dynamic Surgery on December 27, 2018. Not only were the drug screens medically unnecessary because there was no indication that JJ might be taking any medications or using any illicit drugs that might have a negative interaction with the anesthesia, but they also were medically unnecessary because – by the time the results of the drug screens arrived – JJ already had received the interventional pain management and anesthesia services.

319.   These are only representative examples. In the claims identified in Exhibits "4" and "8", Moshe routinely directed the physicians associated with Premier Anesthesia to order medically unnecessary drug screens that were provided and billed through Hudson Regional.

319.   In a legitimate clinical setting, "quantitative" drug screens – which can tell how much of a drug is in a patient's system – sometimes may be medically necessary to confirm the results of "qualitative" drug screens, which can tell whether a patient is positive or negative for a given class of drug, but which do not set forth how much of a drug is in a patient's system.

320.   However, where a patient's qualitative drug screen comes up negative for a given class of drug, there will be no medical necessity to test for that same class of drug using a quantitative drug screen.

321.   Even so, in order to maximize their fraudulent charges for the medically unnecessary drug screens, Moshe and Hudson Regional frequently billed for medically unnecessary quantitative drug screens, ostensibly to confirm the results of contemporaneous qualitative drug screens with negative results.

322.   For example:

(i)    On May 22, 2018, Moshe and Hudson Regional purported to provide medically unnecessary quantitative drug screens to an Insured named PS, despite the fact that contemporaneous qualitative drug screens had come up negative, thereby inflating their drug screen charges by thousands of dollars.

(ii)   On June 9, 2018, Moshe and Hudson Regional purported to provide medically unnecessary quantitative drug screens to an Insured named RJ, despite the fact that contemporaneous qualitative drug screens had come up negative, thereby inflating their drug screen charges by thousands of dollars.

(iii)    On July 6, 2018, Moshe and Hudson Regional purported to provide medically unnecessary quantitative drug screens to an Insured named SK, despite the fact that contemporaneous qualitative drug screens had come up negative, thereby inflating their drug screen charges by thousands of dollars.

(iv)    On July 8, 2018, Moshe and Hudson Regional purported to provide medically unnecessary quantitative drug screens to an Insured named PT, despite the fact that contemporaneous qualitative drug screens had come up negative, thereby inflating their drug screen charges by thousands of dollars.

(v)    On August 31, 2018, Moshe and Hudson Regional purported to provide medically unnecessary quantitative drug screens to an Insured named AB, despite the fact that contemporaneous qualitative drug screens had come up negative, thereby inflating their drug screen charges by thousands of dollars.

(vi)    On September 22, 2018, Moshe and Hudson Regional purported to provide medically unnecessary quantitative drug screens to an Insured named RB, despite the fact that contemporaneous qualitative drug screens had come up negative, thereby inflating their drug screen charges by thousands of dollars.

(vii)    On September 24, 2018, Moshe and Hudson Regional purported to provide medically unnecessary quantitative drug screens to an Insured named RS, despite the fact that contemporaneous qualitative drug screens had come up negative, thereby inflating their drug screen charges by thousands of dollars.

(viii)    On November 8, 2018, Moshe and Hudson Regional purported to provide medically unnecessary quantitative drug screens to an Insured named MK, despite the fact that contemporaneous qualitative drug screens had come up negative, thereby inflating their drug screen charges by thousands of dollars.

(ix)    On December 14, 2018, Moshe and Hudson Regional purported to provide medically unnecessary quantitative drug screens to an Insured named TN, despite the fact that contemporaneous qualitative drug screens had come up negative, thereby inflating their drug screen charges by thousands of dollars.

(x)    On January 17, 2019, Moshe and Hudson Regional purported to provide medically unnecessary quantitative drug screens to an Insured named YG, despite the fact that contemporaneous qualitative drug screens had come up negative, thereby inflating their drug screen charges by thousands of dollars.

(xi)    On February 12, 2019, Moshe and Hudson Regional purported to provide medically unnecessary quantitative drug screens to an Insured named SM, despite the fact that contemporaneous qualitative drug screens had come up negative, thereby inflating their drug screen charges by thousands of dollars.

(xii)   On February 20, 2019, Moshe and Hudson Regional purported to provide medically unnecessary quantitative drug screens to an Insured named WG, despite the fact that contemporaneous qualitative drug screens had come up negative, thereby inflating their drug screen charges by thousands of dollars.

(xiii)   On March 21, 2019, Moshe and Hudson Regional purported to provide medically unnecessary quantitative drug screens to an Insured named AA, despite the fact that contemporaneous qualitative drug screens had come up negative, thereby inflating their drug screen charges by thousands of dollars.

(xiv)   On April 18, 2019, Moshe and Hudson Regional purported to provide medically unnecessary quantitative drug screens to an Insured named ES, despite the fact that contemporaneous qualitative drug screens had come up negative, thereby inflating their drug screen charges by thousands of dollars.

(xv)   On July 12, 2019, Moshe and Hudson Regional purported to provide medically unnecessary quantitative drug screens to an Insured named RH, despite the fact that contemporaneous qualitative drug screens had come up negative, thereby inflating their drug screen charges by thousands of dollars.

323.   These are only representative examples. In the claims identified in Exhibit "4", Moshe and Hudson Regional routinely billed for medically unnecessary quantitative drug screens, ostensibly to confirm the results of contemporaneous qualitative drug screens with negative results.

**F.   The Unlawfully Inflated Facility Fee Charges by Hudson Regional**

324.   As set forth above, the New Jersey no-fault laws specifically prohibit healthcare services providers from charging for services in amounts exceeding the amounts set forth in the NJ Fee Schedule. See N.J.S.A. § 39:6A-4.6; N.J.A.C. 11:3-29.6.

325.   Even so, in the claims identified in Exhibit "4", Hudson Regional and Moshe routinely and unlawfully falsely represented that Hudson Regional was entitled to be reimbursed for facility fees in amounts that far exceeded the limits set forth in the NJ Fee Schedule.

326.   For example:

(i)   On January 5, 2018, an Insured named RC purportedly received a pain management injection at Hudson Regional. Moshe and Hudson Regional then

falsely represented, in the resulting bill, that Hudson Regional was entitled to be paid a $6,666.60 facility fee for hosting the injection, under CPT code 64493. However, pursuant to the NJ Fee Schedule the maximum reimbursable facility fee for the injection was only $2,060.68.

(ii)   On January 11, 2018, an Insured named ML purportedly received a pain management injection at Hudson Regional. Moshe and Hudson Regional then falsely represented, in the resulting bill, that Hudson Regional was entitled to be paid a $7,956.80 facility fee for hosting the injection, under CPT code 64490. However, pursuant to the NJ Fee Schedule the maximum reimbursable facility fee for the injection was only $2,060.68.

(iii)   On January 12, 2018, an Insured named EB purportedly received a shoulder arthroscopy at Hudson Regional. Moshe and Hudson Regional then falsely represented, in the resulting bill, that Hudson Regional was entitled to be paid a $50,586.80 facility fee for hosting the arthroscopy, under CPT code 29807. However, pursuant to the NJ Fee Schedule the maximum reimbursable facility fee for the arthroscopy was only $13,154.68.

(iv)   On March 16, 2018, an Insured named SZ purportedly received a discectomy at Hudson Regional. Moshe and Hudson Regional then falsely represented, in the resulting bill, that Hudson Regional was entitled to be paid a $47,548.90 facility fee for hosting the discectomy, under CPT code 63075. However, pursuant to the NJ Fee Schedule the maximum reimbursable facility fee for the discectomy was only $13,940.72.

(v)   On March 29, 2018, an Insured named CH purportedly received a pain management injection at Hudson Regional. Moshe and Hudson Regional then falsely represented, in the resulting bill, that Hudson Regional was entitled to be paid a $7,956.80 facility fee for hosting the injection, under CPT code 64490. However, pursuant to the NJ Fee Schedule the maximum reimbursable facility fee for the injection was only $2,060.68.

(vi)   On May 16, 2018, an Insured named GD purportedly received a shoulder arthroscopy at Hudson Regional. Moshe and Hudson Regional then falsely represented, in the resulting bill, that Hudson Regional was entitled to be paid a $50,586.80 facility fee for hosting the arthroscopy, under CPT code 29807. However, pursuant to the NJ Fee Schedule the maximum reimbursable facility fee for the arthroscopy was only $13,154.68.

(vii)   On May 29, 2018, an Insured named DH purportedly received surgery on her ankle at Hudson Regional. Moshe and Hudson Regional then falsely represented, in the resulting bill, that Hudson Regional was entitled to be paid a $63,197.33 facility fee for hosting the ankle surgery, under CPT code 28445. However, pursuant to the NJ Fee Schedule the maximum reimbursable facility fee for the surgery was only $13,070.23.

(viii)   On June 11, 2018, an Insured named LV purportedly received a discectomy at Hudson Regional. Moshe and Hudson Regional then falsely represented, in the resulting bill, that Hudson Regional was entitled to be paid a $46,275.90 facility fee for hosting the discectomy, under CPT code 62287. However, pursuant to the NJ Fee Schedule the maximum reimbursable facility fee for the discectomy was only $10,121.96.

