## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| GOVERNMENT EMPLOYEES INSURANCE COMPANY, et al., | : : : : | |
| Plaintiffs, | : : | CIVIL ACTION No.: |
| v. | : : : | **1:20-cv-01098-FB-RER** |
| YAN MOSHE a/k/a YAN LEVIEV, et al., | : : : | |
| Defendants. | : : : : | |

---

## MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO STAY ARBITRATIONS

---

**BRACH EICHLER LLC**
101 Eisenhower Parkway
Roseland, New Jersey 07068-1067
(973) 228-5700
*Attorneys for Defendants Yan Moshe a/k/a Yan Leviev and NJMHMC LLC d/b/a Hudson Regional Hospital*

**MONTGOMERY MCCRACKEN WALKER & RHOADS LLP**
437 Madison Avenue
New York, New York
(212) 867-9500
*Attorneys for Defendants Yan Moshe a/k/a Yan Leviev, Hackensack Specialty ASC LLC f/k/a Dynamic Surgery Center, LLC, and Excel Surgery Center, LLC*

Of Counsel and on the Brief:
    Keith J. Roberts, Esq.
    Jeremy Mishkin, Esq.
    Robert E. O'Connor, Esq.

On the Brief:
    Shannon Carroll, Esq.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS ........................................................................................2

LEGAL ARGUMENT...............................................................................................7

    I.       STANDARD OF REVIEW ................................................................7

    II.      PLAINTIFF HAS FAILED TO ESTABLISH THE ELEMENTS OF A
           PRELIMINARY INJUNCTION BY A CLEAR SHOWING AS REQUIRED
           BY SECOND CIRCUIT PRECEDENT ..................................................8

        A.  Plaintiff Has Failed To Establish A Likelihood Of Success On The Merits, Or
           A Sufficiently Serious Question Going To The Merits, Because Its Motion
           Does Not Contain Any Actual Evidence Supporting Its Claims ............................9

        B.  The Balance Of Hardships Tips Decidedly In Favor Of Defendants ...................16

        C. Plaintiff Has Failed To Prove Irreparable Harm On This Threadbare Motion
           Record .................................................................................18

    III.     ANY RESTRAINT REQUIRES A BOND .........................................20

CONCLUSION.......................................................................................................21

BE:11087692.1/MOS106-278412

# TABLE OF AUTHORITIES

Page(s)

**Cases**

Allstate Ins. Co. v. Avetisyan,
  2018 WL 6344249 (E.D.N.Y. Oct. 30, 2018) ............................................................7, 18, 19

Allstate Ins. Co. v. Harvey Family Chiropractic,
  677 F. App'x 716 (2d Cir. 2017) ...................................................................................18, 19

Allstate Insurance Company v. Elzanaty,
  2011 WL 3539562 (E.D.N.Y. Aug. 11, 2011) ......................................................................15

Allstate Insurance Company v. Elzanaty,
  929 F.Supp. 2d 199 (E.D.N.Y. 2013) ...................................................................................15

Bascom Food Products Corp. v. Reese Finer Foods, Inc.,
  715 F. Supp. 616 (D.N.J. 1989) ..............................................................................................7

Brenntag Int'l Chems., Inc. v. Bank of India,
  175 F.3d 245 (2d Cir. 1999).................................................................................................16

Chandler v. Graham,
  2016 WL 4411407 (N.D.N.Y. Aug. 19, 2016) .......................................................................7

Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.,
  598 F.3d 30 (2d Cir. 2010).....................................................................................................9

Faiveley Transp. Malmo AB v. Wabtec Corp.,
  559 F.3d 110 (2d Cir. 2009)..................................................................................................18

GEICO v. Grand Med. 11 Supply, Inc.,
  No. 11 Civ. 5339, 2012 WL 2577577 (E.D.N.Y. July 4, 2012) ...........................................19

GEICO v. Strut,
  No. 19-CV-728 (JLS), 2020 WL 1820500 (W.D.N.Y. Apr. 10, 2020) ......................13, 14, 20

Government Employees Insurance Co. v. New Hyde Park Imaging, P.C.,
  Case No. 11 Civ. 01166 (E.D.N.Y. Apr. 27, 2011) ..............................................................10

Government Employees Insurance Company v. Cean,
  2019 WL 6253804 (E.D.N.Y. Nov. 22, 2019).......................................................................14

Government Employees Insurance Company v. Cean,
  Case No. 1:19-cv-02363 (E.D.N.Y.), Docket .......................................................................14

BE:11087692.1/MOS106-278412

Government Employees Insurance Company v. Damien,
    2010 WL 4822635 (E.D.N.Y. Nov. 11, 2010) ..........................................................................15

Government Employees Insurance Company v. Damien,
    Case No. 10-cv-5409 (E.D.N.Y.), Docket .............................................................................15

Government Employees Insurance Company v. Mayzenberg,
    2018 WL 6031156 (E.D.N.Y. Nov. 16, 2018) ........................................................................13

Government Employees Insurance Company v. Mayzenberg,
    Case No. 1:17-cv-02802 (E.D.N.Y.), Docket ........................................................................13

Government Employees Insurance Company v. Sheepshead Bay Medical Supply,
    Inc.,
    Case No. 18-cv-04039 (E.D.N.Y) ...................................................................................14, 15

Government Employees Insurance Company v. Strut,
    2019 WL 6338023 (W.D.N.Y. Nov. 26, 2011) .................................................................13, 14

Government Employees Insurance Company v. Strutsovskiy,
    2017 WL 4837584 (W.D.N.Y. Oct. 26, 2017) .................................................................13, 14

Government Employees Insurance Company v. Wellmart Rx, Inc.,
    2020 WL 249020 (E.D.N.Y. Jan. 16, 2020) ..........................................................................12

Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.,
    596 F.2d 70 (2d Cir. 1979) ......................................................................................................9