(ix)   On October 9, 2018, an Insured named CG purportedly received a shoulder arthroscopy at Hudson Regional. Moshe and Hudson Regional then falsely represented, in the resulting bill, that Hudson Regional was entitled to be paid a $50,586.00 facility fee for hosting the arthroscopy, under CPT code 29807. However, pursuant to the NJ Fee Schedule the maximum reimbursable facility fee for the arthroscopy was only $13,154.68.

(x)   On February 27, 2019, an Insured named JS purportedly received surgery on his spine at Hudson Regional. Moshe and Hudson Regional then falsely represented, in the resulting bill, that Hudson Regional was entitled to be paid a $47,548.90 facility fee for hosting the spinal surgery, under CPT code 63047. However, pursuant to the NJ Fee Schedule the maximum reimbursable facility fee for the surgery was only $13,940.72.

327.   These are only representative examples. Virtually all of the facility fee charges from Hudson Regional in the claims identified in Exhibit "4" falsely represented that Hudson Regional was entitled to reimbursement far in excess of the limits set forth in the NJ Fee Schedule.

328.   Each such inflated and unlawful charge constituted a separate violation of N.J.S.A. § 39:6A-4.6 and N.J.A.C. 11:3-29.6.

### III.   The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO

329.   To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3 forms, HCFA-1500 forms, bills, and treatment reports through the Entity Defendants to GEICO seeking payment for the Fraudulent Services for which the Entity Defendants were not entitled to receive payment.

91

330.    The NF-3 forms, HCFA-1500 forms, bills, and treatment reports submitted to GEICO by and on behalf of the Defendants were false and misleading in the following material respects:

(i)     The NF-3 forms, HCFA-1500 forms, bills, and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Defendants and Fraudulent Services were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, as set forth herein, the Defendants and Fraudulent Services were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were not eligible to receive PIP reimbursement.

(ii)    The NF-3 forms, HCFA-1500 forms, bills, and treatment reports frequently misrepresented to GEICO that the Fraudulent Services were medically necessary and eligible for PIP reimbursement, when in fact they were not.

(iii)   The NF-3 forms, HCFA-1500 forms, bills, and treatment reports submitted or caused to be submitted by the Defendants misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

## IV.   The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

331.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submit, or cause to be submitted, to GEICO.

332.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

333.    Specifically, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Defendants were engaged in illegal kickbacks and referrals.

334.    The Defendants also knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that Citimedical, Citimed, and Premier Anesthesia were unlawfully owned and controlled by a non-physician.

335.    What is more, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that Excel Surgery, Dynamic Surgery, and Healthplus Surgery were operated in pervasive violation of the laws and regulations governing ambulatory care facilities.

336.    What is more, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to a fraudulent pre-determined protocol designed to maximize the charges that could be submitted, not to benefit the Insureds who supposedly were subjected to them.

337.    The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming arbitration against GEICO and other insurers if the charges were not promptly paid in full. Much of the arbitration that the Defendants have commenced to collect on their fraudulent PIP claims was commenced in New York, seeking to collect PIP Benefits under GEICO's New York automobile insurance policies for Fraudulent Services that they purported to provide to GEICO's New York-based Insureds.

338.    GEICO is under statutory and contractual obligations to promptly and fairly process claims.  The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and omissions described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred

damages of more than $25,000,000.00 based upon the fraudulent charges representing payments made by GEICO to the Entity Defendants.

339.   Based upon the Defendants' material misrepresentations, omissions, and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against the Entity Defendants
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

340.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

341.   There is an actual case in controversy between GEICO and the Entity Defendants regarding more than $60,000,000.00 in unpaid billing for the Fraudulent Services that has been submitted to GEICO.

342.   The Entity Defendants have no right to receive payment from GEICO on the unpaid billing because of the fraudulent and unlawful activity described herein.

343.   Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Entity Defendants have no right to receive payment for any pending bills submitted to GEICO.

## SECOND CAUSE OF ACTION
### Against Moshe
### (Violation of RICO, 18 U.S.C. § 1962(c))

344.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

345.   Excel Surgery is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

346.   Moshe knowingly conducted and/or participated, directly or indirectly, in the conduct of Excel Surgery's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than five years seeking payments that Excel Surgery was not entitled to receive under the New York or New Jersey no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) Excel Surgery was not in compliance with all significant statutory and regulatory requirements governing healthcare practice and/or licensing laws; and (iv) the Fraudulent Services were not provided in compliance with all significant statutory and regulatory requirements governing healthcare practice. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

347.   Excel Surgery's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Moshe has operated Excel Surgery, inasmuch as Excel Surgery is not engaged in a legitimate ambulatory surgery center business, and acts of mail fraud therefore are essential in order for Excel Surgery to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Excel Surgery to the present day.

95

348.    Excel Surgery is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Excel Surgery in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

349.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $7,000,000.00 pursuant to the fraudulent bills submitted through Excel Surgery.

350.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRD CAUSE OF ACTION
**Against Moshe, R. Moshe, Citimedical, Citimed, Shapiro, and Neurological Diagnostics
(Violation of RICO, 18 U.S.C. § 1962(d))**

351.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

352.    Excel Surgery is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

353.    Moshe, R. Moshe, Citimedical, Citimed, Shapiro, and Neurological Diagnostics are employed by and/or associated with the Excel Surgery enterprise.

354.    Moshe, R. Moshe, Citimedical, Citimed, Shapiro, and Neurological Diagnostics knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Excel Surgery enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C.

§ 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than five years seeking payments that Excel Surgery was not entitled to receive under the New York or New Jersey no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) Excel Surgery was not in compliance with all significant statutory and regulatory requirements governing healthcare practice and/or licensing laws; and (iv) the Fraudulent Services were not provided in compliance with all significant statutory and regulatory requirements governing healthcare practice. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

355. Moshe, R. Moshe, Citimedical, Citimed, Shapiro, and Neurological Diagnostics knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

356. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $7,000,000.00 pursuant to the fraudulent bills submitted through Excel Surgery.

357. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### FOURTH CAUSE OF ACTION
### Against Excel Surgery and Moshe
### (Common Law Fraud)

358.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

359.     Excel Surgery and Moshe intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges through Excel Surgery seeking payment for the Fraudulent Services.

360.     The false and fraudulent statements of material fact and acts of fraudulent concealment include:

   (i)     In every claim, the representation that Excel Surgery and the Fraudulent Services were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, as set forth herein, Excel Surgery and the Fraudulent Services were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were not eligible to receive PIP reimbursement.

   (ii)    In many claims, the representation that the Fraudulent Services were medically necessary and eligible for PIP reimbursement, when in fact they were not.

361.     Excel Surgery and Moshe intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Excel Surgery that were not compensable under the New York and New Jersey no-fault insurance laws.

362.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $7,000,000.00 pursuant to the fraudulent bills submitted by the Defendants through Excel Surgery.

363.   Moshe and Excel Surgery's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

364.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### Against R. Moshe, Citimedical, Citimed, Shapiro, and Neurological Diagnostics
### (Aiding and Abetting Fraud)

365.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

366.   As set forth herein, R. Moshe, Citimedical, Citimed, Shapiro, and Neurological Diagnostics  knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Excel Surgery and Moshe.

367.   The conduct of R. Moshe, Citimedical, Citimed, Shapiro, and Neurological Diagnostics in furtherance of the fraudulent scheme was significant and material.  The conduct of R. Moshe, Citimedical, Citimed, Shapiro, and Neurological Diagnostics was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Excel Surgery and Moshe to obtain payment from GEICO and from other insurers.

368.   R. Moshe, Citimedical, Citimed, Shapiro, and Neurological Diagnostics aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to

Excel Surgery for medically unnecessary, unlawful, or otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

369.   The conduct of R. Moshe, Citimedical, Citimed, Shapiro, and Neurological Diagnostics caused GEICO to pay more than $7,000,000.00 pursuant to the fraudulent bills submitted through Excel Surgery.

370.   R. Moshe, Citimedical, Citimed, Shapiro, and Neurological Diagnostics' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

371.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**SIXTH CAUSE OF ACTION**
**Against Excel Surgery, Moshe, R. Moshe, Citimedical, Citimed, Shapiro, and Neurological Diagnostics**
**(Unjust Enrichment)**

372.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

373.   As set forth above, Excel Surgery, Moshe, R. Moshe, Citimedical, Citimed, Shapiro, and Neurological Diagnostics have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

374.   When GEICO paid the bills and charges submitted by or on behalf of Excel Surgery for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Excel Surgery, Moshe, R. Moshe, Citimedical, Citimed, Shapiro, and Neurological Diagnostics' improper, unlawful, and/or unjust acts.

100

375.   Excel Surgery, Moshe, R. Moshe, Citimedical, Citimed, Shapiro, and Neurological Diagnostics have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Excel Surgery, Moshe, R. Moshe, Citimedical, Citimed, Shapiro, and Neurological Diagnostics voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

376.   Excel Surgery, Moshe, R. Moshe, Citimedical, Citimed, Shapiro, and Neurological Diagnostics' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

377.   By reason of the above, Excel Surgery, Moshe, R. Moshe, Citimedical, Citimed, Shapiro, and Neurological Diagnostics have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $7,000,000.00.