Jayaraj v. Scappini,
    66 F.3d 36 (2d Cir. 1995) ......................................................................................................18

Liberty Mutual Insurance Company v. Excel Imaging, P.C.,
    879 F. Supp.2d 243 (E.D.N.Y. 2012) ...................................................................................14

Liberty Mutual Insurance Company v. Excel Imaging, P.C.,
    Case No. 1:11-cv-05780 (E.D.N.Y.), Docket .......................................................................15

Moore v. Consol. Edison Co. of N.Y., Inc.,
    409 F.3d 506 (2d Cir. 2005) ....................................................................................................7

Renegotiation Bd. v. Bannercraft Clothing Co.,
    415 U.S. 1 (1974) ..................................................................................................................18

Societe Comptoir De L'Industrie Cotonniere, Etablissements Boussac v.
    Alexander's Dep't Stores, Inc.,
    190 F. Supp. 594 (S.D.N.Y. 1961), affd, 299 F.2d 33 (2d Cir. 1962) ...............................8, 9

BE:11087692.1/MOS106-278412

State Farm Mutual Automobile Insurance Company v. Parisien,
    352 F.Supp. 3d 215 (E.D.N.Y. 2018) ......................................................................................15

State Farm Mutual Automobile Insurance Company v. Parisien,
    Case No. 1:18-cv-00289 (E.D.N.Y.), Docket ...........................................................................15

Sussman v. Crawford,
    488 F.3d 136 (2d Cir. 2007)....................................................................................................7

T-Mobile Ne. LLC v. Water Auth. of W. Nassau Cty.,
    249 F. Supp. 3d 680 (E.D.N.Y. 2017) .............................................................................7, 19

**Statutes**

Federal Arbitration Act ..................................................................................................................19

**Other Authorities**

Fifth Amendment ...........................................................................................................................13
Federal Rule of Civil Procedure 65(c) ..........................................................................................19
Notice of Dismissal, Docket No. 14 ..............................................................................................10

BE:11087692.1/MOS106-278412

## PRELIMINARY STATEMENT

Historically, Plaintiff Government Employees Insurance Company and its affiliates (collectively, "Plaintiff" or "GEICO") have investigated their causes of action when pleading insurance fraud and presented some evidence when moving for a preliminary injunction.  Here, GEICO has produced nothing.  GEICO has not produced documents, expert opinions, or sworn testimony that corroborates the alleged fraud.  And that is because GEICO has no such evidence.

GEICO is taking a shot in the dark – relying upon opinion and speculation in support of an application for an injunction.  On the other hand, Defendants Yan Moshe a/k/a Yan Leviev ("Moshe"), NJMHMC LLC d/b/a Hudson Regional Hospital ("Hospital"), Hackensack Specialty ASC LLC f/k/a Dynamic Surgery Center, LLC ("Dynamic"), and Excel Surgery Center, LLC ("Excel")(collectively, "Defendants") have filed opposition containing ***actual proofs*** that thoroughly contest GEICO's pleading.  For example, Defendants have produced detailed declarations, billing reports and other materials demonstrating ***that GEICO's allegations are wrong***.

It is well settled that a preliminary injunction is a drastic remedy that requires the moving party make a "clear showing" that its proofs are sufficient.  On this motion record, however, Plaintiff's proofs fall short of demonstrating that such relief is appropriate at this early stage of the proceedings.

We submit that the Court should carefully scrutinize the prior cases in which Plaintiff successfully enjoined arbitration proceedings.  In the past, GEICO presented extensive evidence supporting the claims alleged, but GEICO has not made a similar showing here.

Importantly, a stay in this matter will not simply maintain the status quo.  Instead, it will cause Defendants serious and irreversible harm because GEICO will likely ***never have to pay*** Defendants for the services that they provided to GEICO insureds.  As months pass, the coverage

limits in the underlying insurance policies are exhausting. As a result, Defendants will lose the opportunity to collect any money from GEICO on these unpaid claims. GEICO knows this fact, and it explains why it prematurely filed such a threadbare motion. In reality, this early application for a preliminary injunction is a strong-armed tactic to try and get Defendants to resolve this case or risk losing the opportunity to collect on their outstanding bills. The Court should not allow it.

For these reasons, which are discussed in detail below, Plaintiff's motion must be denied in its entirety.

## STATEMENT OF FACTS

The relevant facts are set forth at length in the Declarations of Defendant Moshe, Christopher Dalton ("Dalton") and Olga Guzman ("Guzman"). The key facts are highlighted below.

1. Moshe is the majority owner of Defendants, Excel, Dynamic, HealthPlus, and Hospital (collectively, "Entity Defendants"). (Moshe Declaration at ¶1.)

2. In the regular course of business, the Entity Defendants provide necessary healthcare services to GEICO insureds. (Id. at ¶4.)

### Excel Surgery Center

3. Excel was an ambulatory surgery center ("ASC") located in Hackensack, New Jersey, which was accredited by the Accreditation Association for Ambulator Health Care ("AAAHC"). (Id. at ¶5.)

4. Beginning in 2012, the medical director of Excel was Navrajan Kukreja, M.D. ("Dr. Kukreja"). Dr. Kukreja was an active medical director, who was on site at Excel approximately 40 hours per week. Indeed, a billing report demonstrates that Dr. Kukreja provided anesthesia for nearly 680 procedures during his two years at Excel for GEICO insureds alone. (Id. at ¶6.)

5. In early 2014, Dr. Kukreja's contract was set to expire and the parties decided not to renew it. (<u>Id.</u> at ¶7.)

6. GEICO claims that Dr. Kukreja was serving as the medical director of Excel when his license to Practice medicine was suspended. (ECF 1 at 25.) This is false. Dr. Krukeja agreed to a voluntary suspension in December 2015. (<u>Id.</u>) Yet, Dr. Kukreja left Excel nearly two years prior to his voluntary license suspension. (Moshe Declaration at ¶7.) At this point, Dr. Kukreja left Excel well over six years ago.