### SEVENTH CAUSE OF ACTION
**Against Excel Surgery, Moshe, R. Moshe, Citimedical, Citimed, Shapiro, and Neurological Diagnostics**
**(Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A.17:33A-1 et seq.))**

378.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

379.   In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibit "1", Defendants Excel Surgery, Moshe, R. Moshe, Citimedical, Citimed, Shapiro, and Neurological Diagnostics knowingly submitted or caused to be submitted bills and treatment reports through Excel Surgery to GEICO that were false and misleading in the following material respects:

(i)     The NF-3 forms, HCFA-1500 forms, bills, and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Defendants and Fraudulent Services were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, as set

forth herein, the Defendants and Fraudulent Services were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were not eligible to receive PIP reimbursement.

(ii)     The NF-3 forms, HCFA-1500 forms, bills, and treatment reports frequently misrepresented to GEICO that the Fraudulent Services were medically necessary and eligible for PIP reimbursement, when in fact they were not.

(iii)     The NF-3 forms, HCFA-1500 forms, bills, and treatment reports submitted or caused to be submitted by the Defendants misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

380.     Excel Surgery, Moshe, R. Moshe, Citimedical, Citimed, Shapiro, and Neurological Diagnostics' systematic violation of the New Jersey Insurance Fraud Prevention Act constitutes a "pattern" of violations under the Act.  See N.J.S.A. 17:33-A-7.  As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $7,000,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

**EIGHTH CAUSE OF ACTION**
**Against Moshe**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

381.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

382.     Dynamic Surgery is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

383.     Moshe knowingly conducted and/or participated, directly or indirectly, in the conduct of Dynamic Surgery's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the

United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than two years seeking payments that Dynamic Surgery was not entitled to receive under the New York or New Jersey no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) Dynamic Surgery was not in compliance with all significant statutory and regulatory requirements governing healthcare practice and/or licensing laws; and (iv) the Fraudulent Services were not provided in compliance with all significant statutory and regulatory requirements governing healthcare practice. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

384.    Dynamic Surgery's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Moshe has operated Dynamic Surgery, inasmuch as Dynamic Surgery is not engaged in a legitimate ambulatory surgery center business, and acts of mail fraud therefore are essential in order for Dynamic Surgery to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Dynamic Surgery to the present day.

385.    Dynamic Surgery is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Dynamic Surgery in pursuit of inherently unlawful

103

goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

386.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,500,000.00 pursuant to the fraudulent bills submitted through Dynamic Surgery.

387.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**NINTH CAUSE OF ACTION**
**Against Moshe, R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics,**
**Premier Anesthesia, and Kifaieh**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

388.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

389.    Dynamic Surgery is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

390.    Moshe, R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh are employed by and/or associated with the Dynamic Surgery enterprise.

391.    Moshe, R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Dynamic Surgery enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than two

years seeking payments that Dynamic Surgery was not entitled to receive under the New York or New Jersey no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) Dynamic Surgery was not in compliance with all significant statutory and regulatory requirements governing healthcare practice and/or licensing laws; and (iv) the Fraudulent Services were not provided in compliance with all significant statutory and regulatory requirements governing healthcare practice. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

392.    Moshe, R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

393.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,500,000.00 pursuant to the fraudulent bills submitted through Dynamic Surgery.

394.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TENTH CAUSE OF ACTION
### Against Dynamic Surgery and Moshe
### (Common Law Fraud)

395.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

396.    Dynamic Surgery and Moshe intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges through Dynamic Surgery seeking payment for the Fraudulent Services.

397.    The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)     In every claim, the representation that Dynamic Surgery and the Fraudulent Services were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, as set forth herein, Dynamic Surgery and the Fraudulent Services were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were not eligible to receive PIP reimbursement.

(ii)    In many claims, the representation that the Fraudulent Services were medically necessary and eligible for PIP reimbursement, when in fact they were not.

398.    Dynamic Surgery and Moshe intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Dynamic Surgery that were not compensable under the New York and New Jersey no-fault insurance laws.

399.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,500,000.00 pursuant to the fraudulent bills submitted by the Defendants through Dynamic Surgery.

400. Moshe and Dynamic Surgery's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

401. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## ELEVENTH CAUSE OF ACTION
### Against R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh
### (Aiding and Abetting Fraud)

402. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

403. As set forth herein, R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh  knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Dynamic Surgery and Moshe.

404. The conduct of R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh in furtherance of the fraudulent scheme was significant and material.  The conduct of R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Dynamic Surgery and Moshe to obtain payment from GEICO and from other insurers.

405. R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Dynamic Surgery for medically unnecessary, unlawful, or

otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

406.     The conduct of R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh caused GEICO to pay more than $2,500,000.00 pursuant to the fraudulent bills submitted through Dynamic Surgery.

407.     R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

408.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWELFTH CAUSE OF ACTION
### Against Dynamic Surgery, Moshe, R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh
### (Unjust Enrichment)

409.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

410.     As set forth above, Dynamic Surgery, Moshe, R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

411.     When GEICO paid the bills and charges submitted by or on behalf of Dynamic Surgery for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Dynamic Surgery, Moshe, R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh's improper, unlawful, and/or unjust acts.

412.    Dynamic Surgery, Moshe, R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Dynamic Surgery, Moshe, R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

413.    Dynamic Surgery, Moshe, R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

414.    By reason of the above, Dynamic Surgery, Moshe, R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $2,500,000.00.

## THIRTEENTH CAUSE OF ACTION
**Against Dynamic Surgery, Moshe, R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh**
**(Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A.17:33A-1 et seq.))**

415.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

416.    In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibit "2", Defendants Dynamic Surgery, Moshe, R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh knowingly submitted or caused to be submitted bills and treatment

reports through Dynamic Surgery to GEICO that were false and misleading in the following material respects:

(i)    The NF-3 forms, HCFA-1500 forms, bills, and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Defendants and Fraudulent Services were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, as set forth herein, the Defendants and Fraudulent Services were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were not eligible to receive PIP reimbursement.

(ii)    The NF-3 forms, HCFA-1500 forms, bills, and treatment reports frequently misrepresented to GEICO that the Fraudulent Services were medically necessary and eligible for PIP reimbursement, when in fact they were not.

(iii)    The NF-3 forms, HCFA-1500 forms, bills, and treatment reports submitted or caused to be submitted by the Defendants misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

417.    Dynamic Surgery, Moshe, R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh's systematic violation of the New Jersey Insurance Fraud Prevention Act constitutes a "pattern" of violations under the Act. See N.J.S.A. 17:33-A-7. As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $2,500,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

**FOURTEENTH CAUSE OF ACTION**
**Against Moshe**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

418.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

419.    Healthplus Surgery is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

420.    Moshe knowingly conducted and/or participated, directly or indirectly, in the conduct of Healthplus Surgery's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than two years seeking payments that Healthplus Surgery was not entitled to receive under the New York or New Jersey no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) Healthplus Surgery was not in compliance with all significant statutory and regulatory requirements governing healthcare practice and/or licensing laws; and (iv) the Fraudulent Services were not provided in compliance with all significant statutory and regulatory requirements governing healthcare practice. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

421.    Healthplus Surgery's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Moshe has operated Healthplus Surgery, inasmuch as Healthplus Surgery is not engaged in a legitimate ambulatory surgery center business, and acts of mail fraud therefore are essential in order for Healthplus Surgery to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a

threat of continued criminal activity, as does the fact that the Defendants continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Healthplus Surgery to the present day.

422.    Healthplus Surgery is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Healthplus Surgery in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

423.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $5,500,000.00 pursuant to the fraudulent bills submitted through Healthplus Surgery.

424.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FIFTEENTH CAUSE OF ACTION
### Against Moshe, R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh
### (Violation of RICO, 18 U.S.C. § 1962(d))

425.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

426.    Healthplus Surgery is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

427.    Moshe, R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh are employed by and/or associated with the Healthplus Surgery enterprise.

428.    Moshe, R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Healthplus Surgery enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than two years seeking payments that Healthplus Surgery was not entitled to receive under the New York or New Jersey no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) Healthplus Surgery was not in compliance with all significant statutory and regulatory requirements governing healthcare practice and/or licensing laws; and (iv) the Fraudulent Services were not provided in compliance with all significant statutory and regulatory requirements governing healthcare practice. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

429.    Moshe, R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

430.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $5,500,000.00 pursuant to the fraudulent bills submitted through Healthplus Surgery.

431.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## SIXTEENTH CAUSE OF ACTION
### Against Healthplus Surgery and Moshe
### (Common Law Fraud)

432.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

433.    Healthplus Surgery and Moshe intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges through Healthplus Surgery seeking payment for the Fraudulent Services.

434.    The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)     In every claim, the representation that Healthplus Surgery and the Fraudulent Services were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, as set forth herein, Healthplus Surgery and the Fraudulent Services were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were not eligible to receive PIP reimbursement.

(ii)    In many claims, the representation that the Fraudulent Services were medically necessary and eligible for PIP reimbursement, when in fact they were not.

435.    Healthplus Surgery and Moshe intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Healthplus Surgery that were not compensable under the New York and New Jersey no-fault insurance laws.

436.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $5,500,000.00 pursuant to the fraudulent bills submitted by the Defendants through Healthplus Surgery.