7. On February 1, 2014, Leonid Shapiro, M.D. took over as the medical director and director of anesthesia services at Excel pursuant to a written agreement. (<u>Id.</u> at ¶8.) For a few months during the transition between medical directors, Dr. Kukreja remained employed part-time basis to ensure a smooth transition. (<u>Id.</u>)

8. Dr. Shapiro was an active medical director and anesthesia provider at Excel. In fact, billing reports indicate that Dr. Shapiro spent approximately 40 hours per week at Excel. In truth, Dr. Shapiro provided anesthesia for approximately 2,322 cases while serving as medical director for GEICO insureds alone. (**Exhibit A** to Guzman Declaration.)

9. Excel was never cited for violations of serious qualifying regulations, despite GEICO's baseless claims to the contrary. (Moshe Declaration at ¶10.) In the ordinary course of business, Excel was inspected by the Department of Health ("DOH"). (<u>Id.</u>) Any issues raised on inspection were immediately addressed through an appropriate plan of correction ("POC"). (<u>Id.</u>) This is standard in this industry. (<u>Id.</u>)

## Dynamic Surgery Center

10.     In or around December 2016, Excel ceased to perform billable services.  (Id. at ¶11.)  In January 2017, Excel was reorganized and a new entity, Dynamic, began to operate at that location with a new business model.

11.     Dynamic is a licensed ASC, that is accredited by the AAAHC. (Id. at ¶12.)

12.     Dr. Shapiro began to serve as the medical director for Dynamic Surgery Center, just as he had at Excel.  (Id. at ¶13.)

13.     Dynamic was never cited for violations of serious qualifying regulations, despite GEICO's baseless claims to the contrary. (Id. at ¶14.)  In the ordinary course of business, Dynamic was inspected by the DOH and any issued raised where addressed through an appropriate POC. (Id.)

## HealthPlus Surgery Center, LLC

14.     In 2016, Dr. Shapiro began to serve as the medical director of HealthPlus pursuant to a written employment agreement.  At that time, Dr. Shapiro split his time between Dynamic and HealthPlus.  (Id. at ¶15.)

15.     Dr. Shapiro's compensation was limited to the work he performed as the active medical director of different ambulatory surgery centers over time. Records demonstrate his presence on site at each facility. (Id.)

16.     In September 2018, HealthPlus was temporarily closed due to a site inspection during the implementation of a POC.  (Id. at ¶16.)  The DOH raised an issue with sterilization practices at HealthPlus.  (Id.)  The plan of correction was extensive and required approximately two weeks to implement.

-4-

17.     The sterilizing infractions were reviewed by Harry Hull, M.D., a physician epidemiologist with 40 years of experience in infectious disease control, who found no real risk of harm to patients. (Id. at ¶17.)

18.     Dr. Hull's work includes service as an epidemic intelligence officer and a consulting medical epidemiologist for the Centers for Disease Control and a senior advisor and medical officer for the World Health Organization.  Dr. Hull obtained his undergraduate and medical degree from Johns Hopkins University. (Id. at **Exhibit D**.)

**Claims about Citimedical**

19.     Citimedical or Citimed (collectively, "Citimed Practices") are medical practices solely owned by Regina Moshe, M.D., Moshe's sister.  (Id. at ¶18.)

20.     Moshe does not own or control the Citimed Practices and has not invested in the practices.  (Id.)

21.     Any patient that was referred to Excel, Dynamic, HealthPlus, or the Hospital from a Citimed Practice received an appropriate ownership disclosure form.  (Id. at **Exhibit F**.)

**Anesthesia Services**

22.     When Moshe purchased the assets of Meadowlands Hospital on December 29, 2017, Dr. Shapiro's company, Premier Anesthesia, had a contract for anesthesia services with the hospital.  (Id. at ¶21.)

23.     As a result, Moshe tried to negotiate with Dr. Shapiro to provide anesthesia services for the Hospital.  (Id.)  Given the volume of services needed, Dr. Shapiro provided a quote for anesthesia services that seemed very excessive.  (Id.)  In response, Hospital employees received quotes from other anesthesia providers that were also very significant – between $2.5 million and $4 million a year.  (Id.)  This would be a huge line item for this community hospital.  (Id.)

BE:11087692.1/MOS106-278412

24.     During this time, Dr. Nazair decided to purchase Dr. Shapiro's practice, Premier Anesthesia.  (Id. at ¶22.)

25.     Moshe then negotiated with Dr. Nazair to provide anesthesia services for the Hospital.  (Id. at ¶23.)  Dr. Nazair offered the Hospital a fair and reasonable agreement for anesthesia services.

26.     As part of the agreement, the Hospital agreed to provide administrative support for billing and collection services for anesthesia.  (Id.)  This made sense because anesthesia services are not lucrative.  By providing billing and collection services, the Hospital was able to keep Premier's costs down and maintain reasonable anesthesia costs.

27.     Moshe never had any control over the operations of Premier Anesthesia.  (Id. at ¶24.)  All of the clinical anesthesia operations were controlled by Dr. Nazair.

**Pending Arbitrations**

28.     Importantly, the Hospital is required to treat Plaintiff's insureds, many of whom originate through the emergency room.  (Id. at ¶26.)  Hospital time and resources have already been spent on the treatment of GEICO insureds. (Id.)

29.     If Plaintiff obtains a stay of the pending arbitrations, the Hospital must continue to service these insureds at great expense to the Hospital without any ability to receive payment for the services.  (Id. at ¶27.)  This would be devastating for this community hospital.  (Id.)

30.     In addition, in attempting to collect from auto insurance carriers, like GEICO, time is of the essence.  (Id. at ¶28.)  Each of the underlying insureds who received treatment from the Defendants have policies that contain a no-fault insurance limits.  (Guzman Declaration and Dalton Declaration.)