437.    Moshe and Healthplus Surgery's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

438.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SEVENTEENTH CAUSE OF ACTION
### Against R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh
### (Aiding and Abetting Fraud)

439.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

440.    As set forth herein, R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh  knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Healthplus Surgery and Moshe.

441.    The conduct of R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh in furtherance of the fraudulent scheme was

115

significant and material. The conduct of R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Healthplus Surgery and Moshe to obtain payment from GEICO and from other insurers.

442.    R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Healthplus Surgery for medically unnecessary, unlawful, or otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

443.    The conduct of R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh caused GEICO to pay more than $5,500,000.00 pursuant to the fraudulent bills submitted through Healthplus Surgery.

444.    R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

445.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### EIGHTEENTH CAUSE OF ACTION
**Against Healthplus Surgery, Moshe, R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh**
**(Unjust Enrichment)**

446.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

447.    As set forth above, Healthplus Surgery, Moshe, R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

448.    When GEICO paid the bills and charges submitted by or on behalf of Healthplus Surgery for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Healthplus Surgery, Moshe, R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh's improper, unlawful, and/or unjust acts.

449.    Healthplus Surgery, Moshe, R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Healthplus Surgery, Moshe, R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

450.    Healthplus Surgery, Moshe, R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

451.    By reason of the above, Healthplus Surgery, Moshe, R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $5,500,000.00.

### NINETEENTH CAUSE OF ACTION
**Against Healthplus Surgery, Moshe, R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh**
**(Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A. 17:33A-1 et seq.))**

452.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

453.     In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibit "3", Defendants Healthplus Surgery, Moshe, R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh knowingly submitted or caused to be submitted bills and treatment reports through Healthplus Surgery to GEICO that were false and misleading in the following material respects:

(i)     The NF-3 forms, HCFA-1500 forms, bills, and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Defendants and Fraudulent Services were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, as set forth herein, the Defendants and Fraudulent Services were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were not eligible to receive PIP reimbursement.

(ii)    The NF-3 forms, HCFA-1500 forms, bills, and treatment reports frequently misrepresented to GEICO that the Fraudulent Services were medically necessary and eligible for PIP reimbursement, when in fact they were not.

(iii)   The NF-3 forms, HCFA-1500 forms, bills, and treatment reports submitted or caused to be submitted by the Defendants misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

454.    Healthplus Surgery, Moshe, R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh's systematic violation of the New Jersey Insurance Fraud Prevention Act constitutes a "pattern" of violations under the Act. See N.J.S.A. 17:33-A-7. As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding

$5,500,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

### TWENTIETH CAUSE OF ACTION
#### Against Moshe
#### (Violation of RICO, 18 U.S.C. § 1962(c))

455.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

456.    Hudson Regional is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

457.    Moshe knowingly conducted and/or participated, directly or indirectly, in the conduct of Hudson Regional's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than two years seeking payments that Hudson Regional was not entitled to receive under the New York or New Jersey no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) Hudson Regional was not in compliance with all significant statutory and regulatory requirements governing healthcare practice and/or licensing laws; and (iv) the Fraudulent Services were not provided in compliance with all significant statutory and regulatory requirements governing healthcare practice. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

458.    Hudson Regional's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Moshe has operated Hudson Regional, inasmuch as Hudson Regional is not engaged in a legitimate hospital business, and acts of mail fraud therefore are essential in order for Hudson Regional to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Hudson Regional to the present day.

459.    Hudson Regional is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Hudson Regional in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

460.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $6,000,000.00 pursuant to the fraudulent bills submitted through Hudson Regional.

461.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTY-FIRST CAUSE OF ACTION
**Against Moshe, Shapiro, Premier Anesthesia, and Kifaieh**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

462.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

463.     Hudson Regional is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

464.     Moshe, Shapiro, Premier Anesthesia, and Kifaieh are employed by and/or associated with the Hudson Regional enterprise.

465.     Moshe, Shapiro, Premier Anesthesia, and Kifaieh knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Hudson Regional enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than two years seeking payments that Hudson Regional was not entitled to receive under the New York or New Jersey no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) Hudson Regional was not in compliance with all significant statutory and regulatory requirements governing healthcare practice and/or licensing laws; and (iv) the Fraudulent Services were not provided in compliance with all significant statutory and regulatory requirements governing healthcare practice. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4". Each such mailing was made in furtherance of the mail fraud scheme.

466.     Moshe, Shapiro, Premier Anesthesia, and Kifaieh knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

467.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $6,000,000.00 pursuant to the fraudulent bills submitted through Hudson Regional.

468.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTY-SECOND CAUSE OF ACTION
### Against Hudson Regional and Moshe
### (Common Law Fraud)

469.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

470.     Hudson Regional and Moshe intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges through Hudson Regional seeking payment for the Fraudulent Services.

471.     The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)      In every claim, the representation that Hudson Regional and the Fraudulent Services were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, as set forth herein, Hudson Regional and the

Fraudulent Services were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were not eligible to receive PIP reimbursement.

(ii)     In many claims, the representation that the Fraudulent Services were medically necessary and eligible for PIP reimbursement, when in fact they were not.

472.     Hudson Regional and Moshe intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Hudson Regional that were not compensable under the New York and New Jersey no-fault insurance laws.

473.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $6,000,000.00 pursuant to the fraudulent bills submitted by the Defendants through Hudson Regional.

474.     Moshe and Hudson Regional's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

475.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### TWENTY-THIRD CAUSE OF ACTION
**Against Shapiro, Premier Anesthesia, and Kifaieh**
**(Aiding and Abetting Fraud)**

476.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

477.    As set forth herein, Shapiro, Premier Anesthesia, and Kifaieh  knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Hudson Regional and Moshe.

478.    The conduct of Shapiro, Premier Anesthesia, and Kifaieh in furtherance of the fraudulent scheme was significant and material.  The conduct of Shapiro, Premier Anesthesia, and Kifaieh was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Hudson Regional and Moshe to obtain payment from GEICO and from other insurers.

479.    Shapiro, Premier Anesthesia, and Kifaieh aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Hudson Regional for medically unnecessary, unlawful, or otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

480.    The conduct of Shapiro, Premier Anesthesia, and Kifaieh caused GEICO to pay more than $6,000,000.00 pursuant to the fraudulent bills submitted through Hudson Regional.

481.    Shapiro, Premier Anesthesia, and Kifaieh's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

482.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TWENTY-FOURTH CAUSE OF ACTION**
**Against Hudson Regional, Moshe, Shapiro, Premier Anesthesia, and Kifaieh**
**(Unjust Enrichment)**

483.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

484.    As set forth above, Hudson Regional, Moshe, Shapiro, Premier Anesthesia, and Kifaieh have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

485.    When GEICO paid the bills and charges submitted by or on behalf of Hudson Regional for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Hudson Regional, Moshe, Shapiro, Premier Anesthesia, and Kifaieh's improper, unlawful, and/or unjust acts.

486.    Hudson Regional, Moshe, Shapiro, Premier Anesthesia, and Kifaieh have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Hudson Regional, Moshe, Shapiro, Premier Anesthesia, and Kifaieh voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

487.    Hudson Regional, Moshe, Shapiro, Premier Anesthesia, and Kifaieh's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

488.    By reason of the above, Hudson Regional, Moshe, Shapiro, Premier Anesthesia, and Kifaieh have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $6,000,000.00.

## TWENTY-FIFTH CAUSE OF ACTION
### Against Hudson Regional, Moshe, Shapiro, Premier Anesthesia, and Kifaieh
### (Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A.17:33A-1 et seq.))

489.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

490.    In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibit "4", Defendants Hudson Regional, Moshe, Shapiro, Premier Anesthesia, and Kifaieh knowingly submitted or caused to be submitted bills and treatment reports through Hudson Regional to GEICO that were false and misleading in the following material respects:

(i)     The NF-3 forms, HCFA-1500 forms, bills, and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Defendants and Fraudulent Services were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, as set forth herein, the Defendants and Fraudulent Services were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were not eligible to receive PIP reimbursement.

(ii)    The NF-3 forms, HCFA-1500 forms, bills, and treatment reports frequently misrepresented to GEICO that the Fraudulent Services were medically necessary and eligible for PIP reimbursement, when in fact they were not.

(iii)   The NF-3 forms, HCFA-1500 forms, bills, and treatment reports submitted or caused to be submitted by the Defendants misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

491.    Hudson Regional, Moshe, Shapiro, Premier Anesthesia, and Kifaieh's systematic violation of the New Jersey Insurance Fraud Prevention Act constitutes a "pattern" of violations under the Act.  See N.J.S.A. 17:33-A-7.  As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $6,000,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

**TWENTY-SIXTH CAUSE OF ACTION**
**Against Moshe and R. Moshe**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

126

492.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

493.    Citimedical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

494.    Moshe and R. Moshe knowingly conducted and/or participated, directly or indirectly, in the conduct of Citimedical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than four years seeking payments that Citimedical was not entitled to receive under the New York or New Jersey no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) Citimedical was not in compliance with all significant statutory and regulatory requirements governing healthcare practice and/or licensing laws; and (iv) the Fraudulent Services were not provided in compliance with all significant statutory and regulatory requirements governing healthcare practice. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5".