31.     When that policy is exhausted, GEICO will no longer have to pay the Defendants for its services.  (Id.)  Given that many policy limits are quite low in comparison to the treatment required, the policies can be exhausted very quickly.  (Id.)  As a result, providers must prosecute their claims for reimbursement expeditiously.  (Id.)

32.     Crucially, if the arbitrations are put on hold for months to a year, it is very likely that the Hospital will never receive payment for the services it provided.  (Id.)

## LEGAL ARGUMENT

## I.     STANDARD OF REVIEW

GEICO seeks extreme relief.  Therefore, prior to barring medical providers from seeking payment for services rendered, courts in this district apply the well-settled standard for a preliminary injunction when addressing an insurer's request to stay and enjoin no-fault insurance collection arbitrations.  See Allstate Ins. Co. v. Avetisyan,  2018 WL 6344249, at *1 (E.D.N.Y. Oct. 30, 2018) (denying motion to stay and preliminary injunction based on insufficient proofs). And this burden is a heavy one.

Plainly, "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a ***clear showing***, carries the burden of persuasion." Sussman v. Crawford, 488 F.3d 136, 139 (2d Cir. 2007) (internal quotations omitted) (emphasis in original). Here, to obtain extraordinary relief, the moving party must establish all of the following elements: (1) irreparable harm absent the requested injunctive relief; and (2) either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and that the balance of hardships tips decidedly in favor of the moving party.  Moore v. Consol. Edison Co. of N.Y., Inc., 409 F.3d 506, 510 (2d Cir. 2005).  GEICO simply presents a pleading, without objective support, and is unable to meet the required elements in this case.

BE:11087692.1/MOS106-278412

Crucially, the Second Circuit courts have repeatedly held that as "support for a preliminary injunction the court can consider only facts presented by affidavit or testimony and cannot consider facts provable under the modern liberal interpretation of the complaint but which have not been proved." Societe Comptoir De L'Industrie Cotonniere, Etablissements Boussac v. Alexander's Dep't Stores, Inc., 190 F. Supp. 594, 601–02 (S.D.N.Y. 1961), affd, 299 F.2d 33 (2d Cir. 1962); see, e.g., T-Mobile Ne. LLC v. Water Auth. of W. Nassau Cty., 249 F. Supp. 3d 680, 684 (E.D.N.Y. 2017) (rejecting application where there was no evidence to support allegations); Chandler v. Graham, 2016 WL 4411407, at *2 (N.D.N.Y. Aug. 19, 2016) (noting motion must be supported by admissible evidence); accord Bascom Food Products Corp. v. Reese Finer Foods, Inc., 715 F. Supp. 616, 624 n.14 (D.N.J. 1989) ("It has always been the rule that the movant bears the burden of persuasion to establish that the situation meets the standard for a preliminary injunction, and must offer proof beyond the unverified allegations of the pleadings").

It is this clear rule of law that is fatal to GEICO's application for injunctive relief, based upon the inadequate record before the Court.

## II.     PLAINTIFF HAS FAILED TO ESTABLISH THE ELEMENTS OF A PRELIMINARY INJUNCTION BY A CLEAR SHOWING AS REQUIRED BY SECOND CIRCUIT PRECEDENT

Objectively, Plaintiff fails to make a "clear showing" that a stay and injunction are warranted here – despite projecting overconfidence from having successfully made this motion in prior cases filed in this district.  In fact, Plaintiff's entire argument seems to rest upon relief granted in other cases, and that this Court should readily follow.  The controlling precedent, however, requires a lot more.  The proofs provided by Plaintiff in *this* motion in *this* case, support the following conclusions:  that (1) Plaintiff has produced nothing to support its motion but the unsupported allegations in the Complaint; and (2) Defendants have credibly disputed these claims

-8-

with actual proofs.  GEICO falls flat here.  Importantly, the lack of proof supporting GEICO's request for restraints is a radical departure from the precedent it relies upon.

We appropriately address the importance of the preliminary injunction standard – and the lack of proofs supporting this motion – in detail below.

### A.    Plaintiff Has Failed To Establish A Likelihood Of Success On The Merits, Or A Sufficiently Serious Question Going To The Merits, Because Its Motion Does Not Contain Any Actual Evidence Supporting Its Claims

Courts must deny a preliminary injunction unless the movant can show a "likelihood of success on the merits" or "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly" in its favor.  Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979).  The Second Circuit has held that the overall burden of the "serious questions" standard is "no lighter" than the "likelihood of success" standard, because it requires the balance of hardships to "decidedly" tip in the movant's favor.  See Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 35 (2d Cir. 2010).  Plaintiff has not demonstrated it has competent proofs, beyond pled allegations, to satisfy either standard.

In truth, GEICO has not provided *any* substantive proofs for the Court to consider.  GEICO boldly asserts that it made a sufficient showing by relying solely on an unverified complaint.  (ECF 23-1 at 7-10).  Yet, Plaintiff has provided no declarations supporting GEICO's version of any of the ***underlying facts*** in the case.  Further, the Complaint itself does not exhibit any substantive evidence.  The only exhibits are claim lists to support an alleged damage amount.  As such, Plaintiff's application must fail because GEICO does not meet the basic requirement that an application for a preliminary injunction be supported by proofs beyond an unverified complaint.  See Societe Comptoir De L'Industrie Cotonniere, 190 F. Supp. at 601–02.  Indeed, GEICO did not bother to substantiate *any* of its claims before this Court.  As a result, Plaintiff is asking this Court

-9-

to restrain Defendants from collecting for services already rendered ***based solely on the argument of counsel.***  GEICO is overreaching.  The unsupported Complaint alone, irrespective of its damning flourishes, is insufficient for the relief requested.