495.    Citimedical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Moshe and R Moshe have operated Citimedical, inasmuch as Citimedical is not engaged in a legitimate medical business, and acts of mail fraud therefore are essential in order for Citimedical to function. Furthermore, the intricate planning required to

carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Citimedical to the present day.

496.    Citimedical is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Citimedical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

497.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,000,000.00 pursuant to the fraudulent bills submitted through Citimedical.

498.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTY-SEVENTH CAUSE OF ACTION
### Against Moshe, R. Moshe, Citimed, Excel Surgery, Dynamic Surgery, Healthplus Surgery
### (Violation of RICO, 18 U.S.C. § 1962(d))

499.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

500.    Citimedical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

501.    Moshe, R. Moshe, Citimed, Excel Surgery, Dynamic Surgery, and Healthplus Surgery are employed by and/or associated with the Citimedical enterprise.

502.   Moshe, R. Moshe, Citimed, Excel Surgery, Dynamic Surgery, and Healthplus Surgery knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Citimedical enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than four years seeking payments that Citimedical was not entitled to receive under the New York or New Jersey no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) Citimedical was not in compliance with all significant statutory and regulatory requirements governing healthcare practice and/or licensing laws; and (iv) the Fraudulent Services were not provided in compliance with all significant statutory and regulatory requirements governing healthcare practice. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5". Each such mailing was made in furtherance of the mail fraud scheme.

503.   Moshe, R. Moshe, Citimed, Excel Surgery, Dynamic Surgery, and Healthplus Surgery knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

504. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,000,000.00 pursuant to the fraudulent bills submitted through Citimedical.

505. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTY-EIGHTH CAUSE OF ACTION
### Against Citimedical, Moshe, and R. Moshe
### (Common Law Fraud)

506. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

507. Citimedical, Moshe, and R. Moshe intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges through Citimedical seeking payment for the Fraudulent Services.

508. The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i) In every claim, the representation that Citimedical and the Fraudulent Services were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, as set forth herein, Citimedical and the Fraudulent Services were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were not eligible to receive PIP reimbursement.

(ii) In many claims, the representation that the Fraudulent Services were medically necessary and eligible for PIP reimbursement, when in fact they were not.

509. Citimedical, Moshe, and R. Moshe intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to

130

pay charges submitted through Citimedical that were not compensable under the New York and New Jersey no-fault insurance laws.

510.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,000,000.00 pursuant to the fraudulent bills submitted by the Defendants through Citimedical.

511.   Moshe, R. Moshe, and Citimedical's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

512.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### TWENTY-NINTH CAUSE OF ACTION
**Against Citimed, Excel Surgery, Dynamic Surgery, Healthplus Surgery**
**(Aiding and Abetting Fraud)**

513.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

514.   As set forth herein, Citimed, Excel Surgery, Dynamic Surgery, and Healthplus Surgery knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Citimedical, Moshe, and R. Moshe.

515.   The conduct of Citimed, Excel Surgery, Dynamic Surgery, and Healthplus Surgery in furtherance of the fraudulent scheme was significant and material. The conduct of Citimed, Excel Surgery, Dynamic Surgery, and Healthplus Surgery was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would

have been no opportunity for Citimedical, Moshe, and R. Moshe to obtain payment from GEICO and from other insurers.

516.    Citimed, Excel Surgery, Dynamic Surgery, and Healthplus Surgery aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Citimedical for medically unnecessary, unlawful, or otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

517.    The conduct of Citimed, Excel Surgery, Dynamic Surgery, and Healthplus Surgery caused GEICO to pay more than $2,000,000.00 pursuant to the fraudulent bills submitted through Citimedical.

518.    Citimed, Excel Surgery, Dynamic Surgery, and Healthplus Surgery's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

519.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THIRTIETH CAUSE OF ACTION
### Against Citimedical, Moshe, R. Moshe, Citimed, Excel Surgery, Dynamic Surgery, and Healthplus Surgery
### (Unjust Enrichment)

520.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

521.    As set forth above, Citimedical, Moshe, R. Moshe, Citimed, Excel Surgery, Dynamic Surgery, and Healthplus Surgery have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

522.    When GEICO paid the bills and charges submitted by or on behalf of Citimedical for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Citimedical, Moshe, R. Moshe, Citimed, Excel Surgery, Dynamic Surgery, and Healthplus Surgery's improper, unlawful, and/or unjust acts.

523.    Citimedical, Moshe, R. Moshe, Citimed, Excel Surgery, Dynamic Surgery, and Healthplus Surgery have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Citimedical, Moshe, R. Moshe, Citimed, Excel Surgery, Dynamic Surgery, and Healthplus Surgery voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

524.    Citimedical, Moshe, R. Moshe, Citimed, Excel Surgery, Dynamic Surgery, and Healthplus Surgery's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

525.    By reason of the above, Citimedical, Moshe, R. Moshe, Citimed, Excel Surgery, Dynamic Surgery, and Healthplus Surgery have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $2,000,000.00.

## THIRTY-FIRST CAUSE OF ACTION
**Against Citimedical, Moshe, R. Moshe, Citimed, Excel Surgery, Dynamic Surgery, and Healthplus Surgery**
**(Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A.17:33A-1 et seq.))**

526.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

527.    In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibit "5", Defendants Citimedical, Moshe, R. Moshe, Citimed, Excel Surgery, Dynamic Surgery, and Healthplus

Surgery knowingly submitted or caused to be submitted bills and treatment reports through Citimedical to GEICO that were false and misleading in the following material respects:

(i)    The NF-3 forms, HCFA-1500 forms, bills, and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Defendants and Fraudulent Services were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, as set forth herein, the Defendants and Fraudulent Services were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were not eligible to receive PIP reimbursement.

(ii)    The NF-3 forms, HCFA-1500 forms, bills, and treatment reports frequently misrepresented to GEICO that the Fraudulent Services were medically necessary and eligible for PIP reimbursement, when in fact they were not.

(iii)    The NF-3 forms, HCFA-1500 forms, bills, and treatment reports submitted or caused to be submitted by the Defendants misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

528.    Citimedical, Moshe, R. Moshe, Citimed, Excel Surgery, Dynamic Surgery, and Healthplus Surgery's systematic violation of the New Jersey Insurance Fraud Prevention Act constitutes a "pattern" of violations under the Act. See N.J.S.A. 17:33-A-7. As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $2,000,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

### THIRTY-SECOND CAUSE OF ACTION
#### Against Moshe and R. Moshe
#### (Violation of RICO, 18 U.S.C. § 1962(c))

529.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

530.   Citimed is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

531.   Moshe and R. Moshe knowingly conducted and/or participated, directly or indirectly, in the conduct of Citimed's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than three years seeking payments that Citimed was not entitled to receive under the New York or New Jersey no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) Citimed was not in compliance with all significant statutory and regulatory requirements governing healthcare practice and/or licensing laws; and (iv) the Fraudulent Services were not provided in compliance with all significant statutory and regulatory requirements governing healthcare practice. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6".

532.   Citimed's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Moshe and R. Moshe have operated Citimed, inasmuch as Citimed is not engaged in a legitimate medical business, and acts of mail fraud therefore are essential in order for Citimed to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that

the Defendants continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Citimed to the present day.

533.    Citimed is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Citimed in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

534.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,500,000.00 pursuant to the fraudulent bills submitted through Citimed.

535.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THIRTY-THIRD CAUSE OF ACTION
**Against Moshe, R. Moshe, Citimedical, Dynamic Surgery, and Healthplus Surgery**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

536.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

537.    Citimed is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

538.    Moshe, R. Moshe, Citimedical, Dynamic Surgery, and Healthplus Surgery are employed by and/or associated with the Citimed enterprise.

539.    Moshe, R. Moshe, Citimedical, Dynamic Surgery, and Healthplus Surgery knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Citimed enterprise's affairs, through a pattern of racketeering

activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than three years seeking payments that Citimed was not entitled to receive under the New York or New Jersey no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) Citimed was not in compliance with all significant statutory and regulatory requirements governing healthcare practice and/or licensing laws; and (iv) the Fraudulent Services were not provided in compliance with all significant statutory and regulatory requirements governing healthcare practice. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6". Each such mailing was made in furtherance of the mail fraud scheme.

540.    Moshe, R. Moshe, Citimedical, Dynamic Surgery, and Healthplus Surgery knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

541.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,500,000.00 pursuant to the fraudulent bills submitted through Citimed.

542.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRTY-FOURTH CAUSE OF ACTION
### Against Citimed, Moshe, and R. Moshe
### (Common Law Fraud)

543.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

544.    Citimed, Moshe, and R. Moshe intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges through Citimed seeking payment for the Fraudulent Services.

545.    The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)     In every claim, the representation that Citimed and the Fraudulent Services were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, as set forth herein, Citimed and the Fraudulent Services were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were not eligible to receive PIP reimbursement.

(ii)    In many claims, the representation that the Fraudulent Services were medically necessary and eligible for PIP reimbursement, when in fact they were not.

546.    Citimed, Moshe, and R. Moshe intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Citimed that were not compensable under the New York and New Jersey no-fault insurance laws.