More importantly, this was not a mistake.  GEICO failed to provide proofs, because it does not have any.  The wrongdoing alleged in the unverified Complaint is either based upon a theory created by GEICO to support the application, or pure fiction.  In response, Defendants have provided actual proofs credibly disputing GEICO's narrative.  Plaintiff is pushing the boundaries here, and it knows it.  We explain further below.

For example, GEICO references six lawsuits, which it claims were based on "credible" allegations that show "Moshe has a long and disturbing record of insurance fraud."  (ECF 1 at ¶12; ECF 23-1 at n.1.)  These lawsuits were filed over eight years ago and involve none of the co-defendants in this case.  Further, GEICO's citation to and summary of these lawsuits is misleading.  The allegations were not found to be "credible."  To the contrary, each of these cases was resolved without admissions or findings of fact.  See, e.g., Notice of Dismissal, Docket No. 14, Government Employees Insurance Co. v. New Hyde Park Imaging, P.C., Case No. 11 Civ. 01166 (E.D.N.Y. Apr. 27, 2011) (Block, J.).  As such, the claims were never proven, and they provide no support for the baseless allegations in this case.

GEICO alleges, ***without support***, that Excel ASC and Dynamic ASC operated without legitimate medical director s. (ECF 23-1 at 7).  False.  Defendants provide declarations confirming both centers always had active medical directors who were generally on site approximately 40 hours per week.  (Moshe Declaration at ¶¶5, 8).  GEICO's claim that Excel operated without a licensed medical director due to a suspension by the Board of Medical Examiners ("BME") is also false.  In truth, ***nearly two years before*** the suspension of Dr. Kukreja, Excel had obtained a new

medical director, Defendant Leonid Shapiro, M.D. (Moshe Decl. at ¶¶6-8). GEICO pleads allegations in this case recklessly in an attempt to secure restraints.

Similarly, GEICO claims, ***without support***, that Moshe owned and/or controlled Citimedical I, PLLC ("Citimedical") and Citimed Services, PA ("Citimed"). (ECF 23-1 at 8). False – again. As explained in his declaration, Moshe never owned or controlled Citimed or Citimedical. (Moshe Decl. at ¶¶16-18). In fact, despite GEICO's bold contention that Moshe funded Citimed and/or Citimedical (ECF 1 at ¶161), Dr. Moshe funded her own practices. (Moshe Decl. at ¶¶16-17). GEICO's claims about Citimed and Citimedical are further debunked by the Certification of Dr. Moshe, submitted by her counsel in opposition to this motion. Where are the competent proofs supporting GEICO's request for an injunction? Allegations can always be pled, but must have credible support when relied upon for the relief sought here.

Likewise, GEICO asserts that Citimed and/or Citmedical patients were referred for procedures at Excel Surgery, Dynamic Surgery, Healthplus Surgery, and/or the Hospital without required disclosures. (ECF 23-1 at 8). False. Again, this is simply not true as evidenced by the sample disclosure attached to the Moshe Declaration. (**Exh. D** to Moshe Declaration).

GEICO further claims that Dr. Shapiro received unlawful compensation for patient referrals. (ECF 23-1 at 5). False. This allegation is credibly disputed by the Declaration of Moshe, in which he explains that Dr. Shapiro was only compensated for the work he performed as the active medical director of the surgery centers. (Moshe Declaration at ¶13). Dr. Shapiro was an active medical director for the surgery centers. In addition, he was an attending anesthesiologist doing procedures and using the facilities. Factually, billing reports demonstrate that he was on site many hours per week. (**Exhs. B and C** to Moshe Declaration). Dr. Shapiro was appropriately

paid for his services as a medical director pursuant to a written agreement.  (Id. at ¶7).  This is a routine and compliant practice.  There is no fraud here.

Finally, GEICO claims that Moshe owned or controlled Premier Anesthesia.  Again, the claim is false.  (Id. at ¶¶19-23).  The Hospital contracted with Premier Anesthesia for the provision of anesthesia services at that facility, as explained in the Moshe Declaration.  A routine provider contract between a licensed medical facility and an anesthesia group provides no support for an injunction.

The complete absence of proof makes this request for injunctive relief dead on arrival, especially in light of the mounds of contrary evidence produced by Defendants.

Plaintiff cites to a string of authority to support the relief requested.  None of these cases cited, however, apply here given GEICO's failure to produce any meaningful evidence.  In fact, in each of the cases relied upon by GEICO, the insurer produced substantial evidence to support its motion, _e.g._ indictments, guilty pleas, suspension orders, sworn testimony, depositions, expert declarations, bank records, financial documents and other written materials.  And in some of them, the parties had completed substantial discovery.

The stark contrast between the cases cited by GEICO, and this case, is readily apparent.  We illustrate this critical point, as follows:

- In Government Employees Insurance Company v. Wellmart Rx, Inc., 2020 WL 249020 (E.D.N.Y. Jan. 16, 2020), the Court found that the complaint attached exhibits containing "extensive documentation to support GEICO's claims of fraudulent and medically unnecessary treatment[.]"  Id. at *8.  This included (1) "70 pages of prescriptions … on pre-printed forms that list Wellmart's name, address, and contact information, along with the names of pain creams that GEICO asserts the Pharmacy Defendants have dispensed in violation of federal and state compounding regulations," and (2) prescriptions "issued by the Prescribing Defendants using labels or rubber stamps, and which defendants submitted to GEICO in support of the allegedly fraudulent billing[.]"  Id.  In addition, the motion record included a declaration from GEICO's expert witness – a licensed physician – who

reviewed numerous patient records and determined that patients were being prescribed excessive medications "based on unsubstantiated, exaggerated diagnoses designed to give the illusion of more complex injuries that require more extensive treatment[.]" Id. GEICO also submitted a declaration from one of the physician-defendants, who confirmed that she was required to prescribe certain pain creams "on a protocol basis" and signed "preprinted prescription forms for multiple patients" that had been previously filled out by administrative staff. Id. Based on this substantial evidence, the Court determined that GEICO had satisfied its burden and granted the motion. Id. at *9.