547.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,500,000.00 pursuant to the fraudulent bills submitted by the Defendants through Citimed.

548.   Moshe, R. Moshe, and Citimed's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

549.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THIRTY-FIFTH CAUSE OF ACTION
**Against Citimedical, Dynamic Surgery, and Healthplus Surgery**
**(Aiding and Abetting Fraud)**

550.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

551.   As set forth herein, Citimedical, Dynamic Surgery, and Healthplus Surgery knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Citimed, Moshe, and R. Moshe.

552.   The conduct of Citimedical, Dynamic Surgery, and Healthplus Surgery in furtherance of the fraudulent scheme was significant and material.  The conduct of Citimed, Excel Surgery, Dynamic Surgery, and Healthplus Surgery was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Citimed, Moshe, and R. Moshe to obtain payment from GEICO and from other insurers.

553.   Citimedical, Dynamic Surgery, and Healthplus Surgery aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Citimed for medically unnecessary, unlawful, or otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

554.    The conduct of Citimed, Excel Surgery, Dynamic Surgery, and Healthplus Surgery caused GEICO to pay more than $1,500,000.00 pursuant to the fraudulent bills submitted through Citimed.

555.    Citimedical, Dynamic Surgery, and Healthplus Surgery's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

556.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THIRTY-SIXTH CAUSE OF ACTION
### Against Citimed, Moshe, R. Moshe, Citimedical, Dynamic Surgery, and Healthplus Surgery
### (Unjust Enrichment)

557.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

558.    As set forth above, Citimed, Moshe, R. Moshe, Citimedical, Dynamic Surgery, and Healthplus Surgery have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

559.    When GEICO paid the bills and charges submitted by or on behalf of Citimed for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Citimed, Moshe, R. Moshe, Citimedical, Dynamic Surgery, and Healthplus Surgery's improper, unlawful, and/or unjust acts.

560.    Citimed, Moshe, R. Moshe, Citimedical, Dynamic Surgery, and Healthplus Surgery have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Citimed, Moshe, R. Moshe, Citimedical, Dynamic Surgery, and Healthplus Surgery

140

voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

561.    Citimed, Moshe, R. Moshe, Citimedical, Dynamic Surgery, and Healthplus Surgery's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

562.    By reason of the above, Citimed, Moshe, R. Moshe, Citimedical, Dynamic Surgery, and Healthplus Surgery have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $1,500,000.00.

### THIRTY-SEVENTH CAUSE OF ACTION
**Against Citimed, Moshe, R. Moshe, Citimedical, Dynamic Surgery, and Healthplus Surgery**
**(Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A. 17:33A-1 et seq.))**

563.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

564.    In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibit "6", Defendants Citimed, Moshe, R. Moshe, Citimedical, Dynamic Surgery, and Healthplus Surgery knowingly submitted or caused to be submitted bills and treatment reports through Citimed to GEICO that were false and misleading in the following material respects:

(i)     The NF-3 forms, HCFA-1500 forms, bills, and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Defendants and Fraudulent Services were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, as set forth herein, the Defendants and Fraudulent Services were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were not eligible to receive PIP reimbursement.

(ii)  The NF-3 forms, HCFA-1500 forms, bills, and treatment reports frequently misrepresented to GEICO that the Fraudulent Services were medically necessary and eligible for PIP reimbursement, when in fact they were not.

(iii)  The NF-3 forms, HCFA-1500 forms, bills, and treatment reports submitted or caused to be submitted by the Defendants misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

565.  Citimed, Moshe, R. Moshe, Citimedical, Dynamic Surgery, and Healthplus Surgery's systematic violation of the New Jersey Insurance Fraud Prevention Act constitutes a "pattern" of violations under the Act.  See N.J.S.A. 17:33-A-7.  As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $1,500,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

### THIRTY-EIGHTH CAUSE OF ACTION
**Against Shapiro**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

566.  GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

567.  Neurological Diagnostics is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

568.  Shapiro knowingly conducted and/or participated, directly or indirectly, in the conduct of Neurological Diagnostics' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than five years seeking payments that Neurological Diagnostics was

not entitled to receive under the New York or New Jersey no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) Neurological Diagnostics was not in compliance with all significant statutory and regulatory requirements governing healthcare practice and/or licensing laws; and (iv) the Fraudulent Services were not provided in compliance with all significant statutory and regulatory requirements governing healthcare practice. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "7".

569.    Neurological Diagnostics' business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Shapiro has operated Neurological Diagnostics, inasmuch as Neurological Diagnostics is not engaged in a legitimate medical business, and acts of mail fraud therefore are essential in order for Neurological Diagnostics to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Neurological Diagnostics to the present day.

570.    Neurological Diagnostics is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Neurological Diagnostics in pursuit of

inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

571.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,000,000.00 pursuant to the fraudulent bills submitted through Neurological Diagnostics.

572.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRTY-NINTH CAUSE OF ACTION
### Against Shapiro, Moshe, Excel Surgery, Dynamic Surgery, and Healthplus Surgery
### (Violation of RICO, 18 U.S.C. § 1962(d))

573.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

574.    Neurological Diagnostics is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

575.    Shapiro, Moshe, Excel Surgery, Dynamic Surgery, and Healthplus Surgery are employed by and/or associated with the Neurological Diagnostics enterprise.

576.    Shapiro, Moshe, Excel Surgery, Dynamic Surgery, and Healthplus Surgery knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Neurological Diagnostics enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than five years seeking payments that Neurological Diagnostics was not entitled to receive under the New York or New Jersey no-

fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) Neurological Diagnostics was not in compliance with all significant statutory and regulatory requirements governing healthcare practice and/or licensing laws; and (iv) the Fraudulent Services were not provided in compliance with all significant statutory and regulatory requirements governing healthcare practice. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "7". Each such mailing was made in furtherance of the mail fraud scheme.

577.    Shapiro, Moshe, Excel Surgery, Dynamic Surgery, and Healthplus Surgery knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

578.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,000,000.00 pursuant to the fraudulent bills submitted through Neurological Diagnostics.

579.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**FORTIETH CAUSE OF ACTION**
**Against Neurological Diagnostics and Shapiro**
**(Common Law Fraud)**

580.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

581.   Neurological Diagnostics and Shapiro intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges through Neurological Diagnostics seeking payment for the Fraudulent Services.

582.   The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)   In every claim, the representation that Neurological Diagnostics and the Fraudulent Services were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, as set forth herein, Neurological Diagnostics and the Fraudulent Services were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were not eligible to receive PIP reimbursement.

(ii)   In many claims, the representation that the Fraudulent Services were medically necessary and eligible for PIP reimbursement, when in fact they were not.

583.   Neurological Diagnostics and Shapiro intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Neurological Diagnostics that were not compensable under the New York and New Jersey no-fault insurance laws.

584.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,000,000.00 pursuant to the fraudulent bills submitted by the Defendants through Neurological Diagnostics.

585.   Neurological Diagnostics and Shapiro's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

586.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FORTY-FIRST CAUSE OF ACTION
### Against Moshe, Excel Surgery, Dynamic Surgery, and Healthplus Surgery
### (Aiding and Abetting Fraud)

587.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

588.   As set forth herein, Moshe, Excel Surgery, Dynamic Surgery, and Healthplus Surgery knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Neurological Diagnostics and Shapiro.

589.   The conduct of Moshe, Excel Surgery, Dynamic Surgery, and Healthplus Surgery in furtherance of the fraudulent scheme was significant and material.  The conduct of Moshe, Excel Surgery, Dynamic Surgery, and Healthplus Surgery was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Neurological Diagnostics and Shapiro to obtain payment from GEICO and from other insurers.

590.   Moshe, Excel Surgery, Dynamic Surgery, and Healthplus Surgery aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Neurological Diagnostics for medically unnecessary, unlawful, or otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

147

591.   The conduct of Moshe, Excel Surgery, Dynamic Surgery, and Healthplus Surgery caused GEICO to pay more than $1,000,000.00 pursuant to the fraudulent bills submitted through Neurological Diagnostics.

592.   Moshe, Excel Surgery, Dynamic Surgery, and Healthplus Surgery's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

593.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FORTY-SECOND CAUSE OF ACTION
**Against Neurological Diagnostics, Shapiro, Moshe, Excel Surgery, Dynamic Surgery, and Healthplus Surgery**
**(Unjust Enrichment)**

594.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

595.   As set forth above, Neurological Diagnostics, Shapiro, Moshe, Excel Surgery, Dynamic Surgery, and Healthplus Surgery have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

596.   When GEICO paid the bills and charges submitted by or on behalf of Neurological Diagnostics for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Neurological Diagnostics, Shapiro, Moshe, Excel Surgery, Dynamic Surgery, and Healthplus Surgery's improper, unlawful, and/or unjust acts.

597.   Neurological Diagnostics, Shapiro, Moshe, Excel Surgery, Dynamic Surgery, and Healthplus Surgery have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Neurological Diagnostics, Shapiro, Moshe, Excel Surgery, Dynamic

148

Surgery, and Healthplus Surgery voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

598.   Neurological Diagnostics, Shapiro, Moshe, Excel Surgery, Dynamic Surgery, and Healthplus Surgery's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

599.   By reason of the above, Neurological Diagnostics, Shapiro, Moshe, Excel Surgery, Dynamic Surgery, and Healthplus Surgery have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $1,000,000.00.