- In Government Employees Insurance Company v. Mayzenberg, 2018 WL 6031156 (E.D.N.Y. Nov. 16, 2018), the motion record included 18 exhibits including bank records, certificates of incorporation, financial records and checks, all of which were submitted to demonstrate an illegal kickback schedule by the defendants.[1] In addition, the motion record included several affidavits and the deposition testimony of the principal defendants. Based upon a review of this detailed evidence, the Court found that "Mayzenberg … knew very little, if anything at all, about the Dovman shell companies" and that "numerous checks that were made from Sanli and Laogong's accounts to the Dovman shell entities and were signed by Mayzenberg." Id. at *6-7. The Court further noted that when "Dovman was asked whether the payments from Sanli and Laogong were kickbacks in exchange for patient referrals, he invoked his Fifth Amendment protection against self-incrimination. In fact, he invoked the Fifth Amendment in response to every single question at his deposition." Id. at *7. As a result, the Court held that "Mayzenberg, through his professional corporations, paid the Dovmans for the referral of patients in connection with the performance of acupuncture services" and thus "a likelihood of success on the merits" existed for purposes of awarding a preliminary injunction. Id.

- In Government Employees Insurance Company v. Strutsovskiy, 2017 WL 4837584 (W.D.N.Y. Oct. 26, 2017), the Court had before it a fully-developed factual record and the case had reached the summary judgment stage by the time the motion to stay and enjoin was filed. Id. at *1. At that point, the lawsuit was over five years old and the parties had completed discovery. Id. The substantial motion record included evidence demonstrating: "(1) Strutsovskiy's felony conviction in connection with an insurance fraud scheme involving the systematic submissions of fraudulent Medicare billing for medically unnecessary and illusory services; (2) his dire financial straits; (3) the boilerplate language in his initial examination reports which did not vary among patients; and (4) the declarations of two physicians concluding that the defendants routinely misrepresented the complexity of the problems presented by GEICO insureds whom the defendants purported

---

[1] See Government Employees Insurance Company v. Mayzenberg, Case No. 1:17-cv-02802 (E.D.N.Y.), Docket Entry #51 (Motion to Stay and Enjoin Collection Arbitrations).

to treat and routinely prescribed large amounts of narcotics and other habit-forming drugs to GEICO insureds who did not need them." Id. at *6. Based on this detailed evidence, the Court granted the motion. Id. at *8.

- In Government Employees Insurance Company v. Strut, 2019 WL 6338023 (W.D.N.Y. Nov. 26, 2011), report and recommendation adopted, 2020 WL 1820500 (W.D.N.Y. April 10, 2020), the principal defendant had previously pled guilty for engaging in a fraudulent scheme against Medicare, in which he caused to be prepared and submitted "fraudulent claim forms which falsely certified that the medical treatments/services rendered to patients were determined by the medical providers, including the defendant, to be medically necessary." Id. at *2. The plea agreement also admitted that "many of the treatments/services were not medically necessary and were provided as a matter of routine only because the defendant and the *de facto* owners agreed they would be provided to all patients in order to receive money from Medicare." Id. Relying upon these past criminal admissions and a prior civil action, the Court explained: "The prior cases … raise questions about payments that GEICO has been making to defendants. Twice before, Strut has faced civil and criminal litigation under circumstances pertaining to fraudulent billing. The prior circumstances added some context to the considerable detail that GEICO has placed in the present complaint." Id. at *8 (granting stay and injunction based upon substantial proofs, but requiring insurer to post $500,000 bond).[2]

- In Government Employees Insurance Company v. Cean, 2019 WL 6253804 (E.D.N.Y. Nov. 22, 2019), the Complaint cited to a criminal indictment and guilty plea of one of the co-conspirators for health care fraud. In addition, the Complaint included multiple exhibits detailing the fraudulent claims submitted by the defendants, and several fraudulent pharmacy prescriptions that they procured.[3] Nevertheless, the defendants in Cean ***did not oppose the motion to stay and enjoin collection arbitrations***. Id. at *1 ("Defendants did not respond to the motion for a stay and injunction, and the Court deems it unopposed.") (emphasis supplied). This renders Cean irrelevant to the Court's analysis.[4]

---

[2] The principal defendant in Strut and Strutsovskiy were the same physician, *i.e.* Mikhail Strutsovskiy, M.D.

[3] See Government Employees Insurance Company v. Cean, Case No. 1:19-cv-02363 (E.D.N.Y.), Docket Entry #1 (Complaint and Exhibits).

[4] As Plaintiff concedes, the Court in Liberty Mutual Insurance Company v. Excel Imaging, P.C., 879 F. Supp.2d 243 (E.D.N.Y. 2012) and Government Employees Insurance Company v. Sheepshead Bay Medical Supply, Inc., Case No. 18-cv-04039 (E.D.N.Y), did not apply the preliminary injunction standard when addressing the motion to stay and enjoin collection arbitrations. And so, just like Cean, these cases are irrelevant to this Court's analysis. In any event, it is worth noting that the Complaint in Excel Imaging contained numerous exhibits to

- In <u>Government Employees Insurance Company v. Damien</u>, 2010 WL 4822635 (E.D.N.Y. Nov. 11, 2010), the Complaint included at least 14 exhibits that provided supporting evidence for the claims asserted. <u>Id.</u> These exhibits included multiple declarations from physicians confirming a fraudulent fee-splitting scheme with non-physicians, and the existence of multiple fraudulently incorporated professional corporations. While the Court did not issue an opinion, the docket reflects that all this evidence was produced by the insurer with its motion papers.[5]