## FORTY-THIRD CAUSE OF ACTION
### Against Neurological Diagnostics, Shapiro, Moshe, Excel Surgery, Dynamic Surgery, and Healthplus Surgery
### (Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A. 17:33A-1 et seq.))

600.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

601.   In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibit "7", Defendants Neurological Diagnostics, Shapiro, Moshe, Excel Surgery, Dynamic Surgery, and Healthplus Surgery knowingly submitted or caused to be submitted bills and treatment reports through Neurological Diagnostics to GEICO that were false and misleading in the following material respects:

    (i)    The NF-3 forms, HCFA-1500 forms, bills, and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Defendants and Fraudulent Services were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, as set forth herein, the Defendants and Fraudulent Services were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were not eligible to receive PIP reimbursement.

(ii)  The NF-3 forms, HCFA-1500 forms, bills, and treatment reports frequently misrepresented to GEICO that the Fraudulent Services were medically necessary and eligible for PIP reimbursement, when in fact they were not.

(iii)  The NF-3 forms, HCFA-1500 forms, bills, and treatment reports submitted or caused to be submitted by the Defendants misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

602.  Neurological Diagnostics, Shapiro, Moshe, Excel Surgery, Dynamic Surgery, and Healthplus Surgery's systematic violation of the New Jersey Insurance Fraud Prevention Act constitutes a "pattern" of violations under the Act.  See N.J.S.A. 17:33-A-7.  As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $1,000,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

## FORTY-FOURTH CAUSE OF ACTION
### Against Moshe, Shapiro, and Kifaieh
### (Violation of RICO, 18 U.S.C. § 1962(c))

603.  GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

604.  Premier Anesthesia is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

605.  Moshe, Shapiro, and Kifaieh knowingly conducted and/or participated, directly or indirectly, in the conduct of Premier Anesthesia' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than two years seeking payments that Premier Anesthesia

150

was not entitled to receive under the New York or New Jersey no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) Premier Anesthesia was not in compliance with all significant statutory and regulatory requirements governing healthcare practice and/or licensing laws; and (iv) the Fraudulent Services were not provided in compliance with all significant statutory and regulatory requirements governing healthcare practice. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "8".

606.   Premier Anesthesia' business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Moshe, Shapiro, and Kifaieh have operated Premier Anesthesia, inasmuch as Premier Anesthesia is not engaged in a legitimate medical business, and acts of mail fraud therefore are essential in order for Premier Anesthesia to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Premier Anesthesia to the present day.

607.   Premier Anesthesia is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Premier Anesthesia in pursuit of inherently

unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

608.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $350,000.00 pursuant to the fraudulent bills submitted through Premier Anesthesia.

609.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### FORTY-FIFTH CAUSE OF ACTION
**Against Moshe, Shapiro, Kifaieh, Dynamic Surgery, Healthplus Surgery, and Hudson Regional**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

610.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

611.    Premier Anesthesia is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

612.    Moshe, Shapiro, Kifaieh, Dynamic Surgery, Healthplus Surgery, and Hudson Regional are employed by and/or associated with the Premier Anesthesia enterprise.

613.    Moshe, Shapiro, Kifaieh, Dynamic Surgery, Healthplus Surgery, and Hudson Regional knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Premier Anesthesia enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than two years seeking payments that Premier Anesthesia was not entitled to receive under the New York or New Jersey no-fault

insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) Premier Anesthesia was not in compliance with all significant statutory and regulatory requirements governing healthcare practice and/or licensing laws; and (iv) the Fraudulent Services were not provided in compliance with all significant statutory and regulatory requirements governing healthcare practice. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "8". Each such mailing was made in furtherance of the mail fraud scheme.

614.    Moshe, Shapiro, Kifaieh, Dynamic Surgery, Healthplus Surgery, and Hudson Regional knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

615.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $350,000.00 pursuant to the fraudulent bills submitted through Premier Anesthesia.

616.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FORTY-SIXTH CAUSE OF ACTION
### Against Premier Anesthesia, Moshe, Shapiro, and Kifaieh
### (Common Law Fraud)

153

617.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

618.    Premier Anesthesia, Moshe, Shapiro, and Kifaieh intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges through Premier Anesthesia seeking payment for the Fraudulent Services.

619.    The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)     In every claim, the representation that Premier Anesthesia and the Fraudulent Services were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, as set forth herein, Premier Anesthesia and the Fraudulent Services were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were not eligible to receive PIP reimbursement.

(ii)    In many claims, the representation that the Fraudulent Services were medically necessary and eligible for PIP reimbursement, when in fact they were not.

620.    Premier Anesthesia, Moshe, Shapiro, and Kifaieh intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Premier Anesthesia that were not compensable under the New York and New Jersey no-fault insurance laws.

621.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $350,000.00 pursuant to the fraudulent bills submitted by the Defendants through Premier Anesthesia.

622.    Premier Anesthesia, Moshe, Shapiro, and Kifaieh's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

623.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### FORTY-SEVENTH CAUSE OF ACTION
**Against Dynamic Surgery, Healthplus Surgery, and Hudson Regional**
**(Aiding and Abetting Fraud)**

624.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

625.    As set forth herein, Dynamic Surgery, Healthplus Surgery, and Hudson Regional knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Premier Anesthesia, Moshe, Shapiro, and Kifaieh.

626.    The conduct of Dynamic Surgery, Healthplus Surgery, and Hudson Regional in furtherance of the fraudulent scheme was significant and material.  The conduct of Dynamic Surgery, Healthplus Surgery, and Hudson Regional was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Premier Anesthesia, Moshe, Shapiro, and Kifaieh to obtain payment from GEICO and from other insurers.

627.    Dynamic Surgery, Healthplus Surgery, and Hudson Regional aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Premier Anesthesia for medically unnecessary, unlawful, or otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

628.    The conduct of Dynamic Surgery, Healthplus Surgery, and Hudson Regional caused GEICO to pay more than $350,000.00 pursuant to the fraudulent bills submitted through Premier Anesthesia.

629.    Dynamic Surgery, Healthplus Surgery, and Hudson Regional's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

630.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FORTY-EIGHTH CAUSE OF ACTION**
**Against Premier Anesthesia, Moshe, Shapiro, Kifaieh, Dynamic Surgery, Healthplus**
**Surgery, and Hudson Regional**
**(Unjust Enrichment)**

631.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

632.    As set forth above, Premier Anesthesia, Moshe, Shapiro, Kifaieh, Dynamic Surgery, Healthplus Surgery, and Hudson Regional have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

633.    When GEICO paid the bills and charges submitted by or on behalf of Premier Anesthesia for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Premier Anesthesia, Moshe, Shapiro, Kifaieh, Dynamic Surgery, Healthplus Surgery, and Hudson Regional's improper, unlawful, and/or unjust acts.

634.    Premier Anesthesia, Moshe, Shapiro, Kifaieh, Dynamic Surgery, Healthplus Surgery, and Hudson Regional have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Premier Anesthesia, Moshe, Shapiro, Kifaieh, Dynamic Surgery,

156

Healthplus Surgery, and Hudson Regional voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

635.    Premier Anesthesia, Moshe, Shapiro, Kifaieh, Dynamic Surgery, Healthplus Surgery, and Hudson Regional's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

636.    By reason of the above, Premier Anesthesia, Moshe, Shapiro, Kifaieh, Dynamic Surgery, Healthplus Surgery, and Hudson Regional have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $350,000.00.

**FORTY-NINTH CAUSE OF ACTION**
**Against Premier Anesthesia, Moshe, Shapiro, Kifaieh, Dynamic Surgery, Healthplus Surgery, and Hudson Regional**
**(Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A.17:33A-1 et seq.))**

637.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 339 above.

638.    In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibit "8", Defendants Premier Anesthesia, Moshe, Shapiro, Kifaieh, Dynamic Surgery, Healthplus Surgery, and Hudson Regional knowingly submitted or caused to be submitted bills and treatment reports through Premier Anesthesia to GEICO that were false and misleading in the following material respects:

(i)     The NF-3 forms, HCFA-1500 forms, bills, and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Defendants and Fraudulent Services were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, as set forth herein, the Defendants and Fraudulent Services were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were not eligible to receive PIP reimbursement.

(ii)     The NF-3 forms, HCFA-1500 forms, bills, and treatment reports frequently misrepresented to GEICO that the Fraudulent Services were medically necessary and eligible for PIP reimbursement, when in fact they were not.