- In <u>State Farm Mutual Automobile Insurance Company v. Parisien</u>, 352 F. Supp. 3d 215 (E.D.N.Y. 2018), the motion to stay and enjoin collection arbitrations was supported by affidavits and numerous exhibits. For example, the insurer submitted a detailed affidavit supporting their claim that the defendants failed to appear for examinations-under-oath thus evading its efforts to verify the claims. <u>Id.</u> at 223. In addition, the insurer submitted "detailed grids purporting to show the initial evaluations made of patients at 1786 Flatbush, the services and supplies rendered, and how those services and supplies were billed." <u>Id.</u> at 234. The insurer also "provided copies of documents allegedly containing false statements" by some of the defendants. <u>Id.</u> Relying on these undisputed proofs, the Court held that the insurer "adequately detailed a complicated scheme of alleged fraud activity" and, in light of the documentary evidence, the request for injunctive relief did not "rest on mere hypotheticals[.]" <u>Id.</u>[6]

- In <u>Allstate Insurance Company v. Elzanaty</u>, 929 F. Supp. 2d 199 (E.D.N.Y. 2013), the Complaint (and motion record) included a statement of charges, consent agreement and order filed by the New York State Board of Professional Conduct pleading no contest to various claims of fraudulent conduct and annulling multiple corporate entities engaged in

---

support the insurer's claims, including several state board disciplinary orders detailing fraudulent conduct by the defendants. <u>See</u> <u>Liberty Mutual Insurance Company v. Excel Imaging, P.C.</u>, Case No. 1:11-cv-05780 (E.D.N.Y.), Docket Entry #1 (Complaint). The Complaint in <u>Sheepshead Bay Medical Supply</u> did as well. <u>See</u> <u>Government Employees Insurance Company v. Sheepshead Bay Medical Supply, Inc.</u>, Case No. 18-cv-04039, Docket Entry #1 (Complaint)

[5] <u>See</u> <u>Government Employees Insurance Company v. Damien</u>, Case No. 10-cv-5409 (E.D.N.Y.), Docket Entry #33 and #34.

[6] In addition, multiple defendants were indicted in a conspiracy to distribute oxycodone and others had their licenses suspended. <u>See</u> <u>State Farm Mutual Automobile Insurance Company v. Parisien</u>, Case No. 1:18-cv-00289 (E.D.N.Y.), Docket Entry #1 (Complaint).

the practice of medicine.[7]  The Complaint also contained the indictment against the "straw owner" of the medical practice and bank records identifying the individual who was in de facto control of its operations.  Id.

Obviously, the motion record in each case cite above contained substantial evidence to support a "clear showing" that the insurers were likely to succeed on the merits, or at a minimum, that serious questions going to the merits existed.  GEICO has not made a similar effort here. Rather, it: (1) relies entirely upon an unverified pleading; (2) fails to provide any supporting documents or testimony; (3) fails to cite to any corroborating criminal indictments or guilty pleas; and in turn (4) presumes that it is entitled to the extreme remedy of a preliminary injunction simply because it filed this action in its preferred forum.  This is simply not enough to satisfy the exacting legal standard governing this motion.  In fairness, GEICO's application must stand on its own, notwithstanding its attempt to bootstrap authority without demonstrating credible evidence for relief.

Having failed to adequately support this motion, Plaintiff should not be rewarded for resting on its laurels.  The utter lack of proofs requires this motion to be denied in its entirety.

**B.       The Balance Of Hardships Tips Decidedly In Favor Of Defendants**

The balance of the hardships in this case weighs heavily in Defendants' favor, providing an additional reason why Plaintiff's motion must be denied.  In fact, it is the Defendants who will suffer irreparable harm if this motion is granted, because "there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied."  Brenntag Int'l Chems., Inc. v. Bank of India, 175 F.3d 245, 249 (2d Cir. 1999).

_____

[7]      See Allstate Insurance Company v. Elzanaty, 2011 WL 3539562 (E.D.N.Y. Aug. 11, 2011) (Complaint and Exhibits).

BE:11087692.1/MOS106-278412

Crucially, if the arbitrations are stayed, it is very likely that the Hospital will never receive payment for the services it provided. (See Moshe Declaration at ¶26 and Guzman Declaration at ¶¶2-5). In attempting to collect from auto insurance carriers, like GEICO, time is of the essence. (Guzman Declaration at ¶2). Each of the underlying insureds who received treatment from the Hospital have policies that contain a no-fault insurance limits. (Id.) When that policy is exhausted, GEICO will no longer have to pay the Hospital for its services. (Id.) Given that many policy limits are quite low in comparison to the treatment required for hospital patients, the policies can be exhausted very quickly. (Id.) As a result, providers must prosecute their claims for reimbursement expeditiously. (Id.)

As it stands, GEICO is denying payment, likely based on the unsupported allegations in this case. The Hospital is already losing critical time to collect on the underlying policies. GEICO knows that if a stay is granted and Defendants litigate this case, they will run out of time to collect on the policies. GEICO is not trying to maintain the status quo. GEICO is, in essence, trying to run out the clock. In truth, GEICO is attempting to force Defendants to settle this case or risk never being paid for the services that they have already provided. If the stay is granted, Defendants will lose their right to payment simply due to the passage of time. This fact alone tips the balance of the hardships in Defendants' favor. GEICO's strategy here is transparent. Plaintiff filed an elaborate pleading in a fraud action, immediately moved for stay when settlement negotiations broke down, but has failed to provide a critical component – proof.

GEICO claims that there would be no harm to Defendants in staying the arbitrations, because the providers could ultimately receive statutory interest on the claims. (ECF 23-2 at 20). As explained above, this argument ignores the fact that if the policy is exhausted, GEICO will not be required to pay the underlying claim – let alone interest.

In addition to the very real risk of policy exhaustion, the Hospital has already expended and continues to expend the time and resources needed to treat GEICO's insureds. (Moshe Declaration at ¶¶24-25). A stay would bar Defendants from receiving payment for those services. Importantly, the Hospital is required to treat Plaintiffs' insureds, many of whom originate through the emergency room. (Id.) If Plaintiff's application is successful, the Hospital would continue to service these insureds at great expense without any ability to receive payment for the services. This would be devastating for this community hospital, and GEICO knows it.