(iii)    The NF-3 forms, HCFA-1500 forms, bills, and treatment reports submitted or caused to be submitted by the Defendants misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

639.    Premier Anesthesia, Moshe, Shapiro, Kifaieh, Dynamic Surgery, Healthplus Surgery, and Hudson Regional's systematic violation of the New Jersey Insurance Fraud Prevention Act constitutes a "pattern" of violations under the Act. See N.J.S.A. 17:33-A-7. As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $350,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

## JURY DEMAND

640.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.      On the First Cause of Action against the Entity Defendants, for a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Entity Defendants have no right to receive payment for any pending bills submitted to GEICO;

B. On the Second Cause of Action against Moshe, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $7,000,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C. On the Third Cause of Action against Moshe, R. Moshe, Citimedical, Citimed, Shapiro, and Neurological Diagnostics, for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $7,000,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D. On the Fourth Cause of Action against Excel Surgery and Moshe, for compensatory damages in an amount to be determined at trial but in excess of $7,000,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E. On the Fifth Cause of Action against R. Moshe, Citimedical, Citimed, Shapiro, and Neurological Diagnostics, for compensatory damages in an amount to be determined at trial but in excess of $7,000,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

F. On the Sixth Cause of Action against Excel Surgery, Moshe, R. Moshe, Citimedical, Citimed, Shapiro, and Neurological Diagnostics, for more than $7,000,000.00 in compensatory damages, plus costs, interest and such other and further relief as this Court deems just and proper;

G. On the Seventh Cause of Action against Excel Surgery, Moshe, R. Moshe, Citimedical, Citimed, Shapiro, and Neurological Diagnostics, for damages in the form of disgorgement of the PIP Benefits paid in an amount to be established at trial, but exceeding

159

$7,000,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7;

H.    On the Eighth Cause of Action against Moshe, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $2,500,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.    On the Ninth Cause of Action against Moshe, R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh, for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $2,500,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

J.    On the Tenth Cause of Action against Dynamic Surgery and Moshe, for compensatory damages in an amount to be determined at trial but in excess of $2,500,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

K.    On the Eleventh Cause of Action against R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh, for compensatory damages in an amount to be determined at trial but in excess of $2,500,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

L.    On the Twelfth Cause of Action against Dynamic Surgery, Moshe, R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh, for

more than $2,500,000.00 in compensatory damages, plus costs, interest and such other and further relief as this Court deems just and proper;

     M.     On the Thirteenth Cause of Action against Dynamic Surgery, Moshe, R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh, for damages in the form of disgorgement of the PIP Benefits paid in an amount to be established at trial, but exceeding $2,500,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7;

     N.     On the Fourteenth Cause of Action against Moshe, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $5,500,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

     O.     On the Fifteenth Cause of Action against Moshe, R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh, for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $5,500,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

     P.     On the Sixteenth Cause of Action against Healthplus Surgery and Moshe, for compensatory damages in an amount to be determined at trial but in excess of $5,500,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Q.     On the Seventeenth Cause of Action against R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh, for compensatory damages in an amount to be determined at trial but in excess of $5,500,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

R.     On the Eighteenth Cause of Action against Healthplus Surgery, Moshe, R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh, for more than $5,500,000.00 in compensatory damages, plus costs, interest and such other and further relief as this Court deems just and proper;

S.     On the Nineteenth Cause of Action against Healthplus Surgery, Moshe, R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh, for damages in the form of disgorgement of the PIP Benefits paid in an amount to be established at trial, but exceeding $5,500,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7;

T.     On the Twentieth Cause of Action against Moshe, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $6,000,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

U.     On the Twenty-First Cause of Action against Moshe, Shapiro, Premier Anesthesia, and Kifaieh, for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $6,000,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

V.     On the Twenty-Second Cause of Action against Hudson Regional and Moshe, for compensatory damages in an amount to be determined at trial but in excess of $6,000,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

W.     On the Twenty-Third Cause of Action against Shapiro, Premier Anesthesia, and Kifaieh, for compensatory damages in an amount to be determined at trial but in excess of $6,000,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

X.     On the Twenty-Fourth Cause of Action against Hudson Regional, Moshe, Shapiro, Premier Anesthesia, and Kifaieh, for more than $6,000,000.00 in compensatory damages, plus costs, interest and such other and further relief as this Court deems just and proper;

Y.     On the Twenty-Fifth Cause of Action against Healthplus Surgery, Moshe, R. Moshe, Citimedical, Citimed, Shapiro, Neurological Diagnostics, Premier Anesthesia, and Kifaieh, for damages in the form of disgorgement of the PIP Benefits paid in an amount to be established at trial, but exceeding $6,000,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7;

Z.     On the Twenty-Sixth Cause of Action against Moshe and R. Moshe, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $2,000,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

AA. On the Twenty-Seventh Cause of Action against Moshe, R. Moshe, Citimed, Excel Surgery, Dynamic Surgery, and Healthplus Surgery, for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $2,000,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

BB. On the Twenty-Eighth Cause of Action against Citimedical, Moshe, and R. Moshe, for compensatory damages in an amount to be determined at trial but in excess of $2,000,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

CC. On the Twenty-Ninth Cause of Action against Citimed, Excel Surgery, Dynamic Surgery, and Healthplus Surgery, for compensatory damages in an amount to be determined at trial but in excess of $2,000,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

DD. On the Thirtieth Cause of Action against Citimedical, Moshe, R. Moshe, Citimed, Excel Surgery, Dynamic Surgery, and Healthplus Surgery, for more than $2,000,000.00 in compensatory damages, plus costs, interest and such other and further relief as this Court deems just and proper;

EE. On the Thirty-First Cause of Action against Citimedical, Moshe, R. Moshe, Citimed, Excel Surgery, Dynamic Surgery, and Healthplus Surgery, for damages in the form of disgorgement of the PIP Benefits paid in an amount to be established at trial, but exceeding $2,000,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7;

FF.    On the Thirty-Second Cause of Action against Moshe and R. Moshe, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,500,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

GG.    On the Thirty-Third Cause of Action against Moshe, R. Moshe, Citimedical, Dynamic Surgery, and Healthplus Surgery, for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,500,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

HH.    On the Thirty-Fourth Cause of Action against Citimed, Moshe, and R. Moshe, for compensatory damages in an amount to be determined at trial but in excess of $1,500,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

II.    On the Thirty-Fifth Cause of Action against Citimedical, Dynamic Surgery, and Healthplus Surgery, for compensatory damages in an amount to be determined at trial but in excess of $1,500,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

JJ.    On the Thirty-Sixth Cause of Action against Citimed, Moshe, R. Moshe, Citimedical, Dynamic Surgery, and Healthplus Surgery, for more than $1,500,000.00 in compensatory damages, plus costs, interest and such other and further relief as this Court deems just and proper;

KK.    On the Thirty-Seventh Cause of Action against Citimed, Moshe, R. Moshe, Citimedical, Dynamic Surgery, and Healthplus Surgery, for damages in the form of disgorgement of the PIP Benefits paid in an amount to be established at trial, but exceeding

$1,500,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7;

LL.     On the Thirty-Eighth Cause of Action against Shapiro, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,000,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

MM.   On the Thirty-Ninth Cause of Action against Shapiro, Moshe, Excel Surgery, Dynamic Surgery, and Healthplus Surgery, for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,000,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

NN.     On the Fortieth Cause of Action against Neurological Diagnostics and Shapiro, for compensatory damages in an amount to be determined at trial but in excess of $1,000,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

OO.    On the Forty-First Cause of Action against Moshe, Excel Surgery, Dynamic Surgery, and Healthplus Surgery, for compensatory damages in an amount to be determined at trial but in excess of $1,000,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

PP.     On the Forty-Second Cause of Action against Neurological Diagnostics, Shapiro, Moshe, Excel Surgery, Dynamic Surgery, and Healthplus Surgery, for more than $1,000,000.00 in compensatory damages, plus costs, interest and such other and further relief as this Court deems just and proper;

QQ.    On the Forty-Third Cause of Action against Neurological Diagnostics, Shapiro, Moshe, Excel Surgery, Dynamic Surgery, and Healthplus Surgery, for damages in the form of disgorgement of the PIP Benefits paid in an amount to be established at trial, but exceeding $1,000,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7;

RR.    On the Forty-Fourth Cause of Action against Moshe, Shapiro, and Kifaieh, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $350,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

SS.    On the Forty-Fifth Cause of Action against Moshe, Shapiro, Kifaieh, Dynamic Surgery, Healthplus Surgery, and Hudson Regional, for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $350,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

TT.    On the Forty-Sixth Cause of Action against Premier Anesthesia, Moshe, Shapiro, and Kifaieh, for compensatory damages in an amount to be determined at trial but in excess of $350,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

UU.    On the Forty-Seventh Cause of Action against Dynamic Surgery, Healthplus Surgery, and Hudson Regional, for compensatory damages in an amount to be determined at trial but in excess of $350,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

VV.   On the Forty-Eighth Cause of Action against Premier Anesthesia, Moshe, Shapiro, Kifaieh, Dynamic Surgery, Healthplus Surgery, and Hudson Regional, for more than $350,000.00 in compensatory damages, plus costs, interest and such other and further relief as this Court deems just and proper; and

WW.   On the Forty-Ninth Cause of Action against Premier Anesthesia, Moshe, Shapiro, Kifaieh, Dynamic Surgery, Healthplus Surgery, and Hudson Regional, for damages in the form of disgorgement of the PIP Benefits paid in an amount to be established at trial, but exceeding $350,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7.

Dated: February 27, 2020

RIVKIN RADLER LLP

By:_____
Barry I. Levy (BL 2190)
Max Gershenoff (MG 4648)
926 RXR Plaza
Uniondale, New York  11556
(516) 357-3000
*Counsel for Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co, GEICO General Insurance Company and GEICO Casualty Co.*