Conversely, as explained below, GEICO would suffer *no* harm if its application were denied. Therefore, the balance of the hardships clearly favors the Defendants in this case.

## C. Plaintiff Has Failed To Prove Irreparable Harm On This Threadbare Motion Record

In addition to failing to provide *any* substantive proofs, Plaintiff failed to establish any irreparable harm absent a stay.

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009) (quoting Rodriguez v. DeBuono, 175 F.3d 227, 234 (2d Cir.1999)); see also Avetisyan, 2018 WL 6344249, at *2. For the movant to establish its burden of irreparable harm, it must demonstrate "injury for which a monetary award cannot be adequate compensation." Jayaraj v. Scappini, 66 F.3d 36, 39 (2d Cir. 1995) (internal quotation omitted). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." Id. (quoting Sampson v. Murray, 415 U.S. 61, 90 (1974)).

Indeed, in Allstate Ins. Co. v. Harvey Family Chiropractic, 677 F. App'x 716 (2d Cir. 2017), the Second Circuit held that "money, time and energy necessarily expended absent a stay of … arbitration proceedings are not enough to establish irreparable harm." See also Renegotiation

Bd. v. Bannercraft Clothing Co., 415 U.S. 1, 24 (1974) ("Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury."). The Second Circuit further held "the declaratory relief sought" in federal court was not "threatened by the other proceedings." Id. at 718.

Despite the guidance provided by Harvey, GEICO simply argues that the potential for inconsistent arbitration results prior to a determination in this case – in and of itself – provides the requisite irreparable harm. (ECF 23-1 at 19). GEICO does not even claim that this "harm" cannot be calculated in monetary terms. To the contrary, GEICO's motion sets forth the estimated monetary value for the pending No-Fault arbitrations, including the costs of litigating those claims. (Weir Decl. at ¶ 5–12, 22). In fact, at no point does any GEICO representative suggest that there would be irreparable harm absent a stay in this case. (See id.) Plaintiff has moved for an injunction presenting *no proofs* on irreparable harm in this case. Consequently, GEICO's application must fail as a matter of law. See, e.g., T-Mobile Ne. LLC, 249 F. Supp. 3d at 684 (holding that application for injunction "also fails on the ground that plaintiff has failed to provide any evidence to support its allegations of irreparable harm.")

Further, by relying solely on prior distinguishable cases, GEICO ignores the fact that under the Federal Arbitration Act, a court "cannot deny a party its contractual right to arbitrate because [it] believe[s] considerations of efficiency or the goal of avoiding inconsistent judgments should take precedence." GEICO v. Grand Med. 11 Supply, Inc., No. 11 Civ. 5339, 2012 WL 2577577, *7 (E.D.N.Y. July 4, 2012); see also Avetisyan, 2018 WL 6344249, at *4 (rejecting irreparable harm in part because "[a]ny harm to Plaintiffs resulting from adverse awards in the Parallel Proceedings can be adequately remedied by future monetary damages in this action").

BE:11087692.1/MOS106-278412

In short, GEICO failed to establish irreparable harm by presenting ***no proofs*** and relying solely on an unsubstantiated claim of "likely inconsistencies amongst the prospective arbitral rulings themselves and between the prospective arbitral rulings and the Court's ultimate disposition of GEICO's declaratory judgment and fraud-based claims." (ECF 23-1.)  <u>See</u> <u>Harvey</u>, 677 F. App'x at 718.  Plaintiff has simply ignored their burden on this element, and the application must fail.

## III.    ANY RESTRAINT REQUIRES A BOND

Pursuant to Federal Rule of Civil Procedure 65(c), GEICO must post security for the issuance of a preliminary injunction.  GEICO claims that there is no risk of harm to Defendants in staying the arbitrations, because the providers could ultimately receive statutory interest on the claims.  (ECF 23-2 at 21.)  Nonetheless, as explained above and supported by the Declarations of Moshe, Dalton and Guzman, this argument ignores the fact that if the policy is exhausted, GEICO will not be required to pay the underlying claim -- let alone interest.  For GEICO to suggest otherwise is wrong and misleading.  If any injunction is issued, a substantial bond is needed to cover the Hospital's over $14.7 million in outstanding claims, which continue to grow.  <u>See, e.g.</u>, <u>GEICO v. Strut</u>, No. 19-CV-728 (JLS), 2020 WL 1820500, at \*3 (W.D.N.Y. Apr. 10, 2020) (requiring GEICO to post a bond prior to the issuance of a preliminary injunction staying arbitrations).

BE:11087692.1/MOS106-278412

## CONCLUSION

For these reasons, GEICO's motion for a preliminary injunction should be denied.  In the alternative, GEICO must post a security bond.

**BRACH EICHLER L.L.C.**
*Attorneys for Defendants Yan Moshe a/k/a Yan Leviev and NJMHMC, LLC d/b/a Hudson Regional Hospital*

By: /s/ Keith K. Roberts _____
        KEITH J. ROBERTS
Email:  kroberts@bracheichler.com
101 Eisenhower Parkway
Roseland, New Jersey
Phone: (973) 228-5700


**MONTGOMERY MCCRACKEN WALKER & RHOADS LLP**
*Attorneys for Defendants Yan Moshe a/k/a Yan Leviev, Hackensack Specialty ASC LLC f/k/a Dynamic Surgery Center, LLC, and Excel Surgery Center, LLC*

By:  */s/ Jeremy Mishkin* _____
Jeremy Mishkin
Robert E. O'Connor
E-Mail:  jmishkin@mmwr.com
          roconnor@mmwr.com
437 Madison Avenue
New York, New York
Telephone: 212.867.9500

Dated:  June 15, 2